UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

Fit Tech, Inc., Planet Fitness Center, Inc.,
Planet Fitness Center of Maine, Inc., Planet
Fitness Center of Dartmouth, Inc., Planet
Fitness Center of Salem, Inc., Planet Fitness
Center of Brighton, Inc., Stratford Fitness
Center, Inc., David B. Laird and Scott G.
Baker

        Plaintiffs,

v.

Bally Total Fitness Holding Corporation,
Holiday Universal, Inc., Paul Toback, Lee
Hillman and John Dwyer,

        Defendants.

C.A. No. 05-10471 MEL

## FIRST AMENDED COMPLAINT AND JURY DEMAND

NOW COME the Plaintiffs and hereby file, as permitted by Fed. R. Civ. Pro. Rule 15(a),

the following First Amended Complaint against the Defendants:

### I.  Parties

1.  The Plaintiff, Fit Tech, Inc., is a Massachusetts corporation with a principal place

of business in North Reading, Massachusetts.

2.  The Plaintiff, Planet Fitness Center, Inc., is a Massachusetts corporation with a

principal place of business in North Reading, Massachusetts.

3.  The Plaintiff, Planet Fitness Center of Maine, Inc., is a Massachusetts corporation

with a principal place of business in North Reading, Massachusetts.

4.  The Plaintiff, Planet Fitness Center of Dartmouth, Inc., is a Massachusetts

corporation with a principal place of business in North Reading, Massachusetts.

5.     The Plaintiff, Planet Fitness Center of Salem, Inc., is a Massachusetts corporation with a principal place of business in North Reading, Massachusetts.

6.     The Plaintiff, Planet Fitness Center of Brighton, Inc., is a Massachusetts corporation with a principal place of business in North Reading, Massachusetts.

7.     The Plaintiff, Stratford Fitness Center, Inc., is a Massachusetts corporation with a principal place of business in North Reading, Massachusetts.

8.     The Plaintiff, David B. Laird, is an individual with a principal residence in Wayland, Massachusetts.

9.     The Plaintiff, Scott G. Baker, is an individual with a principal residence in Canton, Massachusetts.

10.     Defendant, Bally Total Fitness Holding Corporation ("Bally") is a Delaware corporation with a principal place of business in Chicago, Illinois.

11.     Defendant, Holiday Universal, Inc. ("Holiday") is a Delaware corporation with a principal place of business in Chicago, Illinois. Upon information and belief, Holiday is a wholly owned subsidiary of Bally

12.     Defendant Paul Toback ("Toback") has been Bally's President and Chief Executive Officer since December 11, 2002 and Chairman since May 21, 2003. Toback has a principal place of business in Chicago, Illinois.

13.     Defendant Lee Hillman ("Hillman") was, until December 11, 2002, Bally's Chief Executive Officer and President.

14.     Defendant John Dwyer ("Dwyer") was, until April 28, 2004, Bally's Chief Financial Officer and Executive Vice President.

## II.    Jurisdiction and Venue

15.    This Court has diversity jurisdiction in this matter pursuant to 28 U.S.C. Section 1332(a)(1) because there is complete diversity between all the parties, and the amount in controversy exceeds $75,000.  Venue is proper in this jurisdiction under 28 U.S.C. §1391(a) because a substantial part of the events giving rise to the claim occurred in Massachusetts.

## III    Introduction

16.    In or about 2002, the Plaintiffs and Defendants began negotiations for the sale of the Plaintiffs' fitness centers, known collectively by the name "Planet Fitness," to Bally and Holiday.

17.    Those negotiations and discussions ultimately culminated in the signing, on and as of March 15, 2002, of a certain Asset Purchase Agreement (the "Agreement" or the "APA") by and among the Plaintiffs and Defendants Bally and Holiday providing for the sale of the Planet Fitness clubs, the rights to develop certain New Fitness Centers (and the corresponding obligation to develop at least four (4) of those New Fitness Centers), and certain other assets and rights.

18.    Pursuant to the Agreement, in consideration for the Planet Fitness clubs and the other assets and rights to be purchased, Bally and Holiday promised *inter alia* to pay the Plaintiffs: (i) $3,000,000 in cash; (ii) $11,700,000 (subject to certain adjustments) in Bally stock valued, for purposes of the Agreement, at $23 per share; and (iii) up to $12,000,000 approximately two (2) years after the sale in the form of an "Earn Out Amount."

19.    The sale and purchase contemplated by the Agreement was finally consummated on and as of April 19, 2002 (herein the "Closing").  In connection with the Closing, and pursuant

- 3 -

to the terms of the Agreement and subject to the adjustments provided therein, Bally was to pay the Plaintiffs, through the issuance of its common stock, the sum of $8,805,021. Pursuant to the terms of the Agreement, the parties divided this sum by the agreed $23 per share and Bally issued to the Plaintiffs, in the aggregate, a total of 382,827 shares of its common stock (herein the "Purchase Shares").

## IV.   Defendants' Post- February 13, 2003 Wrongful Acts.

20.     From shortly after the Closing through and including February 14, 2003, Bally and Holiday engaged in a series of acts and omissions, and other misconduct, which breached the requirements of the Agreement, and their other legal obligations, as set forth in Plaintiffs earlier, related lawsuit captioned Fit Tech, Inc. *et al.* vs. Bally Total Fitness Holding Corporation, United States District Court for Massachusetts, Civil Action No. 03-10295-MEL. Since the date the Plaintiffs filed that original action on February 14, 2003, Defendants devised and implemented – in bad faith, in breach of their obligations under the Agreement, and in retaliation for Plaintiffs' filing that lawsuit – a series of measures designed and intended to seize full control of the former Planet Fitness clubs from Plaintiffs Laird and Baker, to drive them out of Bally, to frustrate the Plaintiffs' attempts to use the available contractual mechanisms to contest Bally's wrongful calculation of the Earn-Out Amount and, ultimately, to deprive the Plaintiffs of the fruits and benefits of their contract with Bally and Holiday. Defendants' campaign has included, without limitation, the following illegal and wrongful acts and omissions.

### A.     Withdrawal of Support Services and Equipment

21.     Within hours of receiving notice that Plaintiffs had filed their original Complaint and Jury Demand, Bally faxed a letter to Plaintiffs notifying them that Bally was terminating the "Transition Services" Plaintiffs had used since the April 2002 sale to help manage the Fitness

- 4 -

Centers. These services were performed principally by three individuals who were employed by Plaintiffs and whose costs were reimbursed by Bally under the terms of the APA. These three individuals provided Laird and Baker, and the Fitness Center, with essential administrative support needed to cope with the substantial, additional burden of paperwork required by Bally. These three individuals processed payroll (including dealing with numerous payroll errors still being made by Bally), conducted front desk management and training, reviewed and processed all new member contracts, processed all the work from Bally Human Resources, including new hire packets, OSHA implementation, and drug testing, ordered all office and club supplies, processed and batched all payables and processed and track all construction costs on the two New Fitness Centers, as well as responding to numerous other requests for paperwork and information made by various Bally departments.

22.    When Plaintiffs first explained to Bally the necessity of retaining these three individuals, Bally's Vice President for Operations, Thomas Massimino, agreed and authorized Laird and Baker to hire these three individuals as Bally employees. Just one (1) week later, however, Bally fired these employees after Plaintiffs refused to capitulate to Bally's demand that Plaintiffs waive certain contractual rights they had under the APA, *i.e.*, the right to contend that the costs of these three employees constituted "Corporate Overhead" which could not be factored into the Earn Out. When Plaintiffs objected to these firings, Bally purported to "re-assign" the duties of these three to other, existing Bally employees. Many of these other Bally employees, however, simply refused to perform these duties and/or otherwise to cooperate with Laird and Baker. Moreover, with respect to at least one of the "re-assignments," Bally assigned duties in direct contravention of express provisions of the APA, *i.e.,* Bally assigned some of the duties to "Key Employees" at the Plaintiffs' Fitness Centers in violation of Section 3.5(i)(iii)(B) of the

- 5 -

APA.

23.    Shortly thereafter, Bally also refused to provide Laird and Baker with furniture and computers for their offices at the Bally club in Woburn. For several months thereafter, Laird and Baker were forced to work on folding chairs and use desks composed of doors supported by sawhorses. Bally also refused to provide them with computers or permit them to tie into Bally's computer system. Not only did this treatment hinder Laird and Baker in their management of Plaintiffs' Fitness Centers and New Fitness Centers, this treatment also humiliated Laird and Baker in the eyes of other Bally employees and undermined their authority to operate and management the Fitness Centers.

## B.    Transfer of Plaintiffs' Key Employees Without Consent

24.    In June, 2003, just four (4) months after Plaintiffs filed this lawsuit, Bally deprived Plaintiffs of additional support for the Fitness Centers by transferring Laird's and Baker's principal managers, Aaron Hanel and Aaron West. Hanel and West had worked for Laird and Baker for several years and been trained by them at the Planet Fitness clubs. As Bally well knew, Hanel and West were essential members of the Plaintiffs' management team and were specifically protected from transfer or reassignment by Bally during the two-year Earn Out period. APA Section 3.5(i)(iii).

25.    Nevertheless, in early June 2003, Bally executives transferred Hanel and West to work at other New England Bally clubs which were not managed by Plaintiffs. Bally took this action without the consent – indeed over the strenuous objections – of the Plaintiffs, despite Bally's express recognition that it was prohibited from making such a re-assignment of these "Key Employees" without Plaintiffs' written permission by the Asset Purchase Agreement, Section 3.5(i)(iii)(A) and (C). ("Key Employee" is defined in the APA as *inter alia* "any

- 6 -

salesperson or manager located at or assigned to any one or more of the Fitness Centers or the New Fitness Centers." APA at page 58. Hanel and West are identified as two of Planet Fitness' "key managers" in Schedule 4.18 to the APA, paragraph 8.)

26.     Bally compounded this breach by forcing on Laird and Baker, as replacements for Hanel and West, two new employees named Scott Wolter and Dave LaFazia, neither of whom had ever worked with Laird and Baker before. Plaintiffs objected to the hiring or these two to manage the Fitness Centers, but to no avail. Bally's hiring of these two new employees, over the objection of Plaintiffs, was a direct and knowing violation of Section 3.5(i)(iv) of the Asset Purchase Agreement, under which Plaintiffs had the right – during the two-year Earn Out period – to make all initial determinations of who would be hired to work in or manage the Fitness Centers.

### C.     Directly Undermining Laird's and Baker's Management Authority

27.     Shortly after Bally reassigned Hanel and West, and inserted Wolter and LaFazia into Plaintiffs' Fitness Centers, Bally's agents began a campaign to undermine Laird's and Baker's management authority and their ability to operate the Fitness Centers and construct the New Fitness Centers to help maximize their Earn Out.

28.     For example, shortly after Bally's inserted LaFazia into the Fitness Centers, a subordinate of LaFazia's (who had worked for LaFazia for 10 years) told one of the employees at the Fitness Centers that Laird was no longer "in charge" and that she should take orders only from LaFazia in the future. (This employee, Sussy Aguirre, had complained in the past about discriminatory harassment by LaFazia, who objected to her "Spanish accent" and insisted on introducing her as, "This is Sussy our assistant manager with her Spanish background and

- 7 -

accent." Laird's complaints about this harassment to Bally's director of Human Resources were ignored.)

29. LaFazia himself made several similar statements to other employees working at Plaintiffs' Fitness Centers. For example, LaFazia made statements to employees of the former Planet Fitness club in Dartmouth, Massachusetts that he was in charge and that employees should no longer follow the directions of Laird or Baker. LaFazia further told at least two employees in also told these employees that Bally had paid Laird and Baker $12 Million for the clubs and that he (LaFazia) was sent into the clubs by Bally to "straighten out the mess" created by Laird and Baker. LaFazia also told an employee named Daniel Botello, the Physical Therapy manager of the Dartmouth club, that Laird and Baker were not in charge of that club anymore. (This latter information came to Laird's attention when he reprimanded Botello for placing a malfunctioning piece of equipment in the garbage. Botello informed Laird that LaFazia instructed him to throw the equipment away and that he was instructed not to take direction from Laird.)

30. There were several other instances of Bally representatives instructed Bally employees to ignore both Laird and Baker. For example, the week of June 19, Sandor Feher, Bally's Regional Vice President for the Mid-Atlantic Region, spoke with certain Bally executives and stated that Laird had "sued the company for $12 Million" and that Laird "had been taken out of control."

31. All of these statements were conveyed to Bally, through an e-mail from Laird to Bally's William Fanelli on June 13, 2003 and through an e-mail from Laird to Katz on June 24, 2003. Once again, Laird was ignored.

32. In addition, in early June 2003, Bally also began cutting away at Baker's role in

- 8 -

supervising the construction of the New Fitness Centers which, as alleged above, were expected by all parties to contribute significantly to Plaintiffs' achieving their $12 million Earn Out. Specifically, Bally replaced employees and contractors at the construction site for the New Medford location without informing, or obtaining the consent of, Baker. Bally continued to deprive Baker of his management role until it became painfully obvious that Baker no longer had any control over construction. After Baker complained numerous times in writing to various Bally personnel, Bally confirmed that it had assigned new employees to supervise the construction of the site. Specifically, York Schultz, Bally's director of new construction, wrote to Baker on June 16, 2003 that, "I decided that in the best interest of the company and the Medford project that both Tom [Brodowski] and Scott Case will do this project." This "decision" was in direct violation of the provisions of the Asset Purchase Agreement, as well as the understandings of the parties and the representations of Bally in connection with the execution of the APA.

33.    In addition, at or about this same time period, Bally began to deliberately delay completion of construction of the New Fitness Center in Stratford, Connecticut by refusing to pay contractors and subcontractors on a timely basis. This resulted in many contractors suspending work for various periods, which delayed not only the completion of those contractors' portions of the work, but other contractors whose work was to follow after. This deliberate slow down of payments delayed the opening of the Stratford club by several months, resulting in substantial numbers of cancellations of memberships and a significant reduction in the number of new memberships that could be sold.

### D.    Creation of False Pretext To Exclude Laird and Baker

34.    Starting at least at the end of May 2003, little more than three (3) months after

Plaintiffs filed this lawsuit, Bally executives began creating a false written record to serve as a pretext for throwing Laird and Baker out of management of the Fitness Centers and New Fitness Centers.

35.     Bally's first attempt to construct such a record came in the form of a memorandum from Defendant Wildman in which he falsely contended that Laird and Baker had agreed, in a recent meeting in Chicago, to a radical plan devised by Bally to restructure the management and operations of Plaintiffs' Fitness Centers. When Laird objected and noted that he specifically had stated at the meeting that he would not agree to any plan until it was submitted in writing and he had a chance to evaluate the plan, Bally executives falsely denied that he had done so. Bally executives also falsely denied that they had acknowledged, at the very same meeting, that the implementation of any such restructuring required the written consent of Plaintiffs under the terms of the Asset Purchase Agreement. Based upon their false assertion that Laird and Baker had agreed to their plan, Bally executives stated that they intended to go forward and implement the plan immediately.

36.     In June 2003, and continuing thereafter, Bally attempted to implicate Laird and Baker in an employee embezzlement that took place at the Plaintiffs' Fitness Center in Salem. This embezzlement was discovered in May and promptly reported to Ira Katz, Bally's Director of Human Resources. The employees involved were immediately suspended and, upon Katz's later instruction, fired. The embezzlement was of a type not uncommon in the industry: indeed, at approximately the same time, a similar employee embezzlement scheme was perpetrated in Bally's Revere club (which was not one of the clubs supervised by Laird or Baker). While Bally took no further action (other than permitting the involved employee to resign) with respect to the Revere club embezzlement, Bally executives immediately launched a full-scale investigation of

- 10 -

the Salem embezzlement and, in the course of that investigation, took extraordinary measures to try to implicate Laird and Baker, as well as one of their "Key Employee(s)" Aaron Hanel, in the fraud. Bally executives Defendant Wildman and Sandor Feher even went so far as to falsely allege, in a June 20, 2003 memorandum, that Laird never reported the embezzlement to Bally's human resources department and to make the preposterous claim that the criminals involved in the embezzlement were somehow motivated by Plaintiffs' lawsuit in this Court.

37.     Later in June 2003, Defendant Wildman and Bally executive Feher came to Boston for the purported purpose of touring the Plaintiffs' Fitness Centers. In a memorandum dated June 20, 2003, Wildman and Feher revealed their real purpose: to create a false written record that Bally could use as a pretext to immediately terminate Laird and Baker and exclude them from the management and oversight of their clubs. In this memorandum, Wildman and Feher made numerous false statements for this purpose. For example, Wildman and Feher falsely stated that Laird had "refused to accompany us on our visits" to the clubs when, in fact, Feher had specifically told Laird that he should go home and not accompany them. Wildman and Feher also falsely claimed that Laird and Baker had been criticizing Bally management to their subordinates and sowing dissension among employees. Wildman and Feher made numerous other false statements concerning what they saw and heard during their "tour," purportedly identifying numerous serious "deficiencies" that either did not exist or were not serious and were only exaggerated by Wildman and Feher to build their record.

38.     Finally, in or about August 2003, the head of Bally's Human Resources Department notified Laird that he wanted to meet with him to interview him about an allegation of discrimination brought against Bally by Aaron West. West (who is African American) accused Bally, and particularly Bally's Regional Vice President of its Mid-Atlantic Region

Sandor Feher, of making several demeaning and harassing racially discriminatory remarks to

him, including repeatedly calling West "the Juice" as a reference to O.J. Simpson, who had

recently been on trial for murdering his former wife. Indeed, shortly after the sale of Planet

Fitness to Bally in April 2002, Laird had witnessed some of these comments by Feher and had

promptly brought them to the attention of Thomas Massimino, Bally's Vice President for

Operations, who said he would speak to Feher and take care of it.

39.    Nevertheless, in or about July 2003, just five (5) months after Plaintiffs filed their

original Complaint and Jury Demand in this action, Bally made the false assertion that Laird had

never reported West's complaints, or Feher's racially discriminatory behavior, to Bally. Based

on this false pretext, Bally's Vice President for Human Resources, Harold Morgan, demanded to

meet with Laird and interview him about the allegation. Laird agreed to meet with Morgan, and

was anxious to tell him of his conversation nearly a year before with Massimino, but Laird made

the simple request that his counsel be present for the interview. Laird explained that he was

concerned, and thought it was appropriate to have his counsel present, because Bally (through its

counsel) had already falsely stated that he failed to report the West complaints and, in addition,

Bally had, that previous month, filed an arbitration complaint against him under his Employment

Agreement seeking permission to terminate Laird for cause.

40.    Bally, however, for no reason other than to create a false pretext for retaliating

against Laird, refused this reasonable request.

### E.    Bally Throws Both Laird And Baker Out Of The Fitness Centers

41.    In August 2003, Bally executives told Laird that he would be barred from any

further participation in the management or operation of the Plaintiffs' Fitness Centers. Indeed, he

was specifically instructed not to even visit any of the Plaintiffs' Fitness Centers, or any other

Bally facility. He was also instructed not to contact, or attempt to contact, any employees of
Bally – even those he was contractually permitted to manage under the terms of the Asset
Purchase Agreement. He was also thereafter cut off from virtually all information concerning
the operation of the Plaintiffs' Fitness Centers.

42.    Shortly thereafter, Bally also excluded Baker, again instructing him to stay away
from any of the Plaintiffs' Fitness Centers or any other Bally facility.

43.    Neither Laird nor Baker were given any notice that they would be excluded from
the clubs and neither was given even the opportunity to clean out their desks.

44.    Shortly after Baker was excluded, Bally instructed one of its employees to break
into Laird's and Baker's offices in the back of the Woburn club and abscond with their personal
papers, which he did.

### F.    Obstruction And Corruption Of The Accounting Process

45.    In the midst of this campaign to drum Laird and Baker out of the management and
operation of the Fitness Centers, in July 2003, Bally submitted its "Interim Earn Out"
calculations to Laird and Baker. As they had anticipated when they filed this lawsuit in February
2003, Laird and Baker discovered that Bally had made numerous false and mis-calculations, had
charged them for items specifically excluded under the Asset Purchase Agreement and had jerry-
rigged their accounting and calculations to deprive Plaintiffs of any Interim payment under the
APA.

46.    After lengthy proceedings before this Court, in which Bally insisted that most if
not all issues in this case should be referred to PricewaterhouseCoopers ("PriceWaterhouse")
under the accountant review section of the APA, Section 3.5(f), and Bally's unsuccessful appeal
of this Court's ruling on that issue, the parties began proceedings before PriceWaterhouse. In the

- 13 -

course of selecting the specific partner of PriceWaterhouse who would conduct the review, both parties were extremely careful to insist on an accountant with no real or apparent bias, including any bias that might have been present because of past, present, or expected future work for one of the parties.

47.     In the course of these proceedings, however, Bally did everything in its power to obstruct the process, to deny Plaintiffs the opportunity to participate fairly, and – as Plaintiffs learned only in the last weeks -- to corrupt the entire procedure.

48.     Bally first attempted to obstruct the process by refusing to cooperate with Plaintiffs in their review of Bally's Interim Earn Out calculations. In particular, Bally refused to turn over numerous documents in its sole possession that were essential to Plaintiffs' review, in flagrant breach of the express cooperation clause of the Asset Purchase Agreement, Section 3.5(h).

49.     Later, as the accountant began his review of the materials, Bally made numerous false representations to the accountant that were directly material to the matters he had under consideration, including the identity of the employer of various employees working at the Fitness Centers and the nature of the discussions and negotiations that led to the signing of the Asset Purchase Agreement.

50.     In addition, Bally failed to disclose to the PriceWaterhouse accountant and to the Plaintiffs a massive accounting fraud perpetrated by Bally executives during the years at issue in the Interim accounting. The full scope of this accounting fraud has not, as yet, been fully disclosed by Bally, but in its most recent disclosure on February 8, 2005, Bally has disclosed that four of its principal finance executives – including two former executives who negotiated the APA with Plaintiffs, CEO Lee Hillman and CFO John Dwyer – were involved in "improper

- 14 -

conduct," including "multiple accounting errors and . . . creating a culture of aggressive

accounting." Dwyer was also accused of making a false statement to the SEC.

51.     Most telling, perhaps, was Bally's announcement that it had fired (for improper

conduct) its Vice President and Controller, Ted Noncek, the same individual who prepared the

Interim Earn Out accounting that was the subject of PriceWaterhouse's review. At no point

during the proceeding before PriceWaterhouse did Bally ever disclose Noncek's "improper

conduct."

52.     In addition, Bally failed to disclose to the Price Waterhouse accountant that its

internal accounting controls were grossly deficient and the numbers it generated (including the

Interim Earn Out accounting) were unreliable, as Bally itself ultimately disclosed in its February

8, 2005 press release:

> [T]he Company has identified deficiencies in its internal controls over financial reporting.
> A number of these deficiencies, either individually or in the aggregate, constitute material
> weaknesses in its internal controls over financial reporting.
>
> These material weaknesses include deficiencies in the Company's finance and accounting
> internal control environment, specifically a lack of acceptable and clearly communicated
> policies reflecting management's attitudes towards financial reporting and the financial
> report function, the lack of a permanent Chief Financial Officer, ineffective delegation of
> authority and responsibility, insufficient instruction to employees responsible for
> significant estimates emphasizing the need to report using accurate and reasonable
> assumptions and judgments, and insufficiently experienced and trained staff. In addition,
> there material weaknesses include deficiencies in the controls surrounding the selection
> and application of accounting principles, specifically, ineffective policies requiring
> contemporaneous documentation of factual support for key judgments applied within its
> financial reporting process and the retention of that documentation in accordance with a
> formal document retention policy.
>
> As a result, the Company believes that KPMG will not be able to issue an unqualified
> opinion on the effectiveness of the Company's internal controls in the Company's 2004
> Annual Report on Form 10-K.

53.     Bally's February 8, 2005 press release revealed one other important matter

relevant to this litigation: while PriceWaterhouse was reviewing Bally's Interim Earn Out

calculations pursuant to the Asset Purchase Agreement, Bally secretly hired PriceWaterhouse as an accounting expert to review Bally's unfolding accounting scandal. Although Bally had disclosed, in prior SEC filings, that its Audit Committee had retained "accounting experts," never before did it reveal the name of PriceWaterhouse. It is clear from examination of these earlier filings, as well as Bally's February 8, 2005 press release (which states that the firings then announced resulted from a "five month investigation") that PriceWaterhouse was hired by Bally no later than early September 2004 and probably in August or even earlier. This means that Bally hired PriceWaterhouse while PriceWaterhouse was still reviewing Bally's Interim Earn Out calculations and before PriceWaterhouse issued its final decision on October 23, 2004.

54. Moreover, at least one of the issues that Bally's Audit Committee hired PriceWaterhouse to review – the proper accounting for revenues from member initiation fees – was one of the issues raised in the accountant review procedure then underway under the Asset Purchase Agreement.

55. Bally never disclosed to Plaintiffs that it had hired PriceWaterhouse while PriceWaterhouse was acting as a (supposed) independent accountant under the Asset Purchase Agreement. Bally's hiring of PriceWaterhouse during the course of the accountant review procedure, as well as its failure to disclose this conflict of interest, irretrievably corrupted the process contemplated by the Asset Purchase Agreement for resolution of some of the issues presented by the Interim Earn Out calculations (as well as casting doubt on the independence of PriceWaterhouse's advice to Bally's Audit Committee).

## G. **Bally Issues False And Fraudulent Final Earn Out Calculations**

56. At or about the time that PriceWaterhouse was reviewing Bally's Interim Earn Out calculations, in July 2004 Bally issued its final Earn Out calculation. As might have been

expected by Bally's egregious misconduct as alleged above, this final Earn Out calculation purportedly showed that the Plaintiffs were not owed one dime in compensation under the Earn Out, which had obviously been Bally's goal and design from the outset.

57.    With respect to both the Advance Earn-Out Schedule and the final Earn-Out Schedule, Bally intentionally, deliberately and fraudulently miscalculated the amounts genuinely owed to Plaintiffs.

58.    Despite demand from Plaintiffs, Defendants Bally and Holiday have failed and refused to pay the Plaintiffs the amount of the Earn-Out Payment they are owed under the terms of the Asset Purchase Agreement.

59.    In accordance with the provisions of the Asset Purchase Agreement, Plaintiffs duly submitted to Bally an objection to the final Earn Out calculations. Bally, however, refused, without right or reason, to proceed with the APA's accountant review procedure, contending – inaccurately – that the Plaintiffs had somehow waived their rights under the APA.

## V.    Fraud In The Issuance Of The Purchase Shares

60.    The following allegations are based in part upon investigation made by the Plaintiffs and their counsel, which included, *inter alia*, a review of relevant public filings made by Bally with the Securities and Exchange Commission (the "SEC"), as well as press releases, news articles, court pleadings and media reports concerning Bally. These allegations are based upon the Plaintiff's personal knowledge as to Plaintiff's own acts, the negotiations leading to the APA and the terms of the APA and related documents, and upon information and belief as to all other matters, based upon the aforesaid investigation.

61.    During the course of the negotiations, and in connection with the execution of the APA and the sale contemplated thereby, Defendants made numerous material false and

- 17 -

misleading statements relating to the value of the Bally stock to be received by the Plaintiffs in the sale and Bally's financial performance. These statements were made in order to induce the Plaintiffs to sell the Planet Fitness clubs and other assets and to accept, as the bulk of the consideration therefore, Bally's common stock. These materially false and misleading statements included, without limitation, the following.

62.     During the negotiations leading to the APA, the parties had several discussions and communications about Bally's insistence that most of the sale price be paid in Bally stock, to be valued for purposes of the sale at $23 per share. Plaintiffs were reluctant to accept stock instead of cash and, at one point in the negotiations, Plaintiff Baker confronted Defendant Hillman and told him that he did not want to be paid in stock. In response, and for the purpose of inducing the Plaintiffs to accept Bally stock in partial payment for the Planet Fitness clubs and other assets, Hillman told Baker that: (i) Bally stock was a "bargain" at $23 per share; (ii) that Bally's stock (which was then trading near $23 per share) had been trading at $36 per share and was going to return to that price; and (iii) that Bally's financial prospects going forward were excellent because Bally was growing, was "cutting edge" and was the market leader. Hillman, as well as other Bally representatives, made other statements and representations to the Plaintiffs concerning Bally's business and financial performance in order to induce them to agree to take Bally stock at $23 per share in payment for the Planet Fitness clubs and other assets.

63.     Hillman's and the other Defendants' statements to the effect that Bally stock was worth at least the $23 per share specified in the APA was reinforced by the fact that, at and around the time Hillman made these statements and the APA was signed, Bally's stock was trading on the New York Stock Exchange at around the $23 per share price proposed by Bally.

64.     On and as of March 15, 2002, Bally and Holiday (by and through their officer

William Fanelli) executed and delivered the Asset Purchase Agreement providing for the sale of

the Planet Fitness clubs and other assets and the payment by Bally and Holiday of $3 million in

cash, $11.7 million in Bally stock, and $12 million in the form of the "Earn Out Amount." As a

part of the APA, Defendants Bally and Holiday, jointly and severally, represented and warranted

as follows:

(i)     "The Parent [*i.e.* Bally] has timely filed all required forms, reports, statements and documents with the Securities and Exchange Commission (the "Commission") all of which have complied in all material respects with all applicable requirements of the Securities Act and the Securities Exchange Act of 1934, as amended (the "Exchange Act")."

(ii)    "The Buyer [*i.e.* Holiday] has delivered or made available to the Sellers true and complete copies of (a) the Parent's Annual Report on Form 10-K and Form 10K/A for the fiscal year ended December 31, 2000, (b) the Parent's Quarterly Reports on Form 10-Q for the quarters ended December 31, 2000, March 31, 2001, June 30, 2001, September 30, 2001 (c) all other forms, reports, statements and documents filed by the Parent with the Commission pursuant to the Exchange Act since December 31, 2000, and (d) all reports, statements and other information provided by the Parent to its stockholders since December 31, 2000 (collectively, the "Parent Reports") except as modified by subsequent filings. As of their respective dates, the Parent Reports did not contain any untrue statement or material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading."

(iii)   "The financial statements of the Parent included or incorporated by reference in the Parent Reports were prepared in accordance with GAAP applied on a consistent basis (except as otherwise stated in such financial statements or , in the case of audited statements, the related report thereon of independent certified public accountants), and present fairly the financial position and results of operations, cash flows and of changes in stockholders' equity of the Parent as of the dates and for the periods indicated. . ."

(iv)    "Since December 31, 2000 and except as otherwise reflected in the Parent Reports, there has been no change in any of the significant accounting (including tax accounting) policies, practices, or procedures of the Parent."

(v)     "The Parent is and has been subject to the reporting requirements of the Exchange Act and has timely filed with the Commission all periodic reports required to be

- 19 -

filed by it pursuant thereto and all reports required to be filed under Sections 13, 14 or 15(d) of the Exchange Act since December 31, 2000."

(vi)    "Except as set forth in the Parent Reports, since December 31, 2000, there has not been any fact, event, circumstance or change specifically affecting or relating to the Buyer or the Parent which has had or is reasonably likely to have a Material Adverse Effect on the Buyer or the Parent."

(vii)    "Except for (a) liabilities or obligations which are accrued or reserved against in the public financial statements of the Buyer or the Parent (or reflected in the notes thereto), (b) liabilities and obligations incurred in the Ordinary Course of Business since the most recent date of the financial statements of the Buyer or the Parent, and (c) obligations under contracts and commitments incurred in the Ordinary Course of Business and not required under GAAP to be reflected in the financial statements of the Buyer and the Parent, neither the Buyer nor the Parent has any liabilities or obligations of any nature, whether absolute, secured, contingent or otherwise, of a nature required by GAAP to be reflected in a balance sheet (or reflected in the notes thereto) or which would have a Material Adverse Effect on the Buyer or the Parent."

(viii)    "None of the representations and warranties of the Buyer or the Parent as set forth in this Agreement or any certificate or document delivered pursuant to and simultaneously with this Agreement, contains any untrue statement of a material fact or omits to state a material fact necessary to make the statements contained herein or therein not misleading."

(ix)    "There is no material fact which has not been disclosed to the Sellers and the Principals which materially adversely affects or reasonably be anticipated to materially affect the Assets, the Business or the Buyer's or the Parent's ability to consummate the Contemplated Transactions."

(x)    "At all times prior to the Closing Date, the Buyer will promptly notify the Sellers and the Principals in writing if the Buyer of the Parent becomes aware of any fact or condition that causes or constitutes a Breach of any of the Buyer's or the Parent's representations and warranties, or if the Buyer or the Parent becomes aware of the occurrence of any fact or condition that would cause or constitute a Breach of any such representation or warranty had such representation or warranty been made as of the time of occurrence or discovery of such fact or condition."

65.    The sale and purchase contemplated by the Agreement was finally consummated on and as of April 19, 2002 (herein the "Closing"). In connection with the Closing (and the issuance of the 382,827 Purchase Shares), William Fanelli, a Senior Vice President of both Bally

and Holiday, signed and delivered to Plaintiffs, on behalf of Bally and Holiday, a "Certificate of

Officer" in which he certified as follows:

(i) "The representations and warranties of the Parent and the Buyer contained in the Agreement are true and correct in all material respects on and as of the date hereof [*i.e.* April 19, 2002] (other than those representations and warranties that address matters only as of a particular date or only with respect to a specific period of time, which need only be accurate as of such date or with respect to such period)."

(ii) "The Buyer and the Parent have performed and complied with, in all material respects, all covenants and obligations required by the Agreement to be performed or complied with by it on or prior to the date hereof."

66. Prior to the Closing, Bally and the other Defendants had caused to be filed with

the SEC the following materially false and misleading statements, all of which were the subject

of Bally's and Holiday's representations and warranties in the APA and Fanelli's Certification at

the Closing.

67. On August 3, 1999, Bally announced its results for the second quarter of 1999,

which as reported, represented marked growth over the Company's performance in the previous

year's second quarter. In a press release the Company stated in pertinent part:

> Bally Total Fitness Holdings Corporation today announced second quarter 1999 results -- with fully diluted earnings per share of $.34 versus $.08 in the prior year and operating income of $21.1 million -- an improvement of 82% over the 1998 quarter. Earnings before interest, taxes, depreciation and amortization for the 1999 quarter grew to $33.8 million, a 44% improvement over the 1998 quarter, and the positive trend of growth in operating cash flows continued.
>
> Commenting on achievement of another strong quarter, Lee Hillman, President and Chief Executive Officer of Bally Total Fitness, said, "Bally continued to demonstrate success and gain momentum as evidenced by the growth in earnings and positive trends in cash flows. By implementing the plan we presented two years ago, we are continuing to invest in programs that achieve results with rapid returns. Our aggressive program of facility upgrades, new product and service offerings and club expansion efforts are demonstrating their value. We have now added 26 new fitness centers during 1999, including our recent acquisition of The Sports Clubs of Canada, a

profitable, upscale 10-center group in Toronto. Also, as we had expected, second quarter new member joins grew 9% over prior year levels while seasonal attrition was 5% lower than prior year trends." Mr. Hillman concluded, "A significant driver of our business success, member satisfaction, is improving dramatically, as seen by these trends. And our focus is to make the member experience still better by continuing to execute those initiatives."

68.     On August 16, 1999, Bally filed its quarterly report for the second quarter of 1999 on Form 10- Q with the SEC. The report, signed by Defendant Dwyer, represented that, "[t]he accompanying condensed consolidated financial statements have been prepared in conformity with generally accepted accounting principles." In relevant part, the Company reported the following quarterly results:

|  | THREE MONTHS ENDED JUNE 30 | |
|---|---|---|
|  | 1999 | 1998 |
| Net Revenues: | | |
| Membership revenues – | | |
| Initial membership fees on financed memberships originated......... | $ 118,891 | $ 101,422 |
| Initial membership fees on paid-in-full memberships originated...... | 5,435 | 7,443 |
| Dues collected............................................................... | 55,354 | 46,629 |
| Change in deferred revenues............................................. | (839) | 3,833 |
|  | 178,841 | 159,327 |
| Finance charges earned..................................... | 15,477 | 12,184 |
| Fees and other............................................. | 15,506 | 9,884 |
|  | 209,824 | 181,395 |
| Operating Income............................................... | 21,148 | 11,635 |
| Interest Income.................................................... | 553 | 720 |
| Interest Expense.................................................. | (12,446) | (10,301) |
| Income Before Income Taxes................................... | 9,255 | 2,054 |
| Income Tax Provision.......................................... | (180) | (50) |
| Net Income..................................................... | $ 9,075 | $ 2,004 |
| Net Income per common share-basic............................. | $ .39 | $ .09 |
| Net Income per common share-assuming dilution.................. | $ .34 | $ .08 |

69.     On November 15, 1999, Bally filed its quarterly report for the third quarter of 1999 on Form 10-Q with the SEC. The report, signed by Defendant Dwyer, represented that,

"[t]he accompanying condensed consolidated financial statements have been prepared in conformity with generally accepted accounting principles." In relevant part, Bally reported the following quarterly results, reflecting substantial growth in revenue and net income over the third quarter of 1998:

| THREE MONTHS | ENDED SEPTEMBER 30 | |
| --- | --- | --- |
| | 1999 | 1998 |
| Net Revenues: | | |
| Membership revenues – | | |
| Initial membership fees on financed memberships originated......... | $ 119,968 | $ 107,053 |
| Initial membership fees on paid-in-full memberships originated...... | 5,566 | 7,086 |
| Dues collected............................................................. | 58,922 | 52,016 |
| Change in deferred revenues............................................. | (303) | (183) |
| | 184,153 | 165,972 |
| Income Before Income Taxes.............................................. | 12,493 | 4,536 |
| Income Tax Provision....................................................... | (250) | (275) |
| Net Income.................................................................. | $ 12,243 | $ 4,261 |
| Net Income per common share-basic...................................... | $ .52 | $ .18 |
| Net Income per common share-assuming dilution........................ | $ .45 | $ .16 |

70.    On February 9, 2000, Bally issued a press release announcing its financial results for the fourth quarter and year end of 1999, the periods ended December 31, 1999. For the year, the Company reported diluted earnings per share of $1.56, operating income of $93.3 million and net revenues of $728 million. Defendant Hillman, commenting on the results, stated, in pertinent part, as follows:

> We are very pleased with our quarterly and full-year results and, in particular, that we have continued to deliver on our plans for improving earnings and cash flows. Since 1996, when the Company lost more than $2.00 per share, we have executed against our business plan with earnings per share now at $1.56.
>
> During 1999 we continued investing to grow our business -- opening 22 new fitness centers, upgrading and expanding dozens of our existing clubs and acquiring 24 additional fitness centers, ending the year with 363 clubs in total.

> Also, during the fourth quarter we launched our redesigned website and have
> begun a concerted effort to develop strategic web-based partnerships, which we
> expect to become more important in the years to come. These investments, when
> coupled with our expanding offerings of products and services, provide us with a
> dynamic foundation for continued growth and profit improvement.

Concerning the Company's future, Defendant Hillman continued to state, in pertinent part, as

follows:

> As we move into the year 2000, Bally Total Fitness is a far different company than
> it was just three years ago. Today, we are developing a wide-range of new
> products, services and strategic relationships with top-flight corporate partners that
> want to reach our valuable customer base. In doing so, we are serving our
> customers better and delivering more value to Bally members than ever before.
> With plans to build and open up to 25 new fitness centers this year in addition to
> continuing our selective acquisition of existing clubs, we are committed to
> building upon our formula for success for the long-term.

71.    On March 31, 2000, Bally filed its annual report for the year 1999 with the SEC

on Form 10-K. The report, signed by Defendants Hillman and Dwyer, represented that, "[t]he

accompanying consolidated financial statements have been prepared in conformity with

generally accepted accounting principles." Also included in the Form 10-K was a report from

Bally's outside auditor, Ernst & Young LLP, which represented that "[o]ur opinion, the

consolidated financial statements referred to above present fairly, in all material respects, the

consolidated financial position of Bally Total Fitness Holdings Corporation at December 31,

1999 and 1998, and the consolidated results of its operations and its cash flows for each of the

three years in the period ended December 31, 1999, in conformity with accounting principles

generally accepted in the United States." In relevant part, Bally reported the following results

for the 1999 fiscal year:

|  | YEAR ENDED DECEMBER 31 | | |
|  | 1999 | 1998 | 1997 |
|  | (In thousands, except share data) | | |
| Net Revenues: | | | |
| Membership revenues — | | | |
| Initial membership fees on financed memberships originated……. | $ 465,443 | $ 414,190 | $ 352,661 |
| Initial membership fees on paid-in-full memberships originated...... | 23,721 | 30,318 | 58,117 |
| Dues collected…………………………………………………… | 242,952 | 205,104 | 194,084 |
| Change in deferred revenues………………………………… | (4,078) | 3,122 | 961 |
|  | 728,038 | 652,734 | 605,823 |
| Finance charges earned……………………………… | 59,449 | 50,160 | 39,218 |
| Products and services………………………………… | 62,616 | 32,474 | 10,046 |
| Fees and other………………………………………… | 10,995 | 8,976 | 6,697 |
|  | 861,098 | 774,344 | 661,784 |
| Net Income | $ 42,182 | $ 13,297 | $ (44,870) |
| (Loss)……………………………………………………… | | | |
| Basic Earnings (Loss) Per Common Share: | | | |
| Income (Loss) Before Extraordinary Charge and Cumulative | | | |
| Effect of a Change in Accounting Principal…………………… | $    1.81 | $     .59 | $     (1.51) |
| Extraordinary Loss on Extinguishment of | | | (1.37) |
| Debt……………………. | | | |
| Cumulative Effect of a Change in Accounting Principal…………… | (.01) | | |
| Net Income (Loss) Per Common Share……………………… | $    1.80 | $     .59 | $     (2.88) |
| Average Common Shares Outstanding | 23,382.288 | 22,424,172 | 15,557,491 |
| Diluted Earnings (Loss) Per Common Share: | | | |
| Income (Loss) Before Extraordinary Charge and Cumulative | | | |
| Effect of a Change in Accounting Principal…………………… | $    1.56 | $     .51 | $     (1.51) |
| Extraordinary Loss on Extinguishment of Debt…………………….. | | | (1.37) |
| Cumulative Effect of a Change in Accounting Principal…………… | (.01) | | |
| Net Income (Loss) Per Common Share……………………… | $    1.55 | $     .51 | $     (2.88) |

72.     In addition, in the Form 10-K reporting 1999 results, Bally made statements

concerning the Company's policy of revenue recognition for membership fees and dues. The 10-

K provided, in pertinent part, as follows:

"Membership revenue recognition

"The Company's fitness centers primarily offer a dues membership, which permits
members, upon paying an initial membership fee, which may be financed, to
maintain their membership on a month-to-month basis as long as monthly dues
payments are made. Initial membership fees may be paid in full when members
join or may be financed via installment contracts over periods ranging up to 36
months. Revenues from initial membership fees (net of any related allowances) are
deferred and recognized ratably over the weighted-average expected life of the

- 25 -

memberships, which for paid-in-full memberships and financed memberships sold
have been calculated to be 36 months and 22 months, respectively. Costs directly
related to the origination of memberships (substantially all of which are sales
commissions paid, which are included in "Fitness center operations") are also
deferred and are amortized using the same methodology as for initial membership
fees described above. The allowance for cancellations of memberships under so-
called "cooling-off" statutes in most states, contractually permitted cancellations
and first payment defaults is charged directly against membership revenue. The
provision for doubtful receivables represents the allowance for all other
uncollectible memberships. Dues revenue is recorded as monthly services are
provided. Accordingly, when dues are prepaid, the prepaid portion is deferred and
recognized over the applicable term. Installment contracts bear interest at, or are
adjusted for financial accounting purposes at the time the contracts are sold to,
rates for comparable consumer financing contracts. Unearned finance charges are
amortized over the term of the contracts on the sum-of-the-months-digits method,
which approximates the interest method. [Emphasis added.]"

73.    On February 14, 2001, Bally issued a press release announcing its financial results

for the fourth quarter and year end of 2000, the periods ended December 31, 2000. For the year,

Bally reported diluted earnings per share of $2.35, operating income of $126.4 million and

revenues of over $1 billion. Defendant Hillman, commenting on the results, stated, in pertinent

part, as follows:

> We are pleased to continue posting gains in the key measures of our business.
> Particularly gratifying is our operating success in the fourth quarter, despite the
> extraordinarily harsh weather conditions in the Midwest that affected 35% of our
> clubs throughout December, and the year ending storm that temporarily shut
> down most of our operations in the Northeast during one of our busiest periods.
>
> While the year 2000 was another period of demonstrated increasing strength for
> our Company, we are particularly excited about what 2001 will bring. Our capital
> spending for 2001 is progressing as planned, with fewer dollars overall and a
> greater focus on new club expansion. We came into the new year with more than
> 15 new club facilities under construction, including nine clubs scheduled to open
> during the first quarter. Our returns on new clubs continue to be quite attractive.
> The Bally Total Fitness business model has shown itself to be a great generator of
> enterprise value and we look forward to continuing to achieve the growth goals
> we have set for ourselves over the coming months.

74.    The Company reported another year of impressive top and bottom line growth the

following year. On March 9, 2001, Bally filed its annual report for the year 2000 on Form 10-

K405 with the SEC. The report was signed by defendants Hillman and Dwyer and represented that, "[t]he accompanying consolidated financial statements have been prepared in conformity with generally accepted accounting principles." Also included in the Form 10-K was a report from the Company's outside auditor, Ernst & Young, LLP, which represented that "[i]n our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the consolidated financial position of Bally Total Fitness Holdings Corporation at December 31, 2000 and 1999, and the consolidated results of its operations and its cash flows for each of the three years in the period ended December 31, 2000, in conformity with accounting principles generally accepted in the United States." In relevant part, the Company reported the following results for the 2000 fiscal year:

|  | YEAR ENDED DECEMBER 31 | | |
|---|---|---|---|
|  | 2000 | 1999 | 1998 |
|  | (In thousands, except share data) | | |
| Net Revenues: | | | |
| Membership revenues – | | | |
| Initial membership fees on financed memberships originated......... | $ 518,413 | $ 465,443 | $ 414,190 |
| Initial membership fees on paid-in-full memberships originated....... | 24,576 | 23,721 | 30,318 |
| Dues collected................................................................... | 281,509 | 242,952 | 205,104 |
| Change in deferred revenues.............................................. | (12,395) | (4,078) | 3,122 |
|  | 812,103 | 728,038 | 652,734 |
| Finance charges earned...................................... | 68,462 | 59,449 | 50,160 |
| Products and services......................................... | 110,976 | 62,616 | 32,474 |
| Miscellaneous revenue ...................................... | 15,607 | 10,995 | 8,976 |
|  | 1,007,148 | 861,098 | 744,344 |
| Net Income............................................................................ | $ 78,610 | $ 42,182 | $ 13,297 |
| Basic Earnings Per Common Share: | | | |
| Income Before Cumulative Effect of a Change in Accounting | | | |
| Principal............................................................................. | $ 3.29 | $ 1.81 | $ .59 |
| Cumulative Effect of a Change in Accounting Principal................. |  | (.01) |  |
| Net Income Per Common Share............................................ | $ 3.29 | $ 1.80 | $ .59 |
| Average Common Shares Outstanding | 23,858,486 | 23,382,288 | 22,424,172 |
| Diluted Earnings (Loss) Per Common Share: | | | |
| Income Before Cumulative Effect of a Change in Accounting | | | |
| Principal............................................................................. | $ 2.84 | $ 1.56 | $ .51 |
| Cumulative Effect of a Change in Accounting Principal................ |  | (.01) |  |
| Net Income (Loss) Per Common Share...................................... | $ 2.84 | $ 1.55 | $ .51 |

75.    Concerning the Company's policy of revenue recognition for membership fees

and dues, the 10-K provided, in pertinent part, as follows:

Membership revenue recognition

The Company's fitness centers primarily offer a dues membership, which permits
members, upon paying an initial membership fee, which may be financed, to
maintain their membership on a month-to-month basis as long as monthly dues
payments are made. Initial membership fees may be paid in full when members
join or may be financed via installment contracts over periods ranging up to 36
months. Revenues from initial membership fees (net of any related allowances)
are deferred and recognized ratably over the weighted-average expected life of the
memberships, which for paid-in-full memberships and financed memberships sold
have been calculated to be 36 months and 22 months, respectively. Costs directly
related to the origination of memberships (substantially all of which are sales
commissions paid, which are included in "Fitness center operations") are also
deferred and are amortized using the same methodology as for initial membership

fees described above. The allowance for cancellations of memberships under so-
called "cooling-off" statutes in most states, contractually permitted cancellations
and first payment defaults is charged directly against membership revenue. The
provision for doubtful receivables represents the allowance for all other
uncollectible memberships. Dues revenue is recorded as monthly services are
provided. Accordingly, when dues are prepaid, the prepaid portion is deferred and
recognized over the applicable term. Installment contracts bear interest at, or are
adjusted for financial accounting purposes at the time the contracts are sold to,
rates for comparable consumer financing contracts. Unearned finance charges are
amortized over the term of the contracts on the sum-of-the-months-digits method,
which approximates the interest method. [Emphasis added.]

76.    On February 13, 2002, Bally issued a press release announcing its financial results

for the fourth quarter and year end of 2001, the periods ended December 31, 2001. For the year,

the Company reported diluted earnings per share of $2.43, net income of $72.4 million and net

revenues of over $852 million. Defendant Hillman, commenting on the results, stated, in

pertinent part, as follows:

Despite the many challenges of 2001, Bally had considerable success and made
progress toward our long-term objectives. In a difficult economy, we were able to
increase revenues, with products and services growing very well, and margins
holding steady for the year. We exceeded our cash flow expectations, finishing the
year cash flow positive, exclusive of our year-end acquisition of Crunch Fitness. In
addition, we've worked hard to improve our sales processes and services for our
members, and believe the progress we're making is having an impact.

Our 2001 results have enabled us to continue to improve our already strong balance
sheet, a primary objective over the past three years, reducing debt by nearly $30
million. Clearly, this business model has been confirmed through the successful
completion of new bank and asset-backed facilities during the quarter, as well as
the recent credit upgrade by Moody's.

Looking at 2002, we're excited about our future. During the first six weeks we
have enjoyed an improvement in new membership sales, in terms of both number
of members and membership rates. Comparable club visits have increased more
than 10% year-over-year, fostering an increase in personal training and retail sales
of nearly 30%. We look to build on this success in the coming months through our
strong commitment to our members' health and lifestyles.

Finally, the recent addition of the popular and well-known Crunch Fitness brand
has already begun to have a powerful impact on our business. The company's
expertise in personal training, development of leading-edge programming and

- 29 -

innovative marketing are proving to be tremendous resources to the Bally family.

77.    On March 27, 2002, Bally's filed its annual report with the SEC on Form 10-
K405. The report was signed by defendants Hillman and Dwyer and represented that "[t]he
accompanying consolidated financial statements have been prepared in conformity with
generally accepted accounting principles." Also included in the Form 10-K was a report from
the Company's outside auditor, Ernst & Young, LLP, which represented that "[i]n our opinion,
the consolidated financial position of Bally Total Fitness Holdings Corporation at December 31,
2001 and 2000, and the consolidated results of its operations and its cash flows for each of the
three years in the period ended December 31, 2001, in conformity with accounting principles
generally accepted in the United States." In relevant part the Company reported the following
results for 2001.

|  | YEAR ENDED DECEMBER 31 | | |
|---|---|---|---|
|  | 2001 | 2000 | 1999 |
|  | (In thousands, except share data) | | |
| Net Revenues: | | | |
| Membership revenue – | | | |
| Products and services ......................................................................... | $ 689,547 | $ 659,279 | $ 589,419 |
| Miscellaneous revenue ...................................................................... | 144,926 | 110,869 | 62,616 |
|  | 17,570 | 15,714 | 10,995 |
|  | 852,043 | 785,862 | 663,030 |
| Net Income.......................................................................................... | $ 80,707 | $ 78,610 | $ 42,182 |
| Basic Earnings Per Common Share: | | | |
| Income Before Cumulative Effect of a Change in Accounting | | | |
| Principal............................................................................................ | $ 2.91 | $ 3.29 | $ 1.81 |
| Cumulative Effect of a Change in Accounting Principal................ |  |  | (0.01) |
| Net Income Per Common Share............................................................ | $ 2.91 | $ 3.29 | $ 1.80 |
| Average Common Shares Outstanding | 27,744,046 | 23,858,486 | 23,382,288 |
| Income Before Cumulative Effect of a Change in Accounting Principal... | $ 2.70 | $ 2.84 | $ 1.55 |

78.    Concerning the Company's policy of revenue recognition for membership fees

and dues, the 10-K stated, in pertinent part, as follows:

Summary of Significant Accounting Policies

- 30 -

Revenues from initial membership fees (net of any related allowances) are deferred and recognized ratably over the weighted-average expected life of the memberships, which for paid-in-full memberships and financed memberships sold have been calculated to be 36 months and 22 months, respectively. Costs directly related to the origination of memberships (substantially all of which are sales commissions paid) are also deferred and are amortized using the same methodology as for initial membership fees described above. The allowance for cancellations of memberships under so-called "cooling-off" statutes in most states, contractually permitted cancellations and first payment defaults is charged directly against membership revenue, as is the provision for doubtful receivables, which represents the allowance for all other uncollectible memberships. Dues revenue is recorded as monthly services are provided. Accordingly, when dues are prepaid, the prepaid portion is deferred and recognized over the applicable term. [Emphasis added.]

79.     In addition to these statements and representations, Bally and some or all of the other Defendants made numerous other statements, representations, warranties, omissions, certifications and public disclosures of a similar nature, including in the registration statement filed with the SEC for the sale of the Purchase Shares.

80.     In executing the APA and consummating the sale contemplated thereby, the Plaintiffs reasonably relied upon all these statements, representations, warranties, omissions, certifications and public disclosures.

81.     In addition, Plaintiffs relied upon the integrity of the public market for the trading of Bally's securities as reflecting that the $23 per share was a fair and reasonable value for the Bally stock they were to receive in the transaction. Each of the Defendants knew and intended that the Plaintiffs rely upon the integrity of this market and the market prices determined therein. Plaintiffs' reliance on the integrity of this market and the market prices was reasonable because the market for Bally securities was an efficient market, for the following reasons, among others:

(i)     Bally's stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

- 31 -

(ii)     As a regulated issuer, Bally filed periodic public reports with the SEC and the
         NYSE;

(iii)    Bally regularly communicated with public investors via established market
         communication mechanisms, including through regular dissemination of press
         releases on the national circuits of major newswire services and through other
         wide-ranging public disclosures, such as communications with the financial press
         and other similar reporting services;

(iv)     Bally was followed by several securities analysts employed by major brokerage
         firms who wrote reports which were distributed to the sales force and certain
         customers of their respective brokerage firms, and each of such reports was
         publicly available and entered the public marketplace; and

(v)      As a result of the foregoing, the market for Bally's securities promptly digested
         current information regarding Bally from all publicly available sources and
         reflected such information in Bally's stock price.

82.     Bally continued to make similar, positive public disclosures and filings after the
April 19, 2002 Closing of the Planet Fitness sale.

83.     During April 2004, Bally began to disclose, albeit reluctantly and partially, that its
officers had been engaged for several years in a massive accounting fraud which overstated
Bally's earnings during the period from at least 1997 through 2003 – including those earnings set
forth in the various financial statements and SEC filings that constituted the "Parent Reports"
and other public disclosures the accuracy of which Bally and Holiday had certified in the Asset
Purchase Agreement and at the Closing.

84.     The first partial disclosure of this fraud was made by Bally in a press release

issued after the close of trading on April 28, 2004. On that date, Bally announced that Defendant

Dwyer had resigned as Bally's CFO and that the SEC was investigating Bally in connection with

a restatement of its earnings, which had first been mentioned in a March 11, 2004 press release

and attributed to "errors" in the calculation of prepaid dues.

85.    In response to this April 28, 2004 announcement, the price of Bally common

stock fell over 16% in one day.

86.    Over the next several months, the details of the fraud, and the extent of the fraud,

began to slowly leak out. On May 18, 2004, Bally issued a press release announcing that Bally's

long-time independent auditor, Ernst & Young LLP had resigned and been replaced with KPMG

LLP.

87.    On August 9, 2004, Bally announced that it was required to postpone the release

of its financial results and the filing of a quarterly report with the SEC "due to an examination of

certain accounting issues."

88.    On November 15, 2004, Bally announced that, as a result of an investigation by

its Audit Committee (in consultation with the new auditor KMPG and other unnamed

"accounting experts"), it had concluded that all its financial statements of the years ended

December 31, 2000 through December 31, 2003 and the first quarter of 2004 had to be "restated"

and that "such financial statements and other communications relating to such periods should not

be relied upon." Bally also announced that no further financials statements would be issued until

KMPG completed "the multi-year audits" necessary for the restatement, which audits would not

be completed before July 2005. Bally stated:

> Bally's Audit Committee determined on November 10, 2004 that, following the
> promulgation of Staff Accounting Bulletin No. 101, beginning in fiscal year 2000, Bally
> should have changed its recognition of membership initiation fees. Prior to 2003, the
> Company deferred and recognized financial membership initiation fees over the average

- 33 -

membership life, which it approximated to be 22 months. The Audit Committee determined that, following the effective date of Staff Accounting Bulletin No. 101, Bally should have recognized revenue for all membership fees over the long of the contractual life or the period over which service was provided. The Audit Committee also determined the need to revise its method of accounting for these revenues in 2003 and the first quarter of 2004 to defer recognition under the modified cash method to periods beyond the initial contract period for certain of its members. These changes would have delayed revenue recognition.

The Audit Committee further determined that, prior to the second quarter of 2003, Bally's recognition of revenue associated with recoveries of unpaid dues on inactive member contracts was in error. The Audit Committee also determined that Bally's allowance for doubtful accounts was inadequate for years prior to 2003.

89.    Most recently, on February 8, 2005, Bally issued a press release stating:

Bally Total Fitness announced that the Audit Committee of its Board of Directors has completed its previously announced investigation into various accounting issues. . . . [T]his report includes the final conclusions on two other accounting issues, as well as an assessment of responsibility.

Bally Total Fitness previously announced in November 2004 its decision to restate financial statements from January 1, 2000 through the first quarter of 2004, primarily as a result of errors in its revenue recognition methods as identified in the interim report of the Audit Committee investigation. At that time, Bally also announced that the Company's financial statements and other communications related to the same periods should not be relied upon.

The recently completed investigation also found errors in the Company's rationale for and implementation of its deferral of membership acquisition costs under Bally's prior accounting method. The investigation also concluded that the Company took aggressively optimistic positions on several matters related to the analysis of the adequacy of the allowance for doubtful accounts, which were without a reasonable empirical basis.

The Audit Committee's review found multiple accounting errors in the Company's financial statements and concluded that the Company's former Chairman and Chief Executive Officer Lee Hillman (held position from 1996 to 2002) and former Chief Financial Officer John Dwyer (held position from 1996 to 2004) were responsible for multiple accounting errors and creating a culture within the accounting and finance groups that encouraged aggressive accounting.

The investigation found, among other things, that certain accounting policies and positions were suggested and implemented without a reasonable empirical basis and concluded that Mr. Dwyer made a false and misleading statement to the SEC.

As a result of the findings, the Company has decided to make no further payments to

- 34 -

Messrs. Hillman and Dwyer under their severance arrangements and will evaluate its legal options with respect to these former executives.

The investigation also found improper conduct on the part of the Company's Vice President and Controller Ted Noncek (from 2001 to 2005) and Vice President and Treasurer Geoff Scheitlin (former Controller from 1997 to 2001). As a result, both have been terminated.

Separately . . . the Company has identified deficiencies in its internal controls over financial reporting. A number of these deficiencies, either individually or in the aggregate, constitute material weaknesses in its internal controls over financial reporting.

These material weaknesses include deficiencies in the Company's finance and accounting internal control environment, specifically a lack of acceptable and clearly communicated policies reflecting management's attitudes towards financial reporting and the financial report function, the lack of a permanent Chief Financial Officer, ineffective delegation of authority and responsibility, insufficient instruction to employees responsible for significant estimates emphasizing the need to report using accurate and reasonable assumptions and judgments, and insufficiently experienced and trained staff. In addition, there material weaknesses include deficiencies in the controls surrounding the selection and application of accounting principles, specifically, ineffective policies requiring contemporaneous documentation of factual support for key judgments applied within its financial reporting process and the retention of that documentation in accordance with a formal document retention policy.

As a result, the Company believes that KPMG will not be able to issue an unqualified opinion on the effectiveness of the Company's internal controls in the Company's 2004 Annual Report on Form 10-K.

90.    All of the statements, representations, warranties, certifications and disclosures

set forth above – including those in which the Defendants represented that Bally's financial

statements were prepared in accordance with Generally Accepted Accounting Principles

("GAAP") -- were materially false and misleading because, unknown to the Plaintiffs and the

investing public, Bally used improper accounting practices in violation of GAAP and SEC

reporting requirements to falsely inflate Bally's reported revenues, net income and earnings per

share. In addition, Bally lacked adequate internal controls and was therefore unable to ascertain

the true financial condition of the company. Contrary to the Defendants' statements,

representations, warranties, certifications and disclosures, Bally's financial information was

- 35 -

neither prepared in conformity with GAAP nor was it a fair and accurate presentation of Bally's operations and financial position due to Bally's improper accounting.

91.     Plaintiffs believe and infer, and therefore allege, that the individual Defendants at all material times knew that the public documents and statements issued and disseminated in the name of Bally, and the statements, representations, warranties and certifications made in connection with the negotiation of, signing of and carrying out of the APA, were materially false and misleading, knew that such statements and documents, representations, warranties and certifications would be disseminated to the public and to the Plaintiffs, and knowingly and substantially participated or acquiesced in the issuance and dissemination of such statements, representations, warranties and certifications as primary violations of the federal securities laws. Plaintiffs' belief, inference and allegations are based upon the following.

92.     In its February 8, 2005 press release, Bally's own Audit Committee, after a five-month investigation assisted by outside counsel and accountants, concluded as follows:

"The Audit Committee's review found multiple accounting errors in the Company's financial statements and concluded that the Company's former Chairman and Chief Executive Officer Lee Hillman (held position from 1996 to 2002) and former Chief Financial Officer John Dwyer (held position from 1996 to 2004) were responsible for multiple accounting errors and creating a culture within the accounting and finance groups that encouraged aggressive accounting."

"The investigation found, among other things, that certain accounting policies and positions were suggested and implemented without a reasonable empirical basis and concluded that Mr. Dwyer made a false and misleading statement to the SEC."

93.     In addition, because of the individual Defendants' positions with the Company, they had access to the adverse undisclosed information about Bally's business, operations, operational trends, financial statements, markets and present and future business prospects via access to internal corporate documents (including Bally's operating plans, budgets and forecasts and reports of actual operations compared thereto), conversations and connections with other

corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof and via reports and other information provided to them in connection therewith.

94. In addition, Plaintiffs believe and infer, and therefore allege, that Defendant Toback devised and concocted a scheme to inflate Bally's stated earnings through a program that purportedly provided new members with a package of nutritional supplements and fitness training sessions. In fact, these programs were deliberately structured so that few new members received the nutritional supplements and few new members used the fitness training sessions. Upon information and belief, despite the fact that these programs were a sham, Bally recognized and reported revenue from these "sales" which, in fact, had no real economic substance.

95. Each of the above officers of Bally, by virtue of their high-level positions with the Company, directly participated in the management of the Company, was directly involved in the day-to-day operations of the Company at the highest levels and was privy to confidential proprietary information concerning the Company and its business, operations, growth, financial statements, and financial condition, as alleged herein. The individual Defendants were involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein, were aware, or recklessly disregarded, that the false and misleading statements were being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws.

96. The individual Defendants participated in the drafting, preparation, and/or approval of the various public and shareholder and investor reports and other communications complained of herein and were aware of, or recklessly disregarded, the misstatements contained therein and omissions therefrom, and were aware of their materially false and misleading nature.

Because of their Board membership and/or executive and managerial positions with Bally, each of the individual Defendants had access to the adverse undisclosed information about Bally's business prospects and financial condition and performance as particularized herein and knew (or recklessly disregarded) that these adverse facts rendered the positive representations made by or about Bally and its business issued or adopted by the Company materially false and misleading.

97.     The individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to and did control the content of the various SEC filings, press releases and other public statements pertaining to the Company during the relevant period. Each individual Defendant was provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected. Accordingly, each of the individual Defendants is responsible for the accuracy of the public reports and releases detailed herein and is therefore primarily liable for the representations contained therein.

98.     The individual Defendants were motivated to inflate the financial performance of Bally for several reasons, including because such inflation of financial performance enabled Bally to expand its business through acquisitions of other fitness centers like the Plaintiffs' at a lower cost, because much of the purchase price was paid in the form of artificially inflated Bally stock. In addition to the acquisition of Planet Fitness set forth above, Bally also acquired in late 2001 (during the time the parties were negotiating the Planet Fitness deal) several clubs that operated under the name "Crunch" for a reported $90 million, which included 3 million shares of Bally stock.

## CLAIMS

### COUNT I

### (Breach of Contract)

99.     Plaintiffs repeat and incorporate by reference the allegations contained in all the preceding paragraphs.

100.    The acts and omissions of Defendants Bally and Holiday set forth above constitute breaches of the Asset Purchase Agreement including, without limitation, the covenant of good faith and fair dealing implied therein.

101.    Because of their misconduct set forth above, Bally and Holiday have both waived the procedures provided in the APA for submission of some disputes to PriceWaterhouse and are estopped from relying on those procedures or the decision, issued October 23, 2004 by PriceWaterhouse, with respect to the Advance Earn Out Schedule.

102.    Defendants Bally and Holiday have also both waived the procedures provided in the APA for submission of some disputes to PriceWaterhouse with respect to the final Earn-Out Schedule and are estopped from invoking or relying on such procedures.

103.    Plaintiffs have suffered substantial damage and injury as a direct and proximate result of Bally's and Holiday's breach of contract.

### COUNT II

### (Deceit)

104.    Plaintiffs repeat and incorporate by reference the allegations contained in all the preceding paragraphs.

- 39 -

105.    Defendants made numerous misrepresentations, set forth above, with the purpose and intent of inducing the Plaintiffs to sell their Planet Fitness clubs and other assets to Defendants Bally and Holiday in consideration for, *inter alia*, a substantial quantity of Bally stock. In addition to express misrepresentations, Defendants also failed, refused and omitted to disclose to Defendants facts and information necessary to make their statements and representations not misleading.

106.    Plaintiffs reasonably relied on Defendants' misrepresentations to their detriment.

107.    Plaintiffs have suffered substantial injury and damage as a direct and proximate result of Defendants' deceit.

## COUNT III

### (Equitable Rescission)

108.    Plaintiffs repeat and incorporate by reference the allegations contained in all the preceding paragraphs.

109.    Defendants fraudulently induced Plaintiffs to entered into the APA and sell to Defendants the Planet Fitness clubs and other assets pursuant thereto.

110.    Given the time that has elapsed, and the numerous, detrimental changes Defendants have made to the Planet Fitness clubs and other assets acquired, it is not practicable to rescind the transaction in its entirety.

111.    Plaintiffs, however, are entitled to the following equitable relief from the Court:

(a)    A recession of the stock issuance to Plaintiffs. To the extent Plaintiffs still possess any of the Purchase Shares, the Court should order the Defendants to pay to Plaintiffs $23 per share upon return of those remaining shares. To the extent Plaintiffs have sold any of the Purchase Shares, Defendants should be ordered to

pay Plaintiffs the difference between $23 per share and the price at which

Plaintiffs re-sold the stock.

(b)     An award of the full amount of the potential Earn Out Amount under the APA,

equal to $12 million.

## COUNT IV

### (Mass. Gen. Laws c. 93A)

112.    Plaintiffs repeat and incorporate by reference the allegations contained in all the

preceding paragraphs.

113.    At all times material, Defendants were engaged in trade or commerce within the

Commonwealth of Massachusetts.

114.    All or some of the actions described above, including without limitation Bally's

and Wildman's fraudulent and wrongful campaign to freeze Laird and Baker out of management

of the Plaintiffs' Fitness Centers, occurred primarily and substantially within the Commonwealth

of Massachusetts.

115.    Defendants' acts and omissions set forth above constitute unfair and deceptive

acts and practices on the part of Defendants while engaged in trade or commerce within the

meaning of Mass. Gen. Laws ch. 93A Sections 2 and 11 and the regulations of the Attorney

General promulgated pursuant thereto.

116.    Defendants' unfair and deceptive acts and practices constitute a knowing and

willful violation of Mass. Gen. Laws ch. 93A, entitling Plaintiffs to treble damages.

117.    Plaintiffs have suffered substantial damages and injury directly and proximately

caused by Defendants' unfair and deceptive acts and practices.

- 41 -

## COUNT V

### (815 ILCS 505/2)

118.    Plaintiffs repeat and incorporate by reference the allegations contained in all the preceding paragraphs.

119.    All or some of Defendants' conduct described above constitutes unfair and deceptive trade acts or practices on the part of Defendants while engaged in trade or commerce, giving rise to a violation of 815 LICS 505/2.

120.    As a result of Defendants' violation of 815 ILCS 505/2, the Plaintiffs have suffered, and continue to suffer, harm and damage.

## COUNT VI

### (Massachusetts Uniform Securties Act)

121.    Plaintiffs repeat and incorporate by reference the allegations contained in all the preceding paragraphs.

122.    Defendants' acts and omissions were in violation of the Massachusetts Uniform Security Act, M.G.L. ch. 110A Section 410(a)(2).

123.    Plaintiffs have suffered substantial damage and injury directly and proximately caused by Defendants' wrongful acts and omissions.

## CLAIMS FOR RELIEF

WHEREFORE, Plaintiffs demand the following relief:

A.    On Count I, that the Court enter judgment against Defendants in an amount equal to the damages and losses suffered by Plaintiffs as a result of Bally's and Holiday's breaches of contract;

B.    On Count II, that the Court enter judgment against Defendants in an amount

amount equal to the damages and losses suffered by Plaintiffs as a result of Defendants' deceit;

C. On Count III, that the Court enter judgment against the Defendants in an amount equal to the difference between $23 per share and the price at which the Plaintiffs sold the Purchase Shares, plus $12 million;

D. On Count IV, that the Court enter judgment against the Defendants in an amount equal to three times the damages and losses suffered by Plaintiffs as a result of Defendants' unfair and deceptive acts and practices under Mass. Gen. Laws ch. 93A, together with Plaintiffs attorneys fees;

E. On Count V, that the Court enter judgment against the Defendants in an amount equal to three times the damages and losses suffered by Plaintiffs as a result of Defendants' unfair and deceptive acts and practices under 815 ILCS 505/2, together with Plaintiffs attorneys fees;

F. On Count VI, that the Court enter judgment against the Defendants in an amount equal to the damages and losses suffered by Plaintiffs as a result of the Defendants' violation of the Massachusetts Uniform Securities Act, including an amount equal to $23 per share for each of the Purchase Shares still held by Plaintiffs (upon tender of the security) and, with respect to the Purchase Shares that the Plaintiffs have sold, an amount equal to the difference between $23 per share and the value at which the Plaintiffs disposed of the Shares, plus interest and attorneys fees allowed by the statute;

G. That the Court award Plaintiffs costs, interest, attorneys and expert fees and such other and further relief as the Court deems just and appropriate.

## JURY CLAIM

Plaintiffs demand a trial by jury on all claims and counts asserted in this Complaint as

well as all defenses and counterclaims thereto.

FIT TECH, INC., *et al.*,
Plaintiffs,
By their attorney,

Stephen W. Rider, Esq., BBO # 419820
Stephen W. Rider, P.C.
350 Lincoln Street – Suite 2400
Hingham, MA 02043
Tel: 781-740-1289
Fax: 781-207-9160
Email: stephen.rider@swrpc.com

Dated: 5-12-05

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

Fit Tech, Inc., Planet Fitness Center, Inc.,
Planet Fitness Center of Maine, Inc., Planet
Fitness Center of Dartmouth, Inc., Planet
Fitness Center of Salem, Inc., Planet Fitness
Center of Brighton, Inc., Stratford Fitness
Center, Inc., David B. Laird and Scott G.
Baker

        Plaintiffs,

v.

Bally Total Fitness Holding Corporation,
Holiday Universal, Inc., Paul Toback, Lee
Hillman and John Dwyer,

        Defendants.

C.A. No. 05-10471-MEL

## CERTIFCATE OF SERVICE

I hereby certify that I served the Plaintiffs' <u>First Amended Complaint And Jury Demand</u>

on the only Defendants who have so far appeared in this action by causing a copy to be hand-

delivered, by overnight express, to their counsel on May 13, 2005:

Juliet A. Davison, Esq.
Todd & Weld LLP
28 State Street
Boston, MA  02109

Stephen W. Rider, Esq.
Date:  May 12, 2005