UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

_____

|  |  |
|---|---|
| FIT TECH, INC., PLANET FITNESS CENTER, INC., PLANET FITNESS CENTER OF MAINE, INC., PLANET FITNESS CENTER OF DARTMOUTH, INC., PLANET FITNESS CENTER OF SALEM, INC., PLANET FITNESS CENTER OF BRIGHTON, INC., STRATFORD FITNESS CENTER, INC., DAVID B. LAIRD and SCOTT G. BAKER,<br>　　　　Plaintiffs,<br><br>vs.<br><br>BALLY TOTAL FITNESS HOLDING CORPORATION, HOLIDAY UNIVERSAL, INC., PAUL TOBACK, LEE HILLMAN, and JOHN DWYER,<br>　　　　Defendants. | Civil Action No.<br>05-10471-MEL |

_____

## MEMORANDUM IN SUPPORT OF PAUL TOBACK'S
## MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION

Howard M. Cooper
Juliet A. Davison
Heidi A. Nadel
TODD & WELD LLP
28 State Street, 31st Floor
Boston, MA 02109
(617) 720-2626

Attorneys for Defendant Paul Toback

## TABLE OF CONTENTS

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

JURISDICTIONAL FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

MR. TOBACK'S LIMITED CONTACTS WITH MASSACHUSETTS . . . . . . . 2

THE PURCHASE AGREEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .2

PLAINTIFFS' CLAIMS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .4

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

I.    Massachusetts' Long-Arm Statute Does Not
Authorize Personal Jurisdiction Over Mr. Toback . . . . . . . . . . . . .6

    A.    The Court May Not Exercise Personal Jurisdiction
Over Mr. Toback Under Mass. Gen. L. ch. 223A,
§3(a) Because He Has Not Transacted Any
Business in Massachusetts . . . . . . . . . . . . . . . . . . . . . . . . . . .6

    B.    Mr. Toback Neither Did nor Failed to Do an Act
in Massachusetts that Caused a Tortuous Injury . . . . . . . . .9

II.    Due Process Does Not Permit Personal Jurisdiction over
Mr. Toback . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

    A.    General Jurisdiction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .11

    B.    Specific Jurisdiction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .12

        1.    Mr. Toback Has No Massachusetts Contacts
that Relate to the Suit . . . . . . . . . . . . . . . . . . . . . . . . . .13

        2.    Mr. Toback Has Not Purposefully Availed
Himself of the Privilege of Conducting
Business in Massachusetts . . . . . . . . . . . . . . . . . . . . 14

        3.    It is Unreasonable to Subject Mr. Toback to
Personal Jurisdiction in Massachusetts . . . . . . . . . . .16

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .17

## TABLE OF AUTHORITIES

### Cases

### Supreme Court Cases

*Asahi Metal Indus. Co. v. Sup. Ct. of Cal.*,
   *480 U.S. 102 (1987)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Burger King Corp. v. Rudzewicz*,
   *471 U.S. 462 (1985)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 12, 14, 16

*Helicoptros Nacionales de Colomia, S.A. v. Hall*,
   *466 U.S. 408 (1984)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*International Shoe Co. v. Washington, 326 U.S. 310 (1945)* . . . . . . . . . . . . . . . . . . . . 11, 12

### Federal Cases

*Am. Freedom Train Foundation v. Spurney*,
   *747 F.2d 1069 (1ˢᵗ Cir. 1984)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Barrett v. Lombardi*,
   *239 F.3d 23 (1ˢᵗ Cir. 2001)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 11

*Bearse v. Main St. Invs.*,
   *170 F. Supp. 2d 107 (2001)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Danton v. Innovative Gaming Corp. of Am.*,
   *146 F. Supp. 2d 64 (D. Me. 2003)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*In re Lernout & Hauspie Sec. Litig.*,
   *337 F. Supp. 2d 298 (D. Mass. 2004)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Johnson Creative Arts, Inc. v. Wool Masters, Inc.*,
   *573 F. Supp. 1106 (D. Mass. 1983)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Landmark Bank v. Machera*,
   *736 F. Supp. 375 (D. Mass. 1990)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*LaVallee v. Parrot-Ice Drink Prods of Am., Inc.*,
   *193 F. Supp. 2d 296 (D. Mass. 2002)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 12, 13

*Litchfield Fin. Corp. v. Buyers Source Real Estate Group*,
   *389 F. Supp. 2d 80 (D. Mass. 2005)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Mass. School of Law v. Am. Bar Ass'n,*
  *142 F.3d 26 (1ˢᵗ Cir. 1998)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .13, 15

*Nowak v. Tak How Invs. Ltd.,*
  *94 F.3d 708 (1ˢᵗ Cir. 1996)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .13

*Phillips Exeter Academy v. Howard Phillips Fund, Inc.,*
  *196 F.3d 284 (1ˢᵗ Cir. 1999)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .13

*Sawtelle v. Farrell,*
  *70 F.3d 1381 (1ˢᵗ Cir. 1995)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .13, 14

*Ticketmaster-New York, Inc. v. Alioto,*
  *26 F.3d 201 (1ˢᵗ Cir. 1994)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .15, 16, 17

*United Elec., Radio & Mach. Workers v.*
  *163 Pleasant St. Corp., 960 F.2d 1080 (1ˢᵗ Cir. 1992)* . . . . . . . . . . . . . . . . . . . . . . . . . . . .13

*U.S. v. Swiss Am. Bank, Ltd.,*
  *274 F.3d 610 (1ˢᵗ Cir. 2001)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .13

State Cases

*Droukas v. Divers Training Academy, Inc.,*
  *375 Mass. 149 (1978)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6 ,
                                                                                                                    8, 9

*Intech, Inc. v. Triple "C" Marine Salvage, Inc.,*
  *444 Mass. 122 (2005)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .6, 7, 9

*Kleinerman v. Morse,*
  *26 Mass. App. Ct. 819 (1989)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .7

*National Medical Care, Inc. v. Home Medical of*
  *America, Inc., 2002 WL 1290395 (Mass. Super. April 23, 2002)* . . . . . . . . . . . . . . . . . . .7

*Porshin v. Snider,*
  *349 Mass. 653 (1965)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .13

*Protective Factors Inc. v. Am. Broad. Cos., Inc.,*
  *2002 WL 1477174 (D. Mass. May 28 , 2002)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .15, 16

*Tatro v. Manor Care, Inc.,*
  *416 Mass. 763 (1994)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 9

## Statutes

Mass. Gen. L. ch. 223A §3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .9

## Federal and State Rules

Fed. R. Civ. P. 12(b)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Defendant Paul Toback ("Mr. Toback") respectfully submits this Memorandum in Support of his Motion to Dismiss pursuant to Fed. R. Civ. P. 12(b)(2) for lack of personal jurisdiction.[1]

Introduction

This case arises out of an Asset Purchase Agreement (the "Purchase Agreement") dated as of March 15, 2002 pursuant to which defendants Bally Total Fitness Holding Corporation ("Bally") through its subsidiary, defendant Holiday Universal, Inc. ("Holiday"), acquired eight "Planet Fitness" health club facilities in New England from plaintiffs David Laird ("Mr. Laird") and Scott Baker ("Mr. Baker") and related entities in exchange for cash and shares of Bally stock. Plaintiffs complain essentially of alleged misrepresentations and/or omissions in certain of Bally's SEC filings for the years 2000 and 2001, that they were wrongfully excluded from managing the clubs during the two-year earn-out period following the closing and that they have not received any earn-out payment as addressed in the Purchase Agreement.

This Court should not exercise personal jurisdiction over Mr. Toback, who became Bally's President and Chief Executive Officer almost nine months after the effective date of the Purchase Agreement, and should dismiss him from this action. First, the Massachusetts long-arm statute does not permit the exercise of personal jurisdiction over Mr. Toback because he did not "transact business" in Massachusetts giving rise to this litigation, nor did he cause a tortious injury through "an act or omission in" the Commonwealth. Second, exercising personal jurisdiction over him would not comport

---

[1] Pursuant to the Court's Scheduling Order of August 16, 2005, Mr. Toback's Motion to Dismiss and supporting Memorandum are addressed only to the preliminary and potentially dispositive issue of whether this Court may exercise personal jurisdiction over Mr. Toback. As contemplated by the Scheduling Order, Mr. Toback will present, if necessary, a second motion to dismiss setting forth additional grounds for dismissal, including that the Amended Complaint fails to state any claim against him, at a later date.

with federal due process because Mr. Toback lacks sufficient minimum contacts with Massachusetts.

Jurisdictional Facts[2]

Mr. Toback's Limited Contacts With Massachusetts

Mr. Toback, a citizen and resident of Illinois, became Bally's President and Chief Executive Officer on December 11, 2002. *See* Affidavit of Paul Toback ("Toback Aff.") submitted herewith. He has never lived or worked in Massachusetts. Toback Aff. ¶1. He does not vacation here nor does he have any immediate family in the Commonwealth.[3] *Id.*

He did not sign the Purchase Agreement, the officer's certificate delivered at the closing affirming that the representations and warranties in the Purchase Agreement were, in all material respects, true and correct, nor any of the SEC filings referenced in the Purchase Agreement. Toback Aff. ¶4. He did not negotiate any term of the Purchase Agreement. *Id.* ¶3. He did not sell any stock to plaintiffs. He does not recall discussing any term of the Purchase Agreement with Messrs. Laird or Baker, whether in person, by telephone, email or letter prior to the closing, *id.* ¶4, and plaintiffs do not allege that he had any such discussions. He does not recall ever sending letters or email correspondence to Mr. Laird or Mr. Baker in Massachusetts (or elsewhere) nor does he recall ever speaking with either of them by telephone in Massachusetts (or elsewhere), in each case prior to the execution of the Purchase Agreement. *Id.* ¶6. Nor is there any

---

[2] For the purposes of this motion only, Mr. Toback assumes the truth of the facts alleged in the Amended Complaint – but only to the extent that they do not conflict with his Affidavit. To the extent that conflicts exist, however, plaintiffs cannot rest on the allegations in their Amended Complaint to survive a motion to dismiss; instead, "they must go beyond the pleadings and make affirmative proof." *Cheldea v. H.E. Fortna & Bro., Inc.*, 609 F.2d 1022, 1024 (1st Cir. 1979).

[3] Messrs. Laird and Baker are citizens and residents of Massachusetts. Amended Complaint ¶¶ 8-9. The corporate Plaintiffs are incorporated in Massachusetts and each has its principal place of business in Massachusetts. Amended Complaint ¶¶ 1-9.

allegation in the First Amended Complaint (the "Amended Complaint") that he did any of these things.

Unlike the other individual defendants, the sole allegation against Mr. Toback in the 44-page Amended Complaint is, upon information and belief, that he supposedly "devised and concocted a scheme to inflate Bally's stated earnings through a program that purportedly provided new members with a package of nutritional supplements and fitness training sessions." Amended Complaint ¶94. The Amended Complaint is notably devoid of any factual detail concerning said alleged scheme and, more importantly for purposes of the present motion, fails to allege any nexus between the purported scheme and Massachusetts.

As set forth in the Affidavit of Mr. Toback, the totality of Mr. Toback's contacts with Massachusetts consist of one trip in which he met with Messrs. Laird and Baker and Sandor Feher ("Mr. Feher"), their direct supervisor after the acquisition and, since being named President and CEO of Bally at the end of 2002, about one trip per year to visit the clubs. Toback Aff. ¶¶5 and 7.

The Purchase Agreement

Under the Purchase Agreement, plaintiffs would receive $3,000,000 cash (subject to certain adjustments), with the potential to earn an additional $12,000,000 two years later (the "Earn Out"), and up to $11,700,000 worth of Bally stock (the exact amount to be determined at the closing), which the parties agreed would be valued at $23 per share. Amended Complaint ¶18. In the Purchase Agreement, Bally and Holiday made several representations and warranties, including without limitation that: (a) Holiday had made

3

certain of Bally's 2000 and 2001 SEC filings (the "Parent Reports")[4] available to Messrs.

Laird and Baker; and (b) the Parent Reports did not contain any untrue statement of

material fact or fail to disclose any material fact required to make any not misleading.

Plaintiffs' Claims

Plaintiffs allege that Bally and Holiday breached the representations and

warranties in the Purchase Agreement: (1) because the Parent Reports and Bally's press

releases discussing financial results supposedly contained material omissions and untrue

statements; and (2) because Bally's financial statements supposedly were not prepared in

accordance with generally accepted accounting principles. Amended Complaint ¶90.

Plaintiffs also allege that they were wrongfully excluded from managing the clubs that

they sold. Amended Complaint ¶20. Finally, Plaintiffs allege that they have not received

the Earn Out amount provided for in the Purchase Agreement. Amended Complaint ¶57.

Based on these allegations, Plaintiffs assert five causes of action. Count I alleges

that Bally and Holiday breached their contractual obligations under the Purchase

Agreement, waived any right to invoke or rely on the alternative dispute resolution

mechanism set out in the Purchase Agreement under which any and all disagreements

concerning the Earn-Out are to be submitted to PricewaterhouseCoopers LLP ("PwC")

for resolution, and waived any right to rely on the PwC's decision of October 23, 2004 in

which PwC affirmed Bally's calculation of the Advance Earn-Out Amount for the first

---

[4] The Purchase Agreement defines the Parent Reports as:

> (a)  the Parent's Annual Report on Form 10-K and Form 10-K/A for the fiscal year ended December 31, 2000; (b) the Parent's Quarterly Reports on Form 10-Q for the quarters ended December 31, 2000, March 31, 2000, June 30, 2001, September 30, 2001; (c) all other forms, reports, statements and documents filed by the Parent [Bally] with the Commission pursuant to the Exchange Act since December 31, 2000; and (d) all reports, statements and other information provided by the Parent to its stockholders since December 31, 2000 (collectively, the "Parent Reports").

Amended Complaint ¶64.

year of the Earn-Out period. Amended Complaint ¶¶99-103. Count II alleges deceit, based in part on the defendants' alleged misrepresentations made with the purpose and intent of inducing the Plaintiffs to accept partial payment in the form of Bally stock. Amended Complaint ¶105. Notably, plaintiffs do not allege that Mr. Toback personally made any representation, statement or omission. Count III seeks a partial equitable recession of the Purchase Agreement. Amended Complaint ¶111. Count IV alleges violations of G. L. c. 93A based on the allegation that Bally forced Plaintiffs out of management during the two-year Earn Out period after the closing. Amended Complaint ¶¶114. Count V alleges violations of Illinois' version of the same law. Amended Complaint ¶119. Finally, Count VI alleges a violation of §410(a)(2) of the Massachusetts Uniform Security Act prohibiting material false statements or omissions in connection with the sale of securities.

Plaintiffs assert all of these causes of action—including the breach of contract claims—against all defendants in this case, including Mr. Toback. Amended Complaint A-G. Individually, however, other than the generalized statement appearing in ¶94 regarding sales of nutritional supplements and personal training, plaintiffs do not assert that Mr. Toback transacted any business in Massachusetts, that Mr. Toback caused any tortious injury to plaintiffs through an act or omission in Massachusetts or that Mr. Toback engaged in any interaction of any type with plaintiffs either in Massachusetts or elsewhere.

<u>Argument</u>

Plaintiffs bear the burden of proving that this Court may exercise personal jurisdiction over Mr. Toback. *See, e.g., Barrett v. Lombardi*, 239 F.3d 23, 30 (1st Cir. 2001). They must prove—as to Mr. Toback—that (1) the "literal requirements of the

[long-arm] statute are satisfied," *Intech, Inc. v. Triple "C" Marine Salvage, Inc.*, 444 Mass. 122, 125 (2005) (internal quotation omitted), and (2) that he has sufficient minimum contacts with Massachusetts consistent with federal due process. *See, e.g., LaVallee v. Parrot-Ice Drink Prods of Am., Inc.*, 193 F. Supp. 2d 296, 302 (D. Mass. 2002) (finding that neither the long-arm statute nor due process allowed the court to exercise jurisdiction over corporate employee). Plaintiffs fail to satisfy either requirement and therefore Mr. Toback should be dismissed as a defendant in this action.

I.      Massachusetts' Long-Arm Statute Does Not Authorize Personal Jurisdiction Over Mr. Toback.

The Massachusetts long-arm statute lists eight potential bases for long-arm jurisdiction, but only two even arguably could be raised here. A court may exercise personal jurisdiction over a person "as to a cause of action in law or equity arising from the person's: (a) transacting any business in this commonwealth; or . . . (c) causing tortious injury by act or omission in this commonwealth." Mass. Gen. L. ch. 223A, §3(c). Because none of the jurisdictional facts involving Mr. Toback satisfies either of these sections, this Court should grant Mr. Toback's motion to dismiss for lack of personal jurisdiction.

A.      The Court May Not Exercise Personal Jurisdiction Over Mr. Toback Under Mass. Gen. L. ch. 223A, §3(a) Because He Has Not Transacted Any Business in Massachusetts.

To invoke §3(a) of the Massachusetts long-arm statute, plaintiffs must prove both that Mr. Toback transacted business in Massachusetts and that their claims arise from his transaction of business in the Commonwealth. *Tatro v. Manor Care, Inc.*, 416 Mass. 763, 767 (1994). An isolated transaction with only a slight effect on state commerce does not constitute transacting business. *Droukas v. Divers Training Academy, Inc.*, 375 Mass. 149, 156 (1978); *accord Intech,* 444 Mass. at 126.

6

Merely proving that this Court can exercise personal jurisdiction over Mr. Toback's employer is insufficient to prove that this Court can exercise personal jurisdiction over him: "[J]urisdiction over a corporation does not automatically confer jurisdiction over its officers." *National Medical Care, Inc. v. Home Medical of America, Inc.,* 2002 WL 1290395, at \*3 (Mass. Super. Ct. Apr. 23, 2002)(personal jurisdiction as to corporation but not as to individual employee); *accord Johnson Creative Arts, Inc. v. Wool Masters, Inc.,* 573 F. Supp. 1106, 1111 (D. Mass. 1983) (same). A copy of the *National Medical Care* case is attached hereto as Exhibit A. Rather, "active entrepreneurial or managerial conduct" by a corporate officer in a state will cause jurisdiction to attach. *National Medical Care,* 2002 WL 1290395, at \*3 (citing *Kleinerman v. Morse,* 26 Mass. App. Ct. 819, 824 (1989)).

For instance, in the *National Medical Care* case, the court concluded that the Chief Executive Officer of an out of state corporation was subject to personal jurisdiction in the Commonwealth where he had been the chief negotiator of the sale of a portion of a subsidiary's assets to a Massachusetts company, had come several times to Massachusetts to negotiate the terms of the deal, signed the agreement, established a lockbox system through which payments would be made under the agreement and engaged in communications with Massachusetts citizens by telephone, videoconference and correspondence. The court concluded that the CEO's contacts with Massachusetts during the relevant period were substantial and continuous.

In contrast, here, the Amended Complaint is devoid of any allegation whatsoever concerning any nexus between Mr. Toback and Massachusetts. The sole purported conduct attributed to Mr. Toback in the Amended Complaint, that, upon information and belief, he engaged in a purported scheme to inflate earnings through the sale of

supplements and fitness training sessions is not even alleged to have occurred in the

Commonwealth.  Mr. Toback's Affidavit reflects only isolated and sporadic contacts with

Massachusetts and no contacts at all relating to any issue raised in the Amended

Complaint.  Such contacts are insufficient to subject Mr. Toback to personal jurisdiction

in the Commonwealth.  *See Landmark Bank v. Machera*, 736 F. Supp. 375, 384 (D.

Mass. 1990) (holding that requirement of transacting business in Massachusetts under

Mass. Gen. L. ch. 223A, §3(a) was not satisfied in a suit alleging violations of

Massachusetts securities laws where no misrepresentations occurred in Massachusetts);

*Bearse v. Main St. Invs.*, 170 F. Supp. 2d 107, 112-13 (D. Mass. 2001) (§3(a)'s

"transacting business" requirement not satisfied in a suit involving fraudulent

misrepresentations of mortgage bonds where no misrepresentations occurred in

Massachusetts).  But even sending communications into the state will not necessarily

suffice to satisfy § 3(a).  *See Droukas*, 375 Mass. at 157.

In *Droukas*, the plaintiff saw an advertisement offering two boat engines for sale

that the defendant had placed in a magazine circulated in Massachusetts.  *Droukas*, 375

Mass. at 151.  Even though the plaintiff telephoned the defendant from Massachusetts,

the defendant mailed letters to the plaintiff in Massachusetts relating to the sale, and the

defendant shipped the engines to Massachusetts, the Supreme Judicial Court nonetheless

held that the plaintiff could not hale the nonresident defendant into a Massachusetts court

under § 3(a) to defend against allegations that he had misrepresented the condition of the

engines.  *Id.* at 157.  The court refused to exercise jurisdiction over the defendant because

his conduct had only a "slight effect on the commerce of the Commonwealth" and was

"void of any purposeful intent on the part of the defendant to avail itself of the privilege

of conducting activities within the forum State."  *Id.* at 154.

8

The Amended Complaint fails to allege that Mr. Toback had communications with plaintiffs in Massachusetts from which this action arose. Mr. Toback did not meet with plaintiffs in Massachusetts concerning the terms of the Purchase Agreement, nor do plaintiffs allege that Mr. Toback sent any communications into the Commonwealth, including initiating telephone calls, sending facsimiles, mail, or e-mail to them here. Indeed, plaintiffs' sole allegation against Mr. Toback is that he supposedly engaged in an unspecified scheme to inflate earnings through a program of selling supplements and fitness training, which apparently occurred in the Bally corporate offices in Illinois. Critically, however, this supposed scheme simply does not constitute "transacting business" in Massachusetts because—like the advertisements in *Droukas* and *Intech*—it was not purposefully directed to the Commonwealth, but rather, allegedly, to the public at large again apparently from the corporate offices in Illinois. Accordingly, when Mr. Toback allegedly engaged in this scheme from Illinois, he did not engage in a "purposeful and successful solicitation of business from residents of the Commonwealth," *Tatro*, 416 Mass. at 767; therefore the requirements of §3(a) cannot be satisfied.

B. Mr. Toback Neither Did Nor Failed To Do An Act In Massachusetts That Caused A Tortious Injury.

To invoke § 3(c) of the long-arm statute, the plaintiff must show not only that a tortious injury occurred in Massachusetts, but also that the defendant "caus[ed] tortious injury *by an act or omission in this commonwealth* [sic]." Mass. Gen. L. ch. 223A, § 3(c) (emphasis added); *see also, e.g., Litchfield Fin. Corp. v. Buyers Source Real Estate Group*, 389 F. Supp. 2d 80, 85-86 (D. Mass. 2005) (magistrate's report recommending dismissal because §3(c) does not reach negligent misrepresentations sent into Massachusetts). In this case, plaintiffs do not allege that any conduct by Mr. Toback

9

resulted in any act or omission whereby plaintiffs were injured, and §3(c) therefore cannot be used as the basis for exercising personal jurisdiction.

The Amended Complaint does not allege any particular misrepresentation by Mr. Toback. The sole allegation of tortious conduct attributed to Mr. Toback in the Amended Complaint, that he purportedly engaged in an unspecified scheme to inflate earnings through a program of providing new members with a package of nutritional supplements and fitness training sessions, is utterly devoid of even any claimed nexus to Massachusetts. For instance, it is not alleged that Mr. Toback engaged in this purported scheme in Massachusetts, directed the alleged scheme towards Massachusetts or even engaged in any communication concerning the alleged scheme in Massachusetts.

Because plaintiffs have failed to allege any tortious injury by an act or omission of Mr. Toback in the Commonwealth, they have failed to show that Mr. Toback is subject to personal jurisdiction in the Commonwealth pursuant to §3(c) of the long-arm statute.

II.    Due Process Does Not Permit Personal Jurisdiction over Mr. Toback.

To demonstrate that this Court may exercise personal jurisdiction over Mr. Toback, plaintiffs must plead and establish facts to satisfy both the Massachusetts long-arm statute and due process. *See, e.g., Am. Freedom Train Foundation v. Spurney*, 747 F.2d 1069, 1075 (1st Cir. 1984) (holding that personal jurisdiction did not exist over a corporate director under either the long-arm statute or due process). Even where state law provides a basis for the exercise of jurisdiction, plaintiffs must still make a "more extensive showing" before due process will allow a court to exercise jurisdiction. *Barrett*, 239 F.3d at 26. As demonstrated above, the Massachusetts long-arm statute does *not* provide for jurisdiction over Mr. Toback in this case. Additionally, plaintiffs' attempt

10

to hale Mr. Toback into Massachusetts fails for the separate and independent reason that Mr. Toback's insubstantial contacts with the state do not satisfy due process.

"'[T]he constitutional touchstone' of the determination whether an exercise of personal jurisdiction comports with due process 'remains whether the defendant purposefully established minimum contacts in the forum state.'" *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474 (1985), quoting *International Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945). Due process requires that nonresident defendants such as Mr. Toback have had minimum contacts with the forum state such that the exercise of personal jurisdiction will not offend "traditional notions of fair play and substantial justice." *Int'l Shoe Co.*, 326 U.S. at 316 (internal citation and quotation omitted). "The Due Process Clause protects an individual's liberty interest in not being subject to the binding judgments of a forum with which he has established no meaningful 'contacts, ties, or relations.'" *Burger King Corp.*, 471 U.S. at 472 (quoting *Int'l Shoe Co.*, 326 U.S. at 319). Plaintiffs fail to allege any facts to support a conclusion that Mr. Toback has any such minimum contacts with the Commonwealth of Massachusetts. Because Mr. Toback neither has the extensive contacts with Massachusetts that would authorize general jurisdiction nor has sufficient contacts with Massachusetts relating to this suit that would authorize specific jurisdiction, the Due Process Clause prevents plaintiffs from subjecting him to suit in Massachusetts.

A. General Jurisdiction

Plaintiffs' burden in establishing general jurisdiction is high. *Helicoptros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 416 (1984). General jurisdiction may be found only if the defendant's contacts with the forum, including any contacts unrelated to the cause of action, are "continuous and systematic general business

contacts" that approximate physical presence in the state. *Id.* This test requires plaintiffs to prove that Mr. Toback's contacts with Massachusetts are "extensive and pervasive." *In re Lernout & Hauspie Sec. Litig.*, 337 F. Supp. 2d 298, 320 (D. Mass. 2004) (internal quotation omitted).

Plaintiffs do not and cannot come close to meeting this test. Plaintiffs do not allege that Mr. Toback has continuous and systematic general business contacts with the Commonwealth. Mr. Toback has never resided or worked in Massachusetts. He does not vacation here and has no immediate family in the Commonwealth. He has never traveled to Massachusetts on a consistent basis and has been here approximately four times in the past four years. In short, Mr. Toback has had only "limited and intermittent" contacts with Massachusetts. *U.S. v. Swiss Am. Bank, Ltd.*, 274 F.3d 610, 621 (1st Cir. 2001). *See also Danton v. Innovative Gaming Corp. of Am.*, 246 F. Supp. 2d 64, 67 (D. Me. 2003) (holding that general jurisdiction over corporation was inapplicable even though plaintiffs alleged that CEO "traveled to Maine in person on many occasions for many days in 1999 and 2000"). This is not sufficient to satisfy the high burden required for invoking general jurisdiction.

B. Specific Jurisdiction

Nor can plaintiffs establish that Massachusetts courts can exercise specific jurisdiction over Mr. Toback. Before a plaintiff can invoke specific jurisdiction, the plaintiff must present evidence to satisfy three prerequisites: (1) relatedness; (2) purposeful availment; and (3) reasonableness. *LaVallee v. Parrot-Ice Drink Prods. Of Am.*, 193 F. Supp. 2d 296, 303 (D. Mass. 2002). None of these requirements is alleged to be or is present here.

12

### 1.  Mr. Toback Has No Massachusetts Contacts That Relate To The Suit.

The relatedness prong of the due process inquiry asks whether the defendant's

contacts with the state form the proximate cause of the plaintiff's claim. *See Nowak v.*

*Tak How Invs. Ltd.*, 94 F.3d 708, 716 (1st Cir. 1996).[5]  Thus, if a plaintiff cannot prove

that "the claim underlying the litigation ... *directly* arise[s] out of, or relate[s] to, the

defendant's *forum-state activities*," *United Elec., Radio & Mach. Workers v. 163*

*Pleasant St. Corp.*, 960 F.2d 1080, 1089 (1st Cir. 1992) (emphasis added), then the

complaint must be dismissed. *Phillips Exeter Academy v. Howard Phillips Fund, Inc.*,

196 F.3d 284, 288 (1st Cir. 1999). *See also LaVallee*, 193 F. Supp. 2d at 303 (dismissing

a complaint alleging that the defendant had made fraudulent misrepresentations in

Massachusetts in order to unjustly enrich itself in Saudi Arabia).

Determining proximate causation requires separating the defendant's "ancillary"

in-forum contacts from those going to the "gravamen" of the complaint. *LaVallee*, 193 F.

Supp. 2d at 303.  Relatedness does *not* consider a plaintiff's allegations of in-forum

effects of out-of-forum activity. *See Swiss Am. Bank,* 274 F.3d at 623 ("[T]he 'effects'

test is a gauge for purposeful availment and is to be applied *only after* the relatedness

prong has already been satisfied.") (emphasis added).

*Sawtelle v. Farrell,* 70 F.3d 1381 (1st Cir. 1995), is instructive.  In that case, New

Hampshire residents filed a malpractice suit in New Hampshire against a Virginia

attorney and his local counsel retained to prosecute a wrongful death action in Florida.

---

[5] The First Circuit requires "contract and tort claims [to be analyzed] discreetly." *Phillips Exeter Academy*, 196 F.3d 284, 289 (1st Cir. 1999).  Relatedness analysis for contract actions asks "whether the defendant's forum-based activities are instrumental in the formation of the contract." *Mass. School of Law v. Am. Bar Ass'n*, 142 F.3d 26, 34 (1st Cir. 1998) (internal quotation omitted).  With respect to Mr. Toback, plaintiffs cannot assert any contract claims against him; Mr. Toback was not a party to the Purchase Agreement. *See Porshin v. Snider*, 349 Mass. 653, 655 (1965) ("Unless otherwise agreed, a person making or purporting to make a contract for a disclosed principal does not become a party to the contract.").

Specifically, the plaintiffs claimed that the attorneys committed malpractice when they advised the plaintiff to accept a settlement offer. *Id.* at 1386. Although the defendants had communicated with the plaintiffs by telephone and mail—including a letter advising the plaintiffs to accept the settlement offer—the court held that these in-forum contacts failed the relatedness prong. *Id.* at 1390. Because the attorneys' potential negligence turned on the sufficiency of their investigation in Florida, which the contacts with New Hampshire did not implicate, the First Circuit noted, "It would... be illogical to conclude that those isolated recommendations constituted the negligent conduct that caused the Florida injury and thus were in-forum acts sufficient to establish specific personal jurisdiction in New Hampshire." *Id.* at 1389.

The grounds to dismiss Mr. Toback are even more compelling here. The Amended Complaint does not allege any contacts or communications between Mr. Toback and the Commonwealth and Mr. Toback's Affidavit reflects only isolated and sporadic contact. There is, accordingly, an even stronger basis for finding that the relatedness requirement cannot be met here.

## 2. Mr. Toback Has Not Purposefully Availed Himself Of The Privilege Of Conducting Business In Massachusetts.

Nonresident defendants cannot "be haled into a jurisdiction solely as a result of random, fortuitous or attenuated contacts... or [as a result] of the unilateral activity of another party or third person." *Burger King v. Rudzewicz*, 471 U.S. 462, 475 (1985) (internal citations and quotations omitted). Thus, even assuming that a plaintiff can prove that a nonresident defendant has sufficient forum-related contacts, those contacts alone will not establish specific jurisdiction. A plaintiff must also prove (1) that the nonresident defendant "purposefully availed himself of the privilege of conducting activities in the state," such that (2) the defendant "should reasonably anticipate being

14

haled into court there." *Ticketmaster-New York, Inc., v. Alioto*, 26 F.3d 201, 207 (1st Cir. 1994) (internal quotation omitted). Here, plaintiffs cannot show either of these two required steps—voluntariness or forseeability.

The voluntariness requirement ensures that the nonresident defendant has invoked the privilege of conducting activities in the forum through "a series of personalized affirmative choices reaffirmed at every significant juncture." *Ticketmaster*, 26 F.3d at 209. Thus, the First Circuit has rejected the argument that due process has a transitive property that would allow "a letter from A to B that reports on C's actions [to] confer personal jurisdiction over C in B's home state based on those actions." *Mass. School of Law. v. Am. Bar Ass'n*, 142 F.3d 26, 35-36 (1st Cir. 1998). To satisfy the voluntariness requirement, C must choose to send the letter to B himself. *See id.*

Forseeability, the second step in determining whether purposeful availment is met, requires proving that the defendant could have foreseen that a plaintiff in the particular forum state at issue might subject the defendant to suit there—not simply that the defendant might have foreseen that his conduct might cause injury in some unknown foreign state. *Cf. Asahi Metal Indus. Co. v. Sup. Ct. of Cal.*, 480 U.S. 102, 112 (1987) ("The placement of a product into the stream of commerce, without more, is not an act of the defendant purposefully directed toward the forum State."); *see also Protective Factors Inc. v. Am. Broad. Cos., Inc.*, 2002 WL 1477174, at *3 (D. Mass May 28, 2002) (dismissing defamation claim and noting that "[i]t is probably true that a person who is interviewed by a national media outlet can foresee that her interview will be disseminated to distant jurisdictions. But it is a further step to conclude that such a person has a reasonable expectation that she can be sued anywhere the broadcast is aired"). A copy of the *Protective Factors* case is attached hereto as Exhibit B.

15

Mr. Toback's limited and attenuated contacts with Massachusetts cannot meet either requirement. First, the Amended Complaint is devoid of any allegation at all of a nexus between Mr. Toback and the Commonwealth. Second, Mr. Toback's Affidavit establishes only isolated and sporadic contact with Massachusetts, unrelated to any issue in this action. The SEC filings, which plaintiffs allege contain misrepresentations, were received only after defendant Holiday provided them to plaintiffs. Because Mr. Toback did not send plaintiffs the SEC filings, plaintiffs' attempt to predicate jurisdiction over Mr. Toback through Bally's SEC filings represents the kind of "transitive view" of minimum contacts that the First Circuit has rejected. The alleged actions of other defendants cannot serve as the basis for personal jurisdiction over Mr. Toback.

Second, as in *Protective Factors*, the forseeability component cannot be satisfied. Mr. Toback could not have foreseen being haled into a Massachusetts court any more than the defendant in *Protective Factors*, who allegedly made defamatory statements on national television, could have. Mr. Toback is not alleged to have directed, nor did he direct, any statement or communication concerning any matter at issue in the Amended Complaint to Massachusetts.

### 3. It Is Unreasonable To Subject Mr. Toback To Personal Jurisdiction In Massachusetts.

Due process also requires that any exercise of personal jurisdiction be reasonable. *See, e.g., Burger King v. Rudzewicz*, 471 U.S. 462, 476 (1985). Five factors guide the reasonableness inquiry: (1) the defendant's burden of appearance; (2) the interest of the forum; (3) the plaintiff's convenience; (4) extent to which the forum will afford the most efficient judicial resolution of the controversy; and (5) the common interest of sovereigns in promoting substantial social policies. *Ticketmaster-New York, Inc. v. Alioto*, 26 F.3d 201, 209 (1st Cir. 1994). "[T]he reasonableness prong of the due process inquiry evokes a

16

sliding scale: the weaker the plaintiff's showing on the first two prongs (relatedness and purposeful availment), the less a defendant need show in terms of unreasonableness to defeat jurisdiction." *Id.* at 210.

Subjecting Mr. Toback to the jurisdiction of Massachusetts courts is patently unreasonable, especially given the fundamental weaknesses of plaintiffs' showing on the first two prongs. The First Circuit has recognized that the defendant's burden of appearance is "always a primary concern" when considering the reasonableness of jurisdiction. *Ticketmaster*, 26 F.3d at 210. Forcing Mr. Toback to travel nearly one thousand miles to Massachusetts to defend himself in this action would be burdensome; he has no reason to travel here but for this action. Moreover, much of the evidence and many of the witnesses relating to the claims that Plaintiffs allege against Mr. Toback are located in Illinois. And the central fact issue against him will likely surround Bally's financial reporting and accounting processes; most, if not all, of the documents and witnesses to that process are located in Illinois, an alternative forum where there are currently cases pending that raise similar factual issues. Accordingly, Massachusetts would not be the most efficient forum in which to adjudicate this matter against Mr. Toback.

Conclusion

Because plaintiffs do not allege and, in any event cannot show, either that their cause of action arises from Mr. Toback having transacted business in Massachusetts or that they have suffered a tortious injury caused by an act or omission in Massachusetts, the Massachusetts long-arm statute does not authorize personal jurisdiction over Mr. Toback. Moreover, due process bars application of the statute because Mr. Toback lacks sufficient minimum contacts with Massachusetts to be subject to personal jurisdiction

there.  For each of these reasons, plaintiffs' claims against Mr. Toback should be

dismissed for lack of personal jurisdiction.

Respectfully submitted,

PAUL TOBACK,

By his attorneys,

/s/ Juliet A. Davison
Howard M. Cooper (BBO #543842)
Juliet A. Davison (BBO #562289)
Heidi A. Nadel (BBO #641617)
Todd & Weld LLP
28 State Street, 31st Floor
Boston, MA  02109
(617) 720-2626

Dated: November 30, 2005

# EXHIBIT A



Not Reported in N.E.2d                                                                                      Page 1

Not Reported in N.E.2d, 14 Mass.L.Rptr. 541, 2002 WL 1290395 (Mass.Super.)

**(Cite as: 2002 WL 1290395 (Mass.Super.))**

**H**

Superior Court of Massachusetts.
**NATIONAL MEDICAL CARE**, INC. [FN1]

FN1. D/b/a Fresenius Medical Care North
America, NMC Homecare, Inc. and
Fresenius Medical Care Pharmacy
Services, Inc.

v.

HOME MEDICAL OF AMERICA, INC. et al.
[FN2]

FN2. Homecare Concepts of America,
Inc., National Century Financial
Enterprises, Inc., Kachina, Inc., Thor
Capital Holdings, LLC, Chartwell Care
Givers of New York, Inc. f/k/a Home
Medical of New York, Inc., Lance K.
Poulsen and Craig W. Porter.

No. 001225E.

April 23, 2002.

MEMORANDUM OF DECISION AND ORDER
ON TWO DEFENDANTS' MOTIONS TO
DISMISS FOR LACK
OF PERSONAL JURISDICTION

MARGARET R. HINKLE, Justice.

**\*1** Plaintiff National Medical Care, Inc. and its
related parties (collectively, "plaintiff") bring
claims against defendants Home Medical Care of
America, Inc. ("HMA"), Homecare Concepts of
America, Inc. ("HCA"), National Century Financial
Enterprises, Inc. ("NCFE"), Kachina, Inc.
("Kachina"), Thor Capital Holdings, LLC ("Thor"),
Chartwell Care Givers of New York, Inc. f/k/a
Home Medical of New York, Inc. ("Chartwell"),
Lance K. Poulsen and Craig W. Porter ("the
individual defendants"). This matter is now before

the court on the individual defendants' motions to
dismiss under Rule 12(b)(2) for lack of personal
jurisdiction. [FN3] A hearing on these motions was
held on March 13, 2002. For the following reasons,
Porter's motion to dismiss is *DENIED,* and
Poulsen's motion to dismiss is *ALLOWED.*

FN3. Poulsen filed a single motion to
dismiss for lack of personal jurisdiction
and for failure to state a claim. NCFE,
HMA and Porter also filed 12(b)(6)
motions. A hearing on those motions is
scheduled for April 29, 2002.

BACKGROUND
Defendant Porter's Contacts with Massachusetts
In 1998, plaintiff sold a portion of the assets of its
subsidiary, NMC Homecare, Inc. ("Homecare") to
HMA. Porter, then HMA's Chief Executive Officer,
was the principal negotiator of the purchase on
HMA's behalf. Affidavit of Ronald Kuerbitz, dated
February 14, 2002 ("Kuerbitz Aff.") ¶¶ 3-4.
Porter appeared in Massachusetts several times
between April 1998 and the July 29, 1998 closing
of the asset sale to negotiate the terms of the sale
and to participate in due diligence. *Id.* ¶¶ 3-9.
While in Massachusetts, Porter met with Kuerbitz,
who is NMC's Senior Vice President and General
Counsel. *Id.* ¶ 3. Kuerbitz was NMC's Vice
President of Corporate Development at the time of
the sale.

During negotiations, Porter and Kuerbitz discussed,
among other things, the status and treatment of
accounts receivable and proceeds from Homecare's
interdialytic parenteral nutrition ("IDPN") business,
assets that were not being sold to HMA. *Id.* ¶ 9.
Homecare chose to retain the IDPN business and its
related receivables.

Because plaintiff and HMA recognized that
payments for IDPN services could not easily be
segregated from other payments to which HMA

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.E.2d

Not Reported in N.E.2d, 14 Mass.L.Rptr. 541, 2002 WL 1290395 (Mass.Super.)

**(Cite as: 2002 WL 1290395 (Mass.Super.))**

would be entitled, plaintiff granted HMA temporary access to monies from the bank accounts in which all payments, including IDPN payments, would be deposited. *Id.* According to the procedure established by HMA and NMC, HMA was to separate IDPN payments and return them to plaintiff within five business days of their receipt. HMA maintained that this procedure was necessary to secure its financing arrangement with NCFE.

Because the terms of HMA's purchase of Homecare's assets included $69 million in promissory notes, plaintiff "insisted on, and received, guarantees of HMA's obligations from both HCCA and NCFE, and a pledge of a portion of Thor's stock in HMA as security for the first promissory note." *Id.* ¶ 10.

After the closing, Kuerbitz and Porter remained in contact, both by telephone and video conference. *Id.* ¶ 11-12. During this time, they discussed the status of the IDPN payments. *Id.* ¶ 11. In August or September 1998, Porter called Kuerbitz and requested a change in the parties' agreement regarding the IDPN payments. *Id.* ¶ 13. Specifically, Porter requested that the IDPN payments be sent directly to NCFE and be remitted by NCFE to plaintiff. Plaintiff agreed to this change and, in a letter dated September 8, 1998, set forth a new procedure for handling the IDPN funds. *Id.* ¶ 14. This letter agreement was signed by Porter and mailed to plaintiff in Massachusetts. Under the new procedure, the bank would sweep all payments made to the bank account to NCFE, and NCFE would remit the IDPN payments to plaintiff within five days. *Id.*

*2 On several occasions in December 1998 or January 1999, Porter called Kuerbitz and spoke to him about the IDPN payments. *Id.* ¶ 15 During these calls, Porter told Kuerbitz that Poulsen, Chief Executive Officer of NCFE, was refusing to return IDPN payments as required by the September 8 agreement. *Id.* During these calls, Porter acknowledged that HMA, NCFE, and Poulsen had no legitimate claim to the IDPN payments. *Id.* Therefore, Kuerbitz requested that the funds be returned to plaintiff. In May 2000, Porter attended a

compliance meeting in Massachusetts where he, Kuerbitz and others discussed, among other things, the status of the IDPN funds. *Id.* ¶ 16. During this meeting, Porter acknowledged that the funds had been mistakenly withheld but stated that he was working to resolve the issue. Deposition of Michael Sicilian, January 8, 2002, p. 308.

Plaintiff claims that HMA failed to remit all the IDPN funds and that Porter and Poulsen began to skim the funds without plaintiff's knowledge or consent. Plaintiff sued both individual defendants in their individual capacity, alleging conversion and violation of G.L.c. 93A, § 11.

Defendant Poulsen's Contacts with Massachusetts
Poulsen, his partner Donald Ayers, and their wives, Barbara Poulsen and Rebecca Parrett, own all the stock of each corporate defendant, including HMA and HCA, of which Porter was Chief Executive Officer at all relevant times. Poulsen is Chief Executive Officer of NCFE. In July 1998, UMA bought a portion of Homecare's assets. HMA was a company formed by HCA, NCFE and Thor Capital. NCFE financed the purchase. In May and July 1998, Poulsen sent correspondence to Massachusetts relating to the asset purchase, including a commitment by NCFE to fund the purchase and NCFE's guarantee of HMA's payment obligation. Poulsen Aff. ¶ 9. Poulsen also participated in telephone conversations with Porter during the negotiations in Massachusetts and sent agents to Massachusetts to perform due diligence. Kuerbitz Aff. ¶ 5.

## DISCUSSION

In Massachusetts, personal jurisdiction over a non-resident defendant requires a two-step analysis: (i) whether jurisdiction exists under the longarm statute, G.L.c. 223A, §§ 3(a)-(g), and (ii) whether jurisdiction is constitutional under the due process clause. *Morris v. Morris,* 403 Mass. 1001, 1001 (1988); *Good Hope Indus., Inc. v. Ryder Scott Co.,* 378 Mass. 1, 5-6 (1979). The plaintiff has the burden of establishing personal jurisdiction. *Nicholas Assoc., Inc v. Starr,* 4 Mass.App.Ct. 91, 93, *aff'd.,* 370 Mass. 866 (1976).

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.E.2d                                                                   Page 3

Not Reported in N.E.2d, 14 Mass.L.Rptr. 541, 2002 WL 1290395 (Mass.Super.)

(Cite as: 2002 WL 1290395 (Mass.Super.))

The Longarm Statute

The Massachusetts longarm statute lists the minimum contacts for a court to exercise personal jurisdiction over a non-resident defendant. G.L.c. 223, § 3. At issue in this case is G.L.c. 223A, § 3(a), which provides that "a court may exercise personal jurisdiction over a person, who acts directly or by an agent, as to a cause of action in law or equity arising from the person's transacting any business in this commonwealth." [FN4] The Appeals Court has stated that this subsection "is grounded on specific personal jurisdiction, that is, the defendant must have transacted business in Massachusetts, and the plaintiff's claim must have arisen from those forum-based contacts." *Connecticut Nat'l Bank v. Hoover Treated Wood Products, Inc.,* 37 Mass.App.Ct. 231, 233 n. 6 (1994), citing *Tatro v. Manor Care, Inc.,* 416 Mass. 763, 767 (1994).

> FN4. In its complaint, plaintiff asserted jurisdiction under c. 223A, § 3(a), (c) and (d). However, in its oppositions to the individual defendants' motions to dismiss, plaintiff only asserts jurisdiction under § 3(a).

*3 Section (a) reaches "any purposeful act by an individual, whether personal, private or commercial." *Ross v. Ross,* 371 Mass. 439, 441 (1976). Courts should construe the "transacting any business" language in § 3(a) broadly. See *Tatro,* 416 Mass. at 768; *Ross,* 371 Mass. at 441. Whether a particular defendant's acts constitute transacting any business must be decided on the particular facts of the case. *Morrill v. Tong,* 390 Mass. 120, 129 (1983); *Droukas v. Divers Training Academy, Inc.,* 375 Mass. 149, 156-57 (1978). While jurisdiction over a corporation does not automatically confer jurisdiction over its officers, "active entrepreneurial or managerial conduct" in a State will cause jurisdiction to attach. *Kleinerman v. Morse,* 26 Mass.App.Ct. 819, 824 (1989) (citation omitted). See also *Tufts Electronics Group, Inc. v. Alfarano,* 1998 WL 1284182 (Gants, J.) (finding personal jurisdiction over individual officers of New York corporation, under G.L.c. 223A, § 3(a), where individuals attended meetings in Massachusetts with plaintiff pertaining to defendant corporation's

satisfaction of its accounts payable to plaintiff and entered into memorandum of understanding to resolve dispute).

The "arising from" language in § 3(a) is also to be broadly construed. *Tatro,* 416 Mass at 771. This requires the court to determine whether the plaintiff's claim arises out of a defendant's Massachusetts business transactions. See, e.g., *New Hampshire Ins. Guar. Ass'n v. Markem Corp.,* 424 Mass. 344, 347 (1997) ("[p]ersonal jurisdiction [under G.L.c. 223A, § 3(a) ] is limited to causes of action arising out of the business the person sought to be reached transacts in the State and does not extend to all persons transacting any business at all in the State"). In *Tatro,* the SJC held that the "arising from" clause "should be interpreted as creating a 'but for' test." [FN5] 416 Mass. at 770-71.

> FN5. In adopting the "but for" test, the SJC rejected the First Circuit's analysis in *Marino v. Hyatt Corp.,* 793 F.2d 427, 428 (1st Cir.1986), and *Pizarro v. Hoteles Concorde Intl., C.A.,* 907 F.2d 1256, 1259 (1st Cir.1990), which requires that the business transacted be the legal or proximate cause of the plaintiff's injuries. Instead, the SJC follows the less restrictive approach of *Lanier v. American Bd. of Endodontics,* 843 F.2d 901, 909 (6th Cir.), *cert. denied,* 488 U.S. 926 (1988); *Shute v. Carnival Cruise Lines,* 897 F.2d 377, 383-86 (9th Cir.1990); and *Prejean v. Sonatrach, Inc.,* 652 F.2d 1260, 1270 n. 21 (5th Cir.1981). Specifically, "a claim arises from a defendant's transaction of business in the forum State if the claim was made possible by, or lies in the wake of, the transaction of business in the forum State." *Tatro,* 416 Mass. at 771.

Porter argues that his actions do not subject him to jurisdiction in Massachusetts because he only acted in his corporate capacity in Massachusetts and any alleged conversion necessarily occurred outside Massachusetts. Poulsen, in turn, argues that plaintiff has failed to show that he transacted any business in Massachusetts other than in his corporate capacity

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.E.2d                                                                    Page 4

Not Reported in N.E.2d, 14 Mass.L.Rptr. 541, 2002 WL 1290395 (Mass.Super.)

**(Cite as: 2002 WL 1290395 (Mass.Super.))**

and contends that he never appeared in Massachusetts in connection with the claims against him. Both defendants also argue that plaintiff fails to satisfy the due process requirements of personal jurisdiction.

Plaintiff argues that Porter's status as a corporate officer does not prevent jurisdiction over him because he engaged in "direct personal participation." Pl. Memo. in Opposition to Def. Porter's Mot. to Dismiss (Pl. Memo # 1) at 7. Plaintiff also argues that its claim against Porter for conversion arose from Porter's transaction of business in Massachusetts. Specifically, plaintiff points to the fact that Porter, both in person and by telephone in Massachusetts, negotiated the exclusion of the IDPN assets from the Asset Purchase Agreement and established a lockbox system, arranged the process by which the parties would sweep the fund to HMA and HMA would return the same to plaintiff and later changed that system so that the payments would be swept to NCFE, who would return them to plaintiff.

\*4 Plaintiff argues that Poulsen transacted business in Massachusetts in connection with the IDPN payments. Plaintiff also argues that Poulsen "caused" Porter to negotiate the agreement which gave HMA temporary access to plaintiff's IDPN assets and then "arranged through his agent, Porter," to change the Agreement and grant NCFE temporary access to those assets. Pl. Memo in Opposition to Def. Poulsen's Mot. to Dismiss (Pl. Memo # 2) at 9. Plaintiff also claims that Poulsen "controlled the entire transaction and orchestrated the post-transaction IDPN conversion." *Id.* at 11. Plaintiff contends that Poulsen's alleged conversion of the IDPN payments arose from his transaction of business in Massachusetts, particularly since Poulsen insisted on a modification of the IDPN agreement which resulted in the funds being swept to NCFE.

The record before me shows that Porter's contacts with Massachusetts during the relevant period were substantial and continuous. Porter negotiated the exclusion of the IDPN assets from the Asset Purchase Agreement in Massachusetts and

ultimately signed that Agreement. He also established the IDPN lockbox system and later, by a telephone call to Kuerbitz in Massachusetts, negotiated a change in the system so that the payments would be swept to NCFE. Porter engaged in communication with Massachusetts citizens by telephone, videoconference and correspondence concerning the IDPN payments. He attended a meeting in Massachusetts and discussed, among other things, the status of the IDPN payments. In my view, these contacts are more than sufficient to show that Porter transacted business in Massachusetts within the meaning of § 3(a).

Porter argues that "for jurisdictional purposes, the tort of conversion is said to have occurred where the defendant exercised dominion or control over the allegedly converted items, in this case, the IDPN funds." Porter's Reply Memo. at 5. Since the IDPN funds were never located, controlled in, or transferred to Massachusetts, but instead were at all relevant times located in lockbox accounts in Chicago, Porter (and Poulsen) argue that any claim for conversion necessarily must have arisen in Illinois.

In making his arguments, Porter ignores the difference in establishing jurisdiction of a conversion claim among G.L.c. 223A, § 3(a) and § 3(c) or (d). Because plaintiff asserts jurisdiction over Porter under § 3(a), plaintiff has to show that the alleged conversion of IDPN funds by Porter would not have occurred but for his business transactions in Massachusetts. See *Connecticut Nat'l Bank v. Hoover Treated Wood Products, Inc.,* 37 Mass.App.Ct., 231, 235 (1994) (where secured creditor of lumber company brought action against company's out-of-state supplier for conversion of goods allegedly belonging to creditor, alleged conversion arose from supplier's transaction of business within Massachusetts even though converted lumber was physically located in Georgia).

Porter's argument that this Court lacks jurisdiction over the conversion claim because the IDPN funds were physically located in Illinois becomes relevant only if plaintiff asserts jurisdiction under § 3(c) or

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.E.2d

Not Reported in N.E.2d, 14 Mass.L.Rptr. 541, 2002 WL 1290395 (Mass.Super.)

**(Cite as: 2002 WL 1290395 (Mass.Super.))**

(d). See *Princeton Capital Finance Co., LLC v. Marketechs, Inc.*, 10 Mass. L. Rptr. 157, 1999 WL 1318955 (Connolly, J.) (finding no personal jurisdiction under c. 223A, § 3(d) because plaintiff's property was converted in Connecticut and any resulting injury would have also occurred there so plaintiff could not satisfy requirement of § 3(d) that defendant cause tortious injury in Massachusetts). Here, plaintiff presents sufficient evidence to conclude that the claim for conversion and the related c. 93A claim arise from Porter's meetings, telephone calls, correspondence, and other continuous and purposeful contacts with plaintiff in Massachusetts, all of which relate to the treatment of the IDPN payments. [FN6]

> FN6. Porter argues that the alleged unfair and deceptive acts forming the basis of the Chapter 93A claim did not occur in Massachusetts. I reserve resolution of this issue for the Rule 12(b)(6) hearing.

**\*5** Poulsen's contacts with Massachusetts are another matter. Poulsen's only alleged Massachusetts contacts related to the conversion claim is a telephone call he participated in with Kuerbitz and Porter in connection with the IDPN payments and other post-closing issues and a meeting with Kuerbitz and Porter which included a discussion of treatment of the IDPN payments. See Deposition of Craig Porter, October 23, 2001, Tr. 161, 167. However, Porter's testimony in his deposition on this issue contains no mention of Massachusetts or an approximate time frame as to when the conversation or meeting occurred. Therefore, that testimony does not support plaintiff's position.

### Due Process

The constitutional due process requirement of minimum contacts in the forum state must also be satisfied. *Tatro*, 416 Mass. at 772-73; *Good Hope*, 378 Mass. at 7. At issue is "whether there was some minimum contact with the Commonwealth which resulted from an affirmative, intentional act of the defendant, such that it is fair and reasonable to require the defendant to come into the State to defend the action." *Conn. Nat'l Bank*, 37

Mass.App.Ct. at 236, quoting *Good Hope*, 378 Mass at 7. Where the "defendant's contacts with the forum were deliberate and not fortuitous, [such that the defendant could not reasonably foresee] 'the possible need to invoke the benefits and protections of the forum's laws,' " the plaintiff has met its burden. *HTI Voice Solutions, Inc. v. Telephone Credit Union of New Hampshire*, 2002 WL 287715 (Neel, J.), quoting *Good Hope*, 378 Mass. at 11.

As noted, Porter, on behalf of the defendants, negotiated and entered into a transaction with Massachusetts companies. He negotiated treatment of the IDPN assets and later renegotiated this issue. He initiated telephone calls to and participated in videoconferences in Massachusetts. At Porter's request, plaintiff agreed to allow HMA to establish a videoconferencing facility linking Porter's office in New Jersey to NMC's headquarters in Massachusetts. Porter also visited Massachusetts on many occasions in connection with the overall transaction. The totality of this conduct satisfies due process.

### ORDER

For the foregoing reasons, the motion to dismiss for lack of personal jurisdiction is *DENIED* as to Craig W. Porter and *ALLOWED* as to Lance K. Poulsen.

Not Reported in N.E.2d, 14 Mass.L.Rptr. 541, 2002 WL 1290395 (Mass.Super.)

END OF DOCUMENT

# EXHIBIT B

Westlaw.

Not Reported in F.Supp.2d                                                                Page 1

Not Reported in F.Supp.2d, 2002 WL 1477174 (D.Mass.), 30 Media L. Rep. 2207
**(Cite as: Not Reported in F.Supp.2d)**

**C**
Briefs and Other Related Documents

United States District Court, D. Massachusetts.
PROTECTIVE FACTORS INC., Plaintiff
v.
AMERICAN BROADCASTING COMPANIES,
INC. and Robin Ashinoff, M.D., Defendants
**No. CIV.A. 01CV11668-GAO.**

May 28, 2002.

MEMORANDUM AND ORDER

OTOOLE, D.J.
**\*1** The plaintiff, Protective Factors, Inc. ("
Protective Factors"), complains of comments by the
defendant Dr. Robin Ashinoff that it alleges
disparaged one of its products. The comments were
made on the July 3, 2001 broadcast of the television
show "Good Morning America" produced by the
other defendant, American Broadcasting
Companies, Inc. ("ABC"). Protective Factors
contends that the statements made by Dr. Ashinoff
on the ABC broadcast were defamatory (Count I),
constituted product disparagement or injurious
falsehood (Count II), and interfered with the
plaintiff's advantageous business and contractual
relations (Counts III and IV). Dr. Ashinoff has
moved to dismiss the complaint for lack of personal
jurisdiction and for failure to state a claim upon
which relief can be granted (Docket No. 10), and
ABC has moved to dismiss the complaint for failure
to state a claim or in the alternative for summary
judgment (Docket No. 14). Dr. Ashinoff's motion to
dismiss for lack of personal jurisdiction pursuant to
Fed.R.Civ.P. 12(b)(2) is GRANTED, and ABC's
motion to dismiss for failure to state a claim
pursuant to Fed.R.Civ.P. 12(b)(6) is DENIED.

*Background*

The verified amended complaint alleges the
following: Protective Factors manufactures and
licenses for sale an "internal antioxidant sun
protection product." During ABC's "Good Morning
America" broadcast of July 3, 2001, Dr. Ashinoff, a
dermatologist, "with knowledge of the falsity and/or
with reckless disregard for the truth of her
statements, ... disparaged the Protective Factors'
product by suggesting unequivocally and factually
that the product had no legitimacy or efficacy." In
particular, Dr. Ashinoff said, "We don't have that
drug yet available-We don't have an endogenous
sun protector, unfortunately." Asked by the
interviewer, "So the pill's not worth it?" Dr.
Ashinoff replied, "No." FN1 The only "pill" or
oral antioxidant included among a display of sun
protection products was the plaintiff's. Prior to the
broadcast, the plaintiff had provided the defendants
with information about the plaintiff's product, "
including affirming scientific studies, references
(including positive evaluations from two leading
dermatologists), and patent information." Following
the broadcast, the plaintiff "received disturbing
calls from other media, distributors, scientists, and
industry professionals who had seen the broadcast
and who associated Dr. Ashinoff's comments with
the [plaintiff's] product." As a consequence of the
broadcast, potential investors withdrew their
intended support from the plaintiff, and a leading
licensee ceased ordering the product. *Personal
Jurisdiction over Dr. Ashinoff*

> FN1. The full interview, conducted by "
> Good Morning America" host Charles
> Gibson, went as follows, according to a
> transcript submitted by the defendants:
> Gibson: The first half-hour of the
> broadcast we were talking about various
> kinds of summer safety and we are going
> to talk about skin safety in the sun. There
> are a million new cases of skin cancer in
> this country every year. Forty thousand
> cases of the most serious form which is

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                    Page 2

Not Reported in F.Supp.2d, 2002 WL 1477174 (D.Mass.), 30 Media L. Rep. 2207
**(Cite as: Not Reported in F.Supp.2d)**

melanoma, and I am with Dr. Robin
Ashinoff. She is Chief of Dermatologic
and Laser Surgery at the New York
University Medical Center. Nice to have
you here.
Ashinoff: Nice to be here.
Gibson: There are myths about these
sunscreens. Tell me what they are.
Ashinoff: Well, I think that many people
think if they put on a sunblock that it is
like armor, and they can just go lay out on
a chaise lounge and take the sun which is
probably the worst thing they can do.
Gibson: The numbers keep going up. You
can get 45, you can get 60 now. Should I?
Ashinoff: I think 30 is very good, and I
think my favorite sunblock has titanium
dioxide or zinc oxide in them so they block
all forms of light
Gibson: That's critical. No matter what the
SPF number-look for titanium or look for
zinc oxide.
Ashinoff: Most people with sensitive skin
don't react to that and it blocks everything.
Gibson: And you don't need to go above
30 in the SPF numbers.
Ashinoff: Not if you apply it correctly.
Every two hours, after you are swimming,
when you are perspiring heavily and apply
it thickly enough.
Gibson: So these SPF numbers give you
sort of a false sense of security?
Ashinoff: I think in many instances, 60 if
applied very thinly is not worth probably
up to 15.
Gibson: Really? Really? Okay. So get it on

Ashinoff: Get it on nice and thick.
Gibson: 30 maximum is what you need.
And there are some products you say that
really aren't worth the money you pay for
them.
Ashinoff: Well, I think that certainly there
are propositions of oral medications you
can take that may protect you. We don't
have that drug yet-available-we don't have
an endogenous sun protector, unfortunately.
Gibson: So the pill's not worth it
Ashinoff: No.

Gibson: And you also say, which is
interesting, if you put on a T-shirt it is not
necessarily going to protect you.
Ashinoff: No your average white cotton
T-shirt has a SPF of about 4 or 5. You are
better off putting the sunblock on and then
a thicker weave, maybe darker color shirt
as well.
Gibson: That's right. Darker color is also
greater protection. All right. Good advice.
Dr. Robin Ashinoff.
Ashinoff: Thank you.
Gibson: Thank you very much for being
with us. We appreciate it.
Ashinoff Aff. Ex. B.

According to the complaint, Dr. Ashinoff is a
resident of New Jersey. The plaintiff bears the
burden of demonstrating that the exercise of
personal jurisdiction over her in this forum is
authorized under the Massachusetts long-arm
statute and is constitutional. *Foster-Miller, Inc. v.
Babcock & Wilcox Canada,* 46 F.3d 138, 144-45
(1st Cir.1995) (quoting *Pritzker v. Yari,* 42 F.3d 53,
60 (1st Cir.1994) (other citations omitted))

**\*2** The only potentially applicable section of the
Massachusetts long-arm statute seems to be section
3(c), providing jurisdiction over an out-of-state
person when the cause of action arises from the
person's "causing tortious injury by an act or
omission in this commonwealth." Mass. Gen. L. ch.
223A, § 3(c). The "tort of libel is generally held to
occur wherever the offending material is circulated."
*Keeton v. Hustler Magazine, Inc.,* 465 U.S. 770,
777 (1984) (citing *Restatement (Second) of Torts* §
577A, cmt. a (1977)). Accordingly, Dr. Ashinoff
could have allegedly committed the tort of libel
within Massachusetts when the television program
was broadcast in Massachusetts.

Even if Dr. Ashinoff's conduct may fall within the
scope of the long-arm statute, however, due process
precludes the exercise of extraterritorial jurisdiction
over her. *See Sawtelle v. Farrell,* 70 F.3d 1381,
1389 (1st Cir.1995). The due process "concern of
fundamental fairness is achieved by the central
requirement that certain 'minimum contacts' exist
between the defendant and the forum state."

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2002 WL 1477174 (D.Mass.), 30 Media L. Rep. 2207
(Cite as: Not Reported in F.Supp.2d)

Page 3

*Sawtelle,* 70 F.3d at 1388 (citing *Int'l Shoe Co. v. State of Washington,* 326 U.S. 310, 316 (1945) and *Ticketmaster-New York, Inc, v. Alioto,* 26 F.3d 201, 206 (1st Cir.1994)). In the First Circuit, this constitutional burden is met when (1) the underlying claim arises directly out of or "relates to" the defendant's activities within the forum state; (2) the defendant has purposefully availed herself of the privilege of conducting activities within the forum state; and (3) the exercise of personal jurisdiction is reasonable in light of the Gestalt factors. *See Sawtelle* 70 F.3d at 1389.

The plaintiff's claims against Dr. Ashinoff arise wholly from comments made by her to an interviewer in New York City. According to Dr. Ashinoff's affidavit submitted in support of her motion to dismiss for lack of personal jurisdiction, she has no connections with Massachusetts. Ashinoff Aff. ¶ 4. She lives in New Jersey and teaches and maintains a medical practice in New York City. *Id.* ¶ 4. She was not paid by ABC for her appearance on the television broadcast. *Id* ¶ 5. Even if the broadcast of Dr. Ashinoff's interview into Massachusetts by ABC could be classified as a "contact" by Dr. Ashinoff with Massachusetts such that the plaintiff's claims could be said to have arisen from that "contact," it is nevertheless apparent that Dr. Ashinoff never "purposefully availed herself" of the privilege of conducting activities in Massachusetts. *See Sawtelle,* 70 F.3d at 1389. Nor would exercising jurisdiction over Dr. Ashinoff in this forum be reasonable under the pertinent circumstances. Dr. Ashinoff could not reasonably have foreseen the prospect being "haled into court" in Massachusetts because of a brief interview given before television cameras in New York City. *See World-Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 297 (1980) (finding that due process requires "that the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there") As the court of appeals noted in *Sawtelle,* " Although the concept of long-arm jurisdiction must adjust as technological advances render blurry the boundaries between the states, we must heed the warning that it is a mistake to assume that this trend heralds the eventual demise of all restrictions on the personal jurisdiction of state courts." 70 F.3d at

1395-96 (citations and internal quotation marks omitted)

**\*3** It is probably true that a person who is interviewed by a national media outlet can foresee that her interview will be disseminated to distant jurisdictions. But it is a further step to conclude that such a person has a reasonable expectation that she can be sued anywhere the broadcast is aired. The limit to the exercise of extraterritorial *in personam* jurisdiction imposed by the Due Process Clause prevents haling Dr. Ashinoff into court in Massachusetts based on the events set out in the plaintiff's amended complaint.

### *ABC's Motion to Dismiss for Failure to State a Claim*

ABC has moved to dismiss the case pursuant to Fed.R.Civ.P. 12(b)(6) for failure to state a claim, or in the alternative for summary judgment. Massachusetts law favors summary judgment in defamation cases, *see Dulgarian v. Stone,* 652 N.E.2d 603, 606 (Mass.1995); *King v. Globe Newspaper Co.,* 512 N.E.2d 241, 243 (Mass.1987), but ABC's motion for summary judgment is premature. The parties have not conducted discovery as yet, and the details of the circumstances surrounding the publication of the allegedly defamatory statements are not properly to be considered at this juncture.

A motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6) should be granted "only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Hishon v. King & Spalding,* 467 U.S. 69, 73 (1984). In assessing a motion to dismiss, the Court must " accept the complaint's allegations as true, indulging all reasonable inferences in favor of [the plaintiff]." *See Kiely v. Raytheon Co.,* 105 F.3d 734, 735 (1st Cir.1997). ABC argues that the plaintiff's defamation claim fails as a matter of law because it is based on statements (1) that are protected by the First Amendment as pure opinion; (2) that are protected statements of opinion based on disclosed facts; and (3) that are not "of and concerning" the plaintiff's product.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.2d                                          Page 4

Not Reported in F.Supp.2d, 2002 WL 1477174 (D.Mass.), 30 Media L. Rep. 2207
**(Cite as: Not Reported in F.Supp.2d)**

A claim for defamation must allege "(1) a false and defamatory communication (2) of and concerning the plaintiff which is (3) published or shown to a third party." *Dorn v. Astra USA*, 975 F.Supp. 388, 396 (D.Mass.1997). A defamatory communication is only actionable if it states a fact or states an opinion that implies undisclosed defamatory facts. *See Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 18-20 (1990); *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 339-40 (1974); *see also, Myers v. Boston Magazine Co., Inc.*, 403 N.E.2d 376, 377-78. (Mass.1980). "The distinction between fact and opinion is a question of law ... if the statement unambiguously constitutes either fact or opinion. Where, ... however, the allegedly libelous remarks could have been understood by the average reader in either sense, the issue must be left to the jury's determination." *Myers*, 403 N.E.2d at 378 (internal citation omitted). In determining whether an alleged defamatory statement "constitutes an opinion or an assertion of fact as a matter of law, the court must examine the statement in its totality in the context in which it was uttered or published. The court must consider all the words used, not merely a particular phrase or sentence. In addition, the court must give weight to cautionary terms used by the person publishing the statement. Finally, the court must consider all of the circumstances surrounding the statement, including the medium by which the statement is disseminated and the audience to which it is published." *Aldoupolis v. Globe Newspaper Co.*, 500 N.E.2d 794, 797 (Mass.1986) (citation omitted); *see also, Gray v. St. Martin's Press, Inc.*, 221 F.3d 243 (1st Cir.2000).

*4 The amended complaint alleges that the exchange between Gibson and Dr. Ashinoff during the segment could have been, and allegedly was, understood by investors and others in the industry as an assertion by a dermatological expert that "the pill" did not, as a matter of scientific fact, have the effect that it purported to have. Am. Compl. ¶ 8. Moreover, at least to listeners familiar with the sun protection industry, the comments could have been understood as referring to the plaintiff's product. The plaintiff's allegations sufficiently support a defamation claim and claims for interference with advantageous business relations and interference with contractual relations.

*Conclusion*

For the foregoing reasons, Dr. Ashinoff's motion to dismiss for lack of personal jurisdiction is granted, and the action is dismissed as to her. ABC's motion to dismiss is denied. ABC's motion for summary judgment is denied without prejudice to its renewal at the close of discovery.

It is SO ORDERED.

D.Mass.,2002.
Protective Factors Inc. v. American Broadcasting Companies, Inc.
Not Reported in F.Supp.2d, 2002 WL 1477174 (D.Mass.), 30 Media L. Rep. 2207

Briefs and Other Related Documents (Back to top)

• 1:01CV11668 (Docket) (Sep. 27, 2001)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.