UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

Fit Tech, Inc., Planet Fitness Center, Inc.,
Planet Fitness Center of Maine, Inc., Planet
Fitness Center of Dartmouth, Inc., Planet
Fitness Center of Salem, Inc., Planet Fitness
Center of Brighton, Inc., Stratford Fitness
Center, Inc., David B. Laird and Scott G.
Baker

    Plaintiffs,

v.

Bally Total Fitness Holding Corporation,
Holiday Universal, Inc., Paul Toback, Lee
Hillman and John Dwyer,

    Defendants.

C.A. No. 05-10471 MEL

## AFFIDAVIT OF DAVID B. LAIRD IN OPPOSITION TO
## DEFENDANTS' MOTIONS TO DISMISS ON PERSONAL JURISDICTION GROUNDS

I, the undersigned David B. Laird, do upon my oath depose and say as follows:

1.  I am one of the Plaintiffs in this lawsuit. I submit this affidavit in opposition to the motions brought by Defendants Toback, Hillman and Dwyer in which these individual Defendants ask the Court to dismiss this action on personal jurisdiction grounds. I particularly want to share with the Court what I know about the involvement of these individual Defendants in the transactions and acts that give rise to this lawsuit. I want to remind the Court, however, that the following is based mostly on my memory, the documents I and my business partner, Plaintiff Scott G. Baker ("Baker") retained, and a small number of documents that have been produced so far in a related case. We have not, to date, had a chance to take the depositions of any of the Defendants, nor obtain any documents from them, which might disclose additional

involvement in the matters alleged in our Complaint and/or more contacts with the
Commonwealth of Massachusetts.

## Background

2.      Both I and Scott Baker were born in Massachusetts and have lived here our entire
lives. We both attended the University of Massachusetts at Amherst and, since graduation, have
both consistently worked in Massachusetts and maintained a principal place of business in
Massachusetts.

3.      As the Court probably already knows, this case arises from the 2002 sale of seven
(7) health clubs that Mr. Baker and I owned and operated.  We had six (6) clubs in the following
Massachusetts towns or cities:  Woburn, Downtown Boston, Medford, Dartmouth, Salem and
Brighton.  We also had a club in Portland, Maine.  We operated these clubs under the name
"Planet Fitness."  At the time of the sale, we also had several proposed clubs in various stages of
development, including one in Stratford, Connecticut that was under construction.

4.      In 2001, we began negotiations with Defendant Bally Total Fitness Holding
Corporation ("Bally") for a sale of both our existing clubs and our rights to the clubs that were in
development. On or about November 7, 2001, we signed a letter of intent for the sale and, after
many months of discussions, due diligence by Bally, and further negotiations, we signed an
"Asset Purchase Agreement" to sell the clubs as of March 15, 2002 (the "APA" or the
"Agreement"). Mr. Baker and I signed both the letter of intent and the Asset Purchase
Agreement at our lawyer's office in Boston.

5.      Under the Agreement, Bally and its subsidiary Defendant Holiday Universal Inc.,
promised (among other things) to pay us: (i) $3,000,000 in cash; (ii) $11,700,000 (subject to
certain adjustments) in Bally stock valued, for purposes of the Agreement, at $23 per share; and

(iii) up to $12,000,000 approximately two (2) years after the sale in the form of an "Earn Out Amount."

6.      The sale was finally "closed" as of April 19, 2002.  In connection with that closing, we received, after adjustments, the sum of $8,805,021 in Bally stock, valued under the Agreement at $23 per share.  This resulted in Bally giving us a total of 382,827 shares of Bally's common stock (herein the "Purchase Shares").

7.      Mr. Baker and I signed all the final documents for the closing in our lawyer's office in Boston, Massachusetts.  I have attached as "Exhibit A" a letter from Bally's counsel indicating that the signature copies of the documents, as signed by Bally, were sent to our lawyer, Brian McMillin, on March 29, 2002.  Mr. McMillin worked at the offices of Nixon Peabody in Boston and I believe these documents were sent to him there.

8.      This $23 valuation was a number we negotiated with Bally.  We ultimately accepted this figure because (i) Bally's common stock was trading in the public markets at or around this number, (ii) as a part of the sale, Bally represented and warranted the various financial statements and other public reports and statements that it had filed with the SEC, and (iii) as discussed below, Defendant Hillman – Bally's CEO – told us Bally stock was a "bargain" at $23 per share, that Bally's stock (which was then trading near $23 per share) had been trading at $36 per share and was going to return to that price, and Bally's financial prospects going forward were excellent because Bally was growing, was "cutting edge" and was the market leader.

9.      Beginning shortly after the sale closed, Bally and its representatives began to go back on numerous representations they had made to us in the negotiations leading up to the sale and engaged in other misconduct – including making false, deceptive and unfair calculations of

the amounts Bally owed us under our "Earn Out" -- which resulted in our filing a lawsuit on

February 14, 2003, captioned Fit Tech, Inc. *et al.* vs. Bally Total Fitness Holding Corporation,

United States District Court for Massachusetts, Civil Action No. 03-10295-MEL. Since the date

the we filed that original action, Bally and its representatives devised and implemented – in bad

faith, in breach of their obligations under the Agreement, and in retaliation for our filing that

lawsuit – a series of measures designed and intended to seize full control of the former Planet

Fitness clubs from me and Mr. Baker, to drive us out of Bally, to frustrate our attempts to use the

available contractual mechanisms to contest Bally's wrongful calculation of the Earn-Out

Amount and, ultimately, to deprive us of the fruits and benefits of our contract with Bally and

Holiday.  These actions are set forth in some detail in the First Amended Complaint we filed in

this action.

        10.     Also, on April 28, 2004, Bally began making a series of disclosures and

admissions which ultimately revealed that the SEC filings upon which we and the public relied

in April 2002 were fraudulent.  After more than one and one-half years of investigation, review

and analysis, on November 30, 2005, Bally released a "restatement" of its prior financial

statements for December 31, 2000, 2001, 2002 and 2003, and finally released its financial

results for 2004 and the first three quarters of 2005.  These disclosures showed that, prior to the

April 19, 2002 sale of our clubs to Bally, and our receipt of Bally stock, Bally and its executives

perpetrated a massive accounting fraud which dramatically overstated Bally's earnings and

value.  As just one example, the November 30, 2005 "restatement" indicated that the

accumulated stockholders' equity as of January 1, 2002 (shortly before we sold our clubs) was

**overstated by $1.7 billion.**  More detail on this massive accounting fraud can be found in the

Consolidated Class Action Complaint that was filed on January 3, 2006 in the In re Bally Total

<u>Fitness Securities Litigation</u>, U.S.D.C. No. Ill. Civil Action No. 04 C 3530 presently before Judge Grady.

### **Paul Toback**

11.     According to the 2004 Annual Report filed with the SEC on November 20, 2005, Paul A. Toback started with Bally in 1997.  He became Senior Vice President for Corporate Development in March 1998 and, in June 2001, he was promoted to Chief Operating Officer. He added the title of "Executive Vice President" in February 2002, shortly before Bally bought our clubs.  Later, in December 2002, Toback was made President and Chief Executive Officer and, still later in May 2003, Chairman of the Bally Board of Directors. He is an attorney licensed to practice in Illinois. In 2004, Toback was paid salary and bonus of $975,000.

12.     I first met Mr. Toback in October 2001 during the negotiations over the letter of intent for the sale of our clubs.  Up to that point, we and our advisory Eric Williams, had been dealing principally with Michael Dolski, the Vice President of Business Development for Bally. Because of his active participation in the October meeting, his obvious knowledge about the terms we had discussed with Dolski, and his subsequent involvement in the negotiations, I believe that Mr. Toback was actively involved in directing Dolski's negotiations with us prior to the October meeting.

13.     The purpose of the October 2001 was to negotiate the terms of the sale and, in particular, the major business terms that would be included in the letter of intent.  We were asked to come to Bally's headquarters in Chicago for the meeting and we agreed.  The meeting was attended by the following representatives from Bally:  Paul Toback, Lee Hillman, John Wildman, Tom Massimino, William Fanelli and (perhaps) Ron Seigel and John Dwyer. (Not all these individuals participated at all times in all meetings, but Mr. Toback was present for almost

the entire time and he ran the meeting.)  From our side, I and Mr. Baker were present, along with

our advisor Eric Williams.  During this meeting, we discussed and negotiated numerous aspects

of the sale, as well as how our clubs would be operated after the sale and the benefits to us from

selling to Bally.  Mr. Toback actively participated in this meeting.  For example, Mr. Toback was

present and listening when Mr. Wildman, Bally's Vice President for Marketing, described

Bally's national advertising which promoted a "1-800" telephone number, and the sophisticated

system that routed the calls to the clubs.  Mr. Wildman, in Mr. Toback's presence, told us that

with the addition of our clubs Boston would become an "A market" for Bally, resulting in

additional amounts spent on advertising.  Mr. Wildman, also in Mr. Toback's presence, said that

in "A markets" Bally clubs received between 300 and 400 calls a month or more (at each club) as

a result of Bally's advertising and that our clubs would receive at least that many calls.  Mr.

Toback himself stated that we would have to double the capacity of the locker rooms in our clubs

to accommodate all the new customers generated by Bally advertising.  I also remember Mr.

Toback stating that Bally would not "take away your clubs from you."  This was in the context

of our discussion in which Mr. Baker and I told Mr. Toback that we wanted to receive our full

earn out and that we did not want to add employees or any other expenses unless business

dictated that this was the correct move.  Mr. Toback stated that Bally was buying our clubs

because our payroll was low, we were great operators and there was very little overlap between

the current Planet Fitness clubs and Bally's.  He said that Bally was not going to let anyone else

run our clubs, that Bally was not out to harm us and that, if we made money, so does Bally. It

was in that context that we negotiated for a provision in the sale terms that, if Bally took away

any of our clubs after the sale, the expenses of those clubs would not be charged against the

financial milestones for our Earn Out payments.

14.    I next saw Mr. Toback in Massachusetts when he and other Bally representatives came to tour our clubs and discuss the terms of the sale.  Mr. Toback was accompanied by Tom Massimino (a Vice President who I think was in charge of operations) and Sandor Feher, Bally's Regional Vice President for the Northeast.  Mr. Toback was here, as I remember, for two days. While this tour definitely took place before the Purchase and Sale Agreement was signed in March 2002, I cannot remember whether it took place in the late Fall 2001 or January 2002. (I assume that Mr. Toback's travel records and expense account records – once produced to us – will show the exact date.)

15.    During that tour, as we traveled by car from club to club, we had several discussions/negotiations with Mr. Toback concerning the terms of the sale.  Mr. Toback told us again, as he had in October, that we would be running our clubs during the Earn Out period and Bally would not take them away from us.  Mr. Toback also told us that Bally's clubs made 50% of their profit on the supplemental services (that is, personal training, juice bars, pro club sales, supplements, *etc.*) and that our clubs would increase their profits by this 50% when Bally installed these services immediately after the sale.  In fact, Mr. Toback told us that he had originated this idea (of putting supplemental services in the clubs) shortly after he joined Bally in 1997 and he took full credit for the success of the idea.  During this tour, we also discussed the new clubs that we had on the drawing boards and Mr. Toback, among others, told us that he and Bally were very interested in these new clubs, excited about them in fact, and they wanted us to open and run them.

16.    The next time I saw Mr. Toback was at another meeting in Chicago in early March 2002, shortly before we signed the Asset Purchase Agreement.  This meeting was held principally to address transition issues and involved Mr. Toback, Defendants Hillman and

Dwyer, and Mr. Fanelli and Mr. Massimino.  Again, Mr. Toback ran the meeting, in conjunction

with Mr. Wildman, and showed that he was familiar with the proposed terms of the sale, the

negotiations to date and the remaining open matters.  In the meeting, when Mr. Toback was

present, we again discussed Bally's advertising and "1-800" number, and that we would have to

expand our locker rooms and all new salespeople.  We talked about how the calls were routed to

the closet club, that we would get our pro rata share, our fair share of the calls that were coming

in.  We also discussed the fact that our central office would have to stay in place until the

transition to Bally was complete and negotiated for Bally to pay these non-recurring costs.  Mr.

Toback (and the other Bally representatives at the meeting) stated that they were very excited

about our new clubs (the ones under development) and wanted us to open up the new clubs as

quickly as possible.  We also discussed the status of various new clubs. They also told us that

they wanted us to pursue the new clubs with leases that charged the least expensive rent possible,

because Bally would put this own money in for the improvements needed to fit the space out for

a health club.  This was said either by Mr. Toback or by another Bally representative in the

meeting where Mr. Toback was present.

17.     I have attached as Exhibit B a memo that was found in the documents we and our

attorneys had in connection with the sale of the clubs in 2002.  This memo, from John Wildman

to Mr. Toback, indicates that Mr. Toback was significantly involved in the transition issues that

were discussed at the March 2002 meeting.

18.     I believe that Mr. Toback was involved in the various actions taken after the

closing that breached the Asset Purchase Agreement and contradicted the representations made

to us, by Mr. Toback and others, prior to the sale.  I believe he was particularly and closely

involved in the scheme that was implemented after we filed our first suit against Bally in

February 2003, for the following reasons.

19.     About six (6) weeks after we filed our original lawsuit on February 14, 2003, I received an email from a subordinate of Mr. Toback's indicating that Mr. Toback had asked that I and Mr. Baker come to Chicago for a meeting.  Specifically, the April 3, 2003 email from Bill Fanelli stated:

> "Paul Toback would like to get together in Chicago at your earliest convenience to discuss:  (1) the current state of your operations and (2) any of the issues you have raised in either your recent legal actions or otherwise to see if you would like to attempt to resolve any such issues."

(Copy attached as Exhibit C).  I responded that, while I and Mr. Baker were willing to come to Chicago if Mr. Toback wanted, we thought it would be a good idea for us to bring our legal counsel if the lawsuit was to be discussed.  Mr. Fanelli responded:

> "The meeting with Paul is intended to be a management meeting (as opposed to a legal/settlement discussions).  As a result, it would be inappropriate to have legal counsel present.  While Paul [Toback] has a legal degree, I would characterize the meeting as between the CEO (Paul) and one of our operators (you)."

Based upon this assurance, I and Mr. Baker traveled to Chicago on May 28, 2003 for this meeting.

20.     As it turned out, these assurances from Mr. Fanelli, given on behalf of Mr. Toback, were false and this meeting was nothing more than a setup intended to ambush us. Early in the meeting, Mr. Toback began to insist that we discuss the events giving rise to our lawsuit.  I repeatedly stated to Mr. Toback that we were not prepared to discuss these matter without our counsel present, but Mr. Toback ignored this and persisted with his questioning.  Mr. Toback then began discussing a number of changes that Bally wanted to make to our clubs, including reassigning our two area managers – Aaron Hanel and Aaron West – to other Bally clubs managed by other Bally employees.  I specifically told Mr. Toback in this meeting that I could not agree to <u>any</u> changes until Bally put the requested changes in writing for review.  I

confirmed this in a telephone call with two of Mr. Toback's subordinates, Mr. Wildman and Mr.

Feher, and both confirmed that I had made this position clear in the meeting with Mr. Toback.

21.     Despite this, on May 29, 2003, I received a memo from Mr. Wildman (copy

attached as Exhibit D) in which Mr. Wildman falsely and fraudulently stated that I and Mr.

Baker had agreed in the Chicago meeting to numerous changes outlined in the memo.  Mr.

Wildman also left a voicemail for me on my telephone answering machine in Massachusetts

repeating the same basic falsehood, *i.e.*, that I and Mr. Baker had agreed to the changes outlined

in the memo at the meeting in Chicago.  Mr. Wildman also stated that those changes would go

into effect the following Monday.

22.     On Saturday, May 31, 2003, I emailed Mr. Wildman, stating:

> "I need to express my displeasure with the voice mail you sent me last night and I
> need to reiterate to you that in no way did I agree with you or the statements you
> made in your voice mail.  I really object to your statements because they are in
> direct contrast to what I said in Chicago and on the phone with your [*sic*]
> Thursday.  In Chicago, I asked you to put everything in writing for me to analyze,
> period.  I did not agree to anything. I do not want you to move forward with your
> plan on Monday. You just gave me your intentions that I asked for, in writing, on
> Friday.  You are now forcing me to make a decision in one day that affects my
> entire organization and I consider this to be much to [*sic*] short of a time frame to
> make a decision of this magnitude."

Copy attached as Exhibit E.  I left a voice mail for Mr. Wildman to the same effect.

23.     Despite my protests, Bally went ahead and implemented its changes, including the

unilateral re-assignment of our two Key Employees, Aaron Hanel and Aaron West, without my

or Mr. Baker's consent, in direct violation of the Asset Purchase Agreement and the

representations and assurances that Mr. Toback and others gave us during the negotiations

leading to the sale of our clubs.

24.     In addition, I believe that Mr. Toback was directly involved in at least one

fraudulent scheme that artificially and improperly inflated the reported earnings of Bally.  This

scheme grew out of the "supplemental services" of the Bally clubs. As I mentioned above, Toback told us that he came up with the idea of these supplemental service, like personal training, juice bars and sales of dietary supplements, and while we were associated with Bally, Toback was in charge of this program.

25.    As a promotional effort for these "supplemental services," Bally had a so-called "Starter Kit" for each new member, which contained samples of protein shakes, dietary supplements, energy bars, *etc.* When we were introduced to these "Starter Kits" after Bally bought our clubs, we were told that each new member was to be given one – but not at the time they first signed up. We were told by Bally representatives that, because the new member had a three day rescission right under the Bally contract, the new member did not get his or her Starter Kit until after the three days expired.

26.    When we started selling Bally memberships after the sale, we attempted to give out these Starter Kits to new members, after the 3 day period expired, but this was difficult because the members would forget to ask for the kits and the Bally computer system was not set up to remind our staff to give out the kits to new members who had not yet picked up their kits. Sometime in August 2002, a Bally official (Howard Schwartz) complained about the way we were storing and displaying the Starter Kits. As a result, I called Sandor Feher, Bally's Regional Vice President for my area, to warn him that a complaint about this might come down from headquarters. In that conversation, Mr. Feher told me that, contrary to what I had assumed, Bally in fact did **not** want us to give out these Starter Kits. As Mr. Feher explained it, Bally would book some revenue for the sale of each Starter Kit at the time the new member signed up – that is, part of the initiation or prepayment fee would be allocated to the sale of the Starter Kit. But once that sale was booked, Bally had no interest in actually making sure that the member

**got** the Starter Kit after the three day rescission period was up.  In fact, Mr. Feher said, very few of these Starter Kits were actually given out because very few members remembered to ask for it after the 3-day rescission period was over.  (This was consistent with our experience since the sale of our clubs.)

27.    When I asked Mr. Feher why he did not want us to try to get the Starter Kits to the new members – I said something like, "Don't you want to keep the customer happy? --  Mr. Feher told me that this policy "comes right from the top" and was decided by Paul Toback himself (who was in charge of this area of the business).  Mr. Feher told me that "Paul" said that we all make more money this way.

28.    In short, Mr. Feher, Bally's Regional Manager and my direct report, told me that Mr. Toback had devised this scheme to report "revenue" from the "sale" of the Starter Kits without any intention to make sure that the products were actually distributed to the new members, and that this scheme was hatched so that he, Mr. Feher and others at Bally would make more money.

## Lee Hillman

29.    Our contacts with Defendant Lee Hillman were less extensive than with Mr. Toback but, in some ways, just as significant.  Mr. Hillman attended both of the meetings we had in Chicago to negotiate the terms of the sale, including the meeting in October 2001 and the meeting in early March 2002.  Mr. Hillman was present during much of the discussion and negotiation of the terms of the sale and, because of both his presence and his comments, I concluded that he was familiar with the transaction and the terms of sale.

30.    At the time of the negotiations and the sale, Mr. Hillman was Bally's Chief Executive Office and President.  He was also the Chairman of the Board of Directors.  In that

year (2002), according to Bally's SEC filings, Mr. Hillman received $638,654 in salary,

$1,641,750 in restricted stock awards and $4,863,600 in payments when he retired at the end of

that year.  Mr. Hillman is a Certified Public Accountant.

31.     I was told by several Bally representatives that Mr. Hillman had visited our clubs

in Massachusetts before we sold them to Bally.  In fact, I frequently asked, "When is Hillman

coming to tour our clubs?"  Mike Dolski (Bally's Vice President of Business Development) first

told me that Mr. Hillman had visited our clubs during one of his frequent trips to Massachusetts.

Other Bally officials, particularly Mr. Massimino and Mr. Fanelli, confirmed that Mr. Hillman

had visited our clubs.  One of these gentlemen told me that, in fact, Mr. Hillman had taken a

tour of our Downtown Boston club.

32.     Also, as CEO and President, Mr. Hillman was substantially involved in the

preparation and dissemination of the various financial statements and SEC filings prior to the

sale of our clubs to Bally.  A summary of and quotations from those filings – including several

press releases issued by Bally which directly quote Mr. Hillman -- are set forth in paragraphs 67

to 78 in our First Amended Complaint and Jury Demand in this action.  In fact, on February 13,

2002, just one month before we signed the Asset Purchase Agreement with Bally, Mr. Hillman

made the following comments in a press release issued by Bally:

> Despite the many challenges of 2001, Bally had considerable success and made
> progress toward our long-term objectives.  In a difficult economy, we were able to
> increase revenues, with products and services growing very well, and margins
> holding steady for the year.  We exceeded our cash flow expectations, finishing the
> year cash flow positive, exclusive of our year-end acquisition of Crunch Fitness.  In
> addition, we've worked hard to improve our sales processes and services for our
> members, and believe the progress we're making is having an impact.
>
> Our 2001 results have enabled us to continue to improve our already strong balance
> sheet, a primary objective over the past three years, reducing debt by nearly $30
> million.  Clearly, this business model has been confirmed through the successful
> completion of new bank and asset-backed facilities during the quarter, as well as

the recent credit upgrade by Moody's.

Looking at 2002, we're excited about our future. During the first six weeks we have enjoyed an improvement in new membership sales, in terms of both number of members and membership rates. Comparable club visits have increased more than 10% year-over-year, fostering an increase in personal training and retail sales of nearly 30%. We look to build on this success in the coming months through our strong commitment to our members' health and lifestyles.

Finally, the recent addition of the popular and well-known Crunch Fitness brand has already begun to have a powerful impact on our business. The company's expertise in personal training, development of leading-edge programming and innovative marketing are proving to be tremendous resources to the Bally family.

As I mentioned earlier, on November 30, 2005, Bally "restated" its financial statements for this period and indicating that stockholder equity as of January 1, 2002 was overstated by Mr. Hillman and Bally by $1.7 billion dollars.

33.      In addition to these publicly filed documents (which Bally certified as correct in both the Asset Purchase Agreement and the officers certificate submitted at the April 2002 closing, *see* First Amended Complaint And Jury Demand paragraphs 64 and 65), Mr. Hillman made some personal and very specific statements to us concerning Bally's stock value at the March 2002 meeting in Chicago. During that meeting, Mr. Hillman had a specific discussion with Mr. Baker concerning the term of the sale which required us to take the bulk of the purchase price in Bally stock valued at $23 per share. Part of the arrangement prevented us from selling this stock immediately. If we wanted to sell the stock we received, we would be required to sell it in small monthly increments over a significant amount of time. Mr. Baker was particularly concerned about holding Bally stock for a long period; Mr. Baker preferred to get cash over stock and said so to Mr. Hillman. In response, and for the obvious purpose of inducing us to accept Bally stock in partial payment for our clubs, Mr. Hillman told Mr. Baker that: (i) Bally stock was a "bargain" at $23 per share; (ii) that Bally's stock (which was then

trading near $23 per share) had been trading at $36 per share and was going to return to that price; and (iii) that Bally's financial prospects going forward were excellent because Bally was growing, was "cutting edge" and was the market leader.

### John Dwyer

34.    Defendant John Dwyer was, at the time we were negotiating the sale of our clubs, Bally's Chief Financial Officer and Executive Vice President.  He held those positions until April 28, 2004, when he resigned apparently in connection with the SEC investigation that was announced at the same time.  Bally's Audit Committee later concluded that:

> The Audit Committee's review found multiple accounting errors in the Company's financial statements and concluded that the Company's former Chairman and Chief Executive Officer Lee Hillman (held position from 1996 to 2002) and former Chief Financial Officer John Dwyer (held position from 1996 to 2004) were responsible for multiple accounting errors and creating a culture within the accounting and finance groups that encouraged aggressive accounting.

> The investigation found, among other things, that certain accounting policies and positions were suggested and implemented without a reasonable empirical basis and concluded that Mr. Dwyer made a false and misleading statement to the SEC.

February 8, 2005 press release quoted in our First Amended Complaint And Jury Demand at paragraph 89.

35.    As CFO, Mr. Dwyer signed the SEC filings and financial statements that were submitted prior to the sale of our clubs, and which were certified by Bally in the Asset Purchase Agreement and the officer's certificate submitted at the closing.

36.    Mr. Dwyer also participated in the two pre-sale meetings we had in Chicago – in October 2001 and March 2002 – to negotiate the terms of the sale.  From his comments at and participate in these meetings, I understood that Mr. Dwyer was familiar with the terms of the sale.

SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY THIS 17TH DAY OF JANUARY, 2006.

___/s/__David B. Laird_____
David B. Laird

**EXHIBIT A**

**KMZ Rosenman**
KATTEN MUCHIN ZAVIS ROSENMAN

525 West Monroe Street, Suite 1600
Chicago, IL 60661-3693
312.902.5200 office    312.902.1061 fax

March 29, 2002

By Federal Express

Brian J. McMillin, Esq.

HSINGHUA PAM CHEN
pam.chen@kmzr.com
312.902.5641   312.577.4428 fax

RE:    Acquisition of Fit Tech Inc., Planet Fitness Center Inc., Boston Fitness Center, Inc., Planet
Fitness Center of Maine, Inc., Planet Fitness Center of Dartmouth, Inc., Planet Fitness
Center of Salem, Inc., Planet Fitness Center of Brighton, Inc., and Stratford Fitness Center,
Inc. by Bally Total Fitness Holding Corporation

Dear Brian:

In connection with the above referenced transaction, I am enclosing the original signature pages
(except for the Bill of Sale and Assignment and Assumption Agreement and the Assignment and
Assumption Agreement) and closing deliveries set forth below executed by the appropriate Buyer-
side parties.  All of these signature pages and closing deliveries are to be held in escrow at your
offices at Nixon Peabody LLP pending our written consent to their release at Closing.

1.    Holiday Universal, Inc. Board Resolutions approving the transaction referenced
above;

2.    Officer certificate of Bally Total Fitness Holding Corporation and Holiday
Universal, Inc.;

3.    One (1) copy of the signature pages to the Escrow Agreement;

4.    One (1) copy of the signature pages to the Registration Rights Agreement;

5.    One (1) copy of the Bill of Sale and Assignment and Assumption Agreement;

6.    One (1) copy of the Assignment and Assumption Agreement;

7.    Two (2) copies of the signature pages to Scott G. Baker's Employment Agreement;
and

8.    Two (2) copies of the signature pages to David B. Laird's Employment Agreement.

**NP 003089**

**KMZ Rosenman**
KATTEN MUCHIN ZAVIS ROSENMAN

Brian J. McMillin, Esq.
March 29, 2002
Page 2

Should you have any questions regarding this letter and the enclosures, please call me at (312) 902-5641.  Thank you.

Sincerely,

Hsinghua Pam Chen

Enclosures

cc:    Leslie D. Dent
       Ferdinand J. Gallo, III
       Ronald E. Siegel

60054012

**NP 003090**

**EXHIBIT B**

To:     Paul Toback

CC:     Bill Fanelli, Roger Massie, Tom Massimino, Steve Irlbeck, Winnie Clark, Ron Siegel

From:   John Wildman

Date:   March 12, 2002

RE:     Planet Fitness Acquisition

As we discussed, the following is a preliminary list of the transition issues which need to be addressed in order to move forward with Bally's pending acquisition of Planet Fitness and the resulting name change of all their current locations.   Based on discussions during our meeting on Monday, March 11, it is possible that this acquisition could close by the end of this week.  If the closing does occur prior to April 1, we may want to consider some interim steps prior to changing the Planet Fitness clubs over to the Bally Total Fitness brand.

1) Contracts
   A.   Short-term continued use of the current Planet Fitness contract
   B.   Handwriting Bally Total Fitness contracts at our new clubs until CMS is installed
   C.   Implementation of a computer generated contract at all Planet Fitness clubs by the end of May

2) Pricing
   A.   Interim pricing prior to CMS rollout
   B.   Membership menu and regular prices after CMS
   C.   Posting membership rates

3) Upgrades
   A.   In-club or RSC
   B.   Upgrade prices
   C.   Processing upgrades, interfacing with ABC
   D.   FAQ for upgrades

4) Commission Structure
   A.   Calculation of adjusted gross
   B.   Commission rates
   C.   Compensation for pay-as-you-go memberships

5) Waiver and Release
   A.   Determine if the Planet Fitness waiver and release is sufficient for our requirements
   B.   Decide if we want Planet Fitness members who upgrade to sign a new waiver and release

6) Membership Cards
   A.   Immediate installation of membership card hardware at all Planet Fitness clubs
   B.   Resolve all issues relative to distributing cards to individuals that purchase new memberships
   C.   Issuing Bally cards to Planet Fitness members who upgrade
   D.   Card distribution to Planet Fitness members who do not purchase upgrades

7) In-Club Systems Transition
   A.   Determine necessary steps and schedule for transition from Afflion to CMS
   B.   New credit card equipment and merchant numbers for Planet Fitness clubs
   C.   Phone systems and telephone numbers

*[handwritten annotations:]*
*We will Develop* (next to item 4)
*We + Don't Need* (next to item 5)
*We will Cross our Credit Card machines* (next to item 7)

**NP 037274**

*Just Child Care*

8) Human Resource Issues
   A. Drug testing
   B. Background checks
   C. New hire paperwork

*min 7.73/hr in mass*
*Min ___ in CT  communicate with Steve*

9) Communication
   A. Announcement to Bally Total Fitness members
   B. Announcement to Planet Fitness members
   C. Meeting with Planet Fitness employees

10) Back Office and Area Office Support
   A. member service calls from current Planet Fitness members
   B. Commission calculations for March sales
   C. Service supervisor, Group Ex supervisor and OA supervisor support

*Calculate the March commissions As usual or on April 1 change to Bally's*

11) Sales Support Material
   A. New membership presentation books
   B. Price presentation sheets
   C. Referral presentation pages — *only 3re member gets referral program*
   D. Information call log, appointment books, and daily performance planners

12) Uniforms
   A. Issuing an initial uniform to all current staff
   B. Uniform storage and inventory
   C. Cost of additional uniforms and collecting fees from employees

*when uniforms*

13) Club Signage
   A. Temporary BTF banners
   B. Permanent signs
   C. In-club signage announcing name change and upgrade opportunity

*York Shultz*

14) Area Supervisors
   A. Two current area supervisors
   B. Supervisor compensation packages
   C. Commission grid
   D. Car allowances, reimbursements, etc.

*John + Tom to review with me*

15) Advertising
   A. Announcement of Boston expansion
   B. Impact on advertising budget
   C. Information call routing

16) Personal Training
   A. Recruiting trainers
   B. Training personal trainers
   C. Selling System and Ultra memberships

17) Rapid Results Products
   A. Distributing RR products to Planet Fitness clubs
   B. Maintaining an inventory of RR products
   C. Selling RR memberships
   D. Controlling distribution of RR products to new members

NP 037276

18) Group Ex
    A.  Modifications to class schedules
    B.  Quick Fitness
    C.  Passport classes

19) Training
    A.  BEST training
    B.  CMS training
    C.  Guerilla marketing

I'm certain there will be additional issues not mentioned above which we need to address. Hopefully, this provides a starting point for today's transition discussions. Let's discuss which of the items above will be assigned to myself and my department, as well as who will be responsible for all other items.

NP 037277

**EXHIBIT C**

-----Original Message-----
From: Fanelli, Bill [mailto:bfanelli@ballyfitness.com]
Sent: Tuesday, April 08, 2003 10:12 AM
To: Laird, David (Planet Fitness)
Cc: Toback, Paul
Subject: RE: Meeting in Chicago to discuss operations


David:

The meeting with Paul is intended to be a management meeting (as opposed to a
legal/settlement discussion).  As a result, it would be inappropriate to have legal
counsel present.  While Paul has a legal degree, I would characterize the meeting as
between the CEO (Paul) and one of our operators (you).

Paul would like to get together sometime next week.  Please let me know which days work
best for you.


    -----Original Message-----
From:      David Laird [mailto:David@thecia.net]
Sent: Thursday, April 03, 2003 2:29 PM
To:   'Fanelli, Bill'
Cc:   'Toback, Paul'
Subject:    RE: Meeting in Chicago to discuss operations

Bill-

Thank you for your e-mail proposing that we get together in Chicago with Paul Toback to
discuss the current state of operations and issues raised in our law suit to see if we can
resolve them.  I would like to meet with Paul to see if we can come to some resolution.
Since the discussion will contain issues raised in our lawsuit (and since I know that Paul
is an attorney), I would like to have counsel present at this meeting.

Thank you,

David Laird

-----Original Message-----
From: Fanelli, Bill [mailto:bfanelli@ballyfitness.com]
Sent: Thursday, April 03, 2003 11:01 AM
To: Laird, David (Planet Fitness)
Cc: Toback, Paul
Subject: Meeting in Chicago to discuss operations

Dear Dave:

Paul Toback would like to get together in Chicago at your earliest convenience to discuss:
(1) the current state of your operations and (2) any of the issues you have raised in
either your recent legal actions or otherwise to see if you would like to attempt to
resolve any such issues.

Presumably you will be able to get out here sometime during the next two weeks.  Please
let me know what dates work for you.

1

**EXHIBIT D**

 **TOTAL FITNESS**

**MARKETING DEPARTMENT**

### MEMORANDUM

TO:        David Laird and Scott Baker

CC:        Sandor Feher, Jerry Espinosa

FROM:      John Wildman

DATE:      May 29, 2003

RE:        Boston Market Sales Initiatives

---

Thank you again for traveling to Chicago just for the day. In talking with Sandor, it sounds like you both may have been extensively delayed on your way home. I'm sorry to hear the weather delayed your return trip, but I certainly hope that you feel that your time spent in Chicago was productive.

Per your request, I have prepared the following outline which summarizes our agreed to go forward strategy regarding sales initiatives that will affect the Boston market. I'm glad we were all able to agree on some immediately executable initiatives which should favorably impact Boston sales results in both the short and long run.

The Boston sales initiatives will address personnel, compensation, membership prices, field marketing, sales goals, and employee training. These sales initiatives are as follows:

1. The supervisors from the former Planet Fitness clubs will be reassigned to supervise the Northshore, Cambridge, Lowell, Revere, and Worchester Bally Total Fitness clubs.

    a. The reassignment of Aaron West and Aaron Hanel will be for a trial period of 90 days, in order for them to gain a better understanding of Bally Total Fitness systems and procedures.

    b. The two Aarons will answer directly to Jerry Espinosa. Jerry will be instructed to spend the majority of his time in our Boston clubs so that his new supervisors get the maximum training benefit from their new club assignments.

    c. Both Aaron West and Aaron Hanel will earn their at-risk compensation based solely on the performance of their new club assignments.
        - Since their newly assigned clubs are currently performing at approximately 90% of budget, and the prior Planet Fitness clubs are only at 38%, they should both experience a favorable impact on their pay (providing they are able to maintain the current run rate).

2. Scott Wolters and Dave LaFazia will supervise the prior Planet Fitness clubs and report directly to David Laird for at least 90 days effective June 1st.

   a. Scott Wolters will supervise Salem, Medford, and Portland. Dave LaFazia will supervise Stratford, Dartmouth, Brighton, and Woburn.

   b. Both Scott and Dave will earn their at-risk compensation based on the performance of their newly assigned clubs.

3. A special commission grid which provides for greater at-risk earnings potential will be developed for all the Boston supervisors, and will be effective during the 90 day trial period.

   a. The revised commission grid will provide greater reward potential for these supervisors as temporary accommodation for the additional work associated with adjusting to new club assignments.

4. Additional supervisor assistance will be provided to all Boston clubs over the next 90 days on a rotation basis.

   a. Both Sandor and myself will spend time in the Boston market during the first week of June to help launch new sales initiatives.

   b. Carmen Ferullo will work on enforcing compliance of our sales management information system (SMIS).

   c. Debbie Jenks will assist in recruiting new sales people.

   d. Stephanie Beers will continue to do basic sales training and Eddie Carrington will provide some additional follow-up training to both current and newly hired sales people
- Eddie Carrington's availability is limited, but every effort will be made for him to conduct at least one training session in June.

   e. Ira Katz will provide human resource training to Club Managers.

   f. Colleen Feit will provide some front desk training and supervision.

   g. Richy Martinez will oversee implementation of new field marketing initiatives.

5. June sales budgets will be established based on the current lower sales volume of the former Planet Fitness clubs, and gradually raised over the following two months to assist the clubs in returning back to their prior run rates.

   a. Additional bi-weekly bonuses will be made available to managers for attaining short-term sales goals.
- These bi-weekly bonuses are temporary, and being made available to help managers earn back missed commissions associated with below average performance over the past few months.

6. The fitness membership prices will be adjusted on a by-club basis to address any unique competitor concerns recently identified.

   a. We will test a one-club pay-as-you-go membership rate to identify if this special membership program can have a favorable impact on membership sales.

7. Weekly conference calls will be scheduled with both of you, Sandor Feher, Jerry Espinosa, and myself to facilitate communication between the corporate office, your local area office, and our Boston field management team.

8. A comprehensive follow-up system for our new Internet leads will be developed and implemented at all clubs.

9. Throughout the 90-day trial period we will continue to make adjustments to our sales and operations strategy to adjust for any new developments in the market as they arise.

   a. After this 90-day trial has been completed, we will decide how to most appropriately maintain a higher level of sales performance we have hopefully achieved.

The general outline provided above will provide a basic framework for next steps. I have recently spoken with Sandor Feher, and he has promised to closely review this correspondence and call me with his feedback tonight or tomorrow. You should also do the same.

Please continue to work with both Sandor and myself to set the stage for implementing the initiatives described above. As usual, we will continue to adjust our plans as business needs dictate.

**EXHIBIT E**

| From: | David Laird [David@thecia.net] |
|---|---|
| Sent: | Saturday, May 31, 2003 3:02 PM |
| To: | 'David@thecia.net' |
| Subject: | FW: Response to Widlman's voice mail message |
| Attachments: | Hanel e-mail about Espinoza with Sandor.htm |

John-

I need to express my displeasure with the voice mail you sent me last night and I need to reiterate to you that in no way did I agree with you or the statements you made in your voice mail. I really object to your statements because they are in direct contrast to what I said in Chicago and on the phone with your Thursday. In Chicago, I asked you to put everything in writing for me to analyze, period. I did not agree to anything. I do not want you to move forward with your plan on Monday. You just gave me your intentions that I asked for, in writing, on Friday.

You are now forcing me to make a decision in one day that affects my entire organization and I consider this to be much to short of a time frame to make a decision of this magnitude. I also told you in Chicago that I would need to speak to my attorneys about this and I have not had the opportunity to do so.

I have spoken to both of my Supervisors and both told me that neither one of them wants to work for Espinoza because, among other reasons, he is unethical. Aaron Hanel actually raised the issue of Espinoza's unethical behavior with Sandor and Sandor actually confirmed this to him. Please see the attached e-mail I received from Aaron Hanel about the conversation that took place between them.

Scott Baker and I want the Aaron's to stay within our area and have you train them there. We do not want them to be relocated to Espinoza's area. Your idea to relocate our two Area Supervisors to Espinoza's area is precisely why we negotiated a provision in our Asset Purchase Agreement to prevent this type of action. Bill Fanelli acknowledged, in our meeting in Chicago, that Bally can not do this without our consent and I don't know why you are forcing this on us. It is in direct contrast to our Asset Purchase Agreement. Furthermore, we do not want Espinoza's Supervisors to work for us because we feel they have been part of the problem since day one. As you are aware, Area Supervisors have direct communication with the clubs in the field and they implement the direction they receive from their Area Directors. It is my opinion that Espinoza's Area Supervisors have been in collusion with Espinoza by following and implementing his unethical orders that have directly hurt our sales in the past. These supervisors should have reported Espinoza to HR but they did not. We will consider other aspects of your proposal but we are not ready to move forward on any one of them.

John, you also said that you are counting on me to be "a cooperative ally" with your proposal and help turn the clubs around. I definitely would like the clubs to perform better but I do not feel this is the correct solution. I will follow any direction from you or Sandor but I am requesting that you delay your proposed changes and reconsider relocating my key personnel. If directed to do so I will go to the clubs with you and Sandor on Monday morning but I cannot pretend that I agree with your unilateral changes.

Once again, I am asking you not to move forward with your plans, not to move our Area Supervisors to Espinoza's area on Monday, and to stop everything entirely until we can analyze the impact on our organization and receive the necessary input from our attorneys. Thank you.