UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

FIT TECH, INC., PLANET FITNESS CENTER, INC., PLANET FITNESS CENTER OF MAINE, INC., PLANET FITNESS CENTER OF DARTMOUTH, INC., PLANET FITNESS CENTER OF SALEM, INC., PLANET FITNESS CENTER OF BRIGHTON, INC., STRATFORD FITNESS CENTER, INC., DAVID B. LAIRD and SCOTT G. BAKER,
Plaintiffs,

vs.

BALLY TOTAL FITNESS HOLDING CORPORATION, HOLIDAY UNIVERSAL, INC. PAUL TOBACK, LEE HILLMAN, and JOHN DWYER,
Defendants.

Civil Action No. 05-10471-MEL

**DEFENDANT PAUL TOBACK'S REPLY MEMORANDUM TO PLAINTIFFS' OPPOSITION TO ALL INDIVIDUAL DEFENDANTS' MOTIONS TO DISMISS FOR LACK OF PERSONAL JURISDICTION AND CROSS MOTION FOR LEAVE TO TAKE JURISDICTIONAL DISCOVERY**

Howard M. Cooper (BBO #543842)
Juliet A. Davison (BBO #562289)
Heidi A. Nadel (BBO #641617)
TODD & WELD LLP
28 State Street, 31st Floor
Boston, MA 02109
(617) 720-2626

Attorneys for Defendant Paul Toback

Defendant Paul Toback ("Mr. Toback") respectfully submits this Reply Memorandum to Plaintiffs' Opposition to all Individual Defendants' Motions to Dismiss for Lack of Personal Jurisdiction and Cross Motion for Leave to Take Jurisdictional Discovery ("Opposition").[1]

As the Opposition makes clear, plaintiffs' claim that Mr. Toback is subject to personal jurisdiction in Massachusetts is largely and improperly founded on speculation, inference and "belief." Plaintiffs allege only one contact with Mr. Toback in Massachusetts when Mr. Toback is alleged to have toured the clubs with other Bally executives at some point prior to the closing. That contact cannot provide the basis for the assertion of personal jurisdiction over Mr. Toback because plaintiffs' claims do not arise (directly or indirectly) from that contact and that contact in no way constitutes the actual or proximate cause of any alleged injury to plaintiffs. Moreover, the one time nature of that contact is devoid of the minimum contacts with Massachusetts necessary to satisfy due process analysis and survive constitutional scrutiny.

Beyond this one Massachusetts contact with Mr. Toback, plaintiffs seek, improperly, to ground their claims of personal jurisdiction on alleged comments made at three meetings in Chicago, and on speculation that Mr. Toback "must" have known of alleged misstatements in the financial statements of Bally Total Fitness Holding Company ("Bally" or the "Company") by virtue of his position at the time as the Chief

---

[1] The Court's original Joint Scheduling Order provided that Replies were to be filed by January 31, 2006. The parties subsequently agreed that Replies would be filed on February 7, 2006 and the Court so ordered on January 17, 2006

Operating Officer.[2] Further, plaintiffs ask the Court improperly to assert personal jurisdiction over Mr. Toback based upon the alleged comments and conduct of other Bally executives (not named as defendants herein), a transitive approach to minimum contacts analysis and due process which the First Circuit has explicitly and categorically rejected. *Mass. School of Law at Andover, Inc. v. American Bar Association*, 142 F.3d 26, 34 (1st Cir. 1998).

Because plaintiffs have utterly failed to show that: (1) their claim directly arises out of any activity of Mr. Toback in Massachusetts; and (2) Mr. Toback has the minimum contacts with Massachusetts necessary to satisfy due process requirements, Mr. Toback's Motion to Dismiss should be allowed.

Alleged Jurisdictional Facts

Plaintiffs' claim that Mr. Toback is subject to the personal jurisdiction of this Court is premised fundamentally upon four alleged face-to-face communications, one in Massachusetts and three in Chicago.

1) First, plaintiffs claim that Mr. Toback toured the clubs with them and other Bally executives prior to the closing and made the following three comments:

(a) that Bally would not take the clubs away from them during the Earn-Out Period;

(b) that Mr. Toback had originated the idea of putting supplemental services (personal training, juice bars, pro shop sales and supplements) into the Bally clubs shortly after he joined Bally in 1997; this was a successful idea as Bally made 50% of its profit on supplemental services and the Planet Fitness clubs would increase their profits by 50% when Bally installed these services immediately after the closing; and

(c) that Bally was excited about the new Planet Fitness clubs on the drawing board and Bally wanted Messrs. Laird and Baker to open and run them.

[2] Of course, on this theory, every senior and even many mid-level of executives of any company would be, without more, subject to the personal jurisdiction of every state in the union.

*See* Laird Aff. ¶15.

2 and 3) The second and third alleged contacts were in the form of meetings in Chicago prior to the closing with Bally executives; plaintiffs allege that Mr. Toback "ran" these meetings although Mr. Laird cannot recall whether Mr. Toback was present throughout the meetings and attributes only the following two comments to Mr. Toback at both meetings:

(a) that Bally would not take the clubs away from them and would not let anyone else run them; and

(b) that Bally was excited about the new clubs and wanted Messrs. Laird and Baker to run them after they opened.

4) Fourth, after the closing and after Messrs. Laird and Baker filed their first lawsuit against Bally, Messrs. Laird and Baker met with Mr. Toback in Chicago and Mr. Toback asked about the lawsuit and indicated that Bally wanted to make some personnel changes in the clubs. Mr. Laird alleges that it was Bally Executive Vice-President, William Fanelli, (and not Mr. Toback) who contacted him and asked him to come to Chicago for the meeting and that it was Bally Executive Vice-President, John Wildman, (and not Mr. Toback) who had follow-up communications with Messrs. Laird and Baker in Massachusetts regarding the personnel changes. *See* Laird Aff. ¶¶19-22.

Finally, plaintiffs "believe," based upon a claimed comment by Bally Regional Vice President Sandor Feher that Mr. Toback was involved in a scheme to increase revenue through the sale of Starter Kits. Laird Aff. ¶¶25-28. The Opposition confirms that plaintiffs do not allege that Mr. Toback ever sent any communication (by letter or email) to them into Massachusetts (or elsewhere) nor do they allege that Mr. Toback ever spoke with them by telephone in Massachusetts (or anywhere else). *See* Toback Aff. ¶6.

Mr. Toback did not sign the Purchase Agreement at issue in this action or any related agreements nor did Mr. Toback sign any of the financial statements defined in the Amended Complaint as the "Parent Reports."

Argument

Although not stated clearly in the Opposition, plaintiffs apparently concede that Mr. Toback did not transact any business in Massachusetts within the meaning of the Long-Arm Statute, G. L. c. 223A, §3(a). Rather, plaintiffs appear to contend that Mr. Toback is subject to the personal jurisdiction of the Massachusetts courts because he allegedly caused tortious injury by an act or omission in this Commonwealth within the meaning of G. L. c. 223A, §3(c). *See* Opposition at p. 3 (stating that each individual defendant "knowingly sent into Massachusetts a false statement, intending that it should be relied upon to the injury of a Massachusetts resident"), citing *Murphy v. Erwin-Wasey, Inc.*, 460 F.2d 661, 664 (1st Cir. 1972) and subsequent line of cases. The nature of any statement that Mr. Toback is alleged to have "knowingly sent into Massachusetts" is unclear. Rather, with respect to Mr. Toback, plaintiffs allege only one communication in Massachusetts in which only three comments are attributed to Mr. Toback.

Personal jurisdiction cannot be grounded on these comments because plaintiffs' claims do not arise (either directly or indirectly) out of these comments. *See, e.g., Mass. School of Law at Andover, Inc. v. American Bar Association*, 142 F.3d 26, 34 (1st Cir. 1998)("[s]pecific jurisdiction exists when there is a demonstrable nexus between a plaintiff's claims and a defendant's forum-based activities, such as when the litigation itself is founded directly on those activities"), citing *Donatelli v. National Hockey League*, 893 F.2d 459, 462-63 (1st Cir. 1990); *Phillips Exeter Academy v. Howard*

*Phillips Fund, Inc.*, 196 F.3d 284, 289 (1st Cir. 1999); *Nowak v. Tak How Invs., Ltd.*, 94 F.3d 708, 715-16 (1st Cir. 1996) nor does this one in-forum contact reflect the minimum contacts necessary to satisfy due process analysis. Further, personal jurisdiction cannot be grounded on alleged comments at meetings in Chicago as the First Circuit has rejected the notion that in-forum effects of extra-forum activities can satisfy minimum contacts analysis. *Mass. School of Law at Andover, Inc. v. American Bar Association*, 142 F.3d 26, 35-36 (1st Cir. 1998), citing *Helicopteros Nacionales de Colombia v. Hall*, 466 U.S. 408, 417 (1984).[3]

I. Personal Jurisdiction May Not Be Premised Upon The Three Comments Attributed To Mr. Toback In Massachusetts

A. Plaintiffs' Claims In No Way Arise Out Of Or Relate To The Three Comments Alleged To Have Been Made In Massachusetts

"In order for the extension of personal jurisdiction to survive constitutional scrutiny, a claim must 'arise out of, or be related to, the defendant's in-forum activities.'" *Mass. School of Law*, 142 F.3d at 35. The Court may not exercise personal jurisdiction over Mr. Toback based upon the three comments attributed to him in Massachusetts because plaintiffs' claims in no way arise out of those alleged comments.

1. Plaintiffs Are Collaterally Estopped From Raising A Claim That The Clubs Would Not Be Taken Away From Them During The Earn-Out Period

Plaintiffs are barred from asserting any claims or injuries arising out of an alleged comment that Bally would not take the clubs away from them as, by Order of this Court

[3] As set forth in the Memorandum in Support of Mr. Toback's Motion to Dismiss for Lack of Personal Jurisdiction, due process analysis has "three distinct components, namely, relatedness, purposeful availment (sometimes called 'minimum contacts') and reasonableness." *Mass. School of Law*, 142 F.3d at 34, quoting *Foster-Miller, Inc. v. Babcock & Wilcox Canada*, 46 F.3d 138, 147 (1st Cir. 1995). "Short of general jurisdiction, a court still may hear a particular case if that case relates sufficiently to, or arises from, a significant subset of contacts between the defendant and the forum." *Phillips Exeter Academy*, 196 F.3d at 288

and of the First Circuit Court of Appeal, any such claims were (or should have been) resolved through binding arbitration before PricewaterhouseCoopers LLP ("PwC"). Specifically, on February 13, 2003, Messrs. Laird and Baker filed their first lawsuit against Bally (the "2003 Action"), alleging, among other things, that Bally acted improperly when it removed them from the management of the Downtown Crossing club and converted that club to a "Crunch" club. Plaintiffs claimed that they had negotiated a specific provision in the Purchase Agreement such that, if they were removed from management of the club(s), all employee/payroll expenses for the club(s) would be part of "Corporate Overhead" and excluded from EBITDA from which the Earn-Out is calculated. *See* Complaint in 2003 Action ¶27. On Bally's motion, the Court referred this claim (and another unrelated claim) to binding arbitration before PwC based on the explicit provision in the Purchase Agreement that any disputes concerning the Earn-Out were to be resolved in this fashion. *See* Court's Memorandum and Order of November 6, 2003 in 2003 Action. The First Circuit affirmed this decision on July 1, 2004. On September 24, 2004, after the parties had submitted lengthy and detailed submissions to the arbitrator and answered two sets of interrogatories propounded by the arbitrator, PwC issued its final decision overwhelmingly in Bally's favor, soundly rejecting the contention that all employee expenses at the Crunch club were to be excluded from EBITDA for purposes of calculating the earn-out. A copy of the PwC Decision is attached hereto as Exhibit A.

In the PwC proceeding, Mr. Laird submitted an Affidavit which is, in relevant respects, identical to the Affidavit he has submitted here. *See* Second Affidavit of David Laird dated July 15, 2004 ("Laird Second Aff."), attached hereto as Exhibit B. In that

Affidavit, Mr. Laird stated that he and Mr. Baker raised their concern that they not be removed from management of the clubs during the Earn-Out Period with Mr. Toback, Mr. Fanelli, Mr. Wildman, Bally Senior Vice-President of Operations, Thomas Massimino as well as Regional Vice-President Sandor Feher and Messrs. Hillman and Dwyer and that:

> They assured us that Bally had no intention of removing us from management of any of our clubs. Mr. Baker and I told Mr. Toback that it was our intention to receive our full earn-out, and that we did not want to add employees or any other expenses unless business dictates that it is the correct move. We also told Messrs. Toback and Massimino that, despite their oral assurances, we still wanted written protection to prevent our removal from management of any clubs, to prevent the takeover by a Bally affiliate and to restrict Bally's ability to increase costs that would result in a detrimental effect on our earn-out. Mr. Toback finally agreed with us saying that "Bally is buying your clubs because your payroll is low, you are great operators, and there is very little overlap between the current clubs we operate and your clubs. We are not going to let anyone else run your clubs. We are not out to harm you. If you make money, so do we. We can and will give you the assurances you need to protect yourselves.[4]

Laird Second Aff. ¶3.[5]

This Court already dismissed plaintiffs' claims arising out of alleged promises that they would not be removed from management of the clubs during the Earn-Out

[4] Notably, in that affidavit, Mr. Laird goes on to state: "The most important negotiations with regard to the above issues, and specifically the issue of Bally taking over our clubs, occurred in Chicago." Laird Second Aff. ¶4.

[5] Compare Mr. Laird's Affidavit here in which he states:

> I also remember Mr. Toback stating that Bally would not "take away your clubs from you." This was in the context of our discussion in which Mr. Baker and I told Mr. Toback that we wanted to receive our full earn-out and that we did not want to add employees or any other expenses unless business dictated that this was the correct move. Mr. Toback stated that Bally was buying our clubs because our payroll was low, we were great operators and there was very little overlap between the current Planet Fitness clubs and Bally's. he said that Bally was not out to harm us and that, if we made money, so does Bally. It was in that context that we negotiated for a provision in the sale terms that, if Bally took away any of our clubs after the sale, the expenses of those clubs would not be charged against the financial milestones for our Earn-Out payments.

Laird Aff. ¶13

Period in favor of binding arbitration before PwC. PwC adjudicated the claims submitted and, under the express terms of the Purchase Agreement, its decision is final and binding.[6] Under well-established principles of issue preclusion, plaintiffs are collaterally estopped from seeking to relitigate the identical issues here. *See, e.g., Monarch Life Insurance Co. v. Ropes & Gray*, 65 F.3d 973, 978 (1st Cir. 1995)(setting forth the following preclusion principles: (1) the proceedings involve the same issue of law or fact; (2) the parties actually litigated the issue in the [prior]proceeding[]; (3) the [first] court actually resolved the issue in a final and binding judgment . . .; and (4) its resolution of that issue of law or fact was essential to its judgment (i.e., necessary to its holding)"); *see also In re Bankvest Capital Corp.*, 375 F.3d 51, 70 (1st Cir. 2004). All of these factors are satisfied here where plaintiffs raised the identical issue in the 2003 Action, this Court referred that issue to PwC for binding resolution, the parties fully litigated the issue in accordance with the express provisions of the Purchase Agreement and PwC issued its Final Decision, squarely rejecting plaintiffs' contention. Because plaintiffs are estopped from asserting claims against Mr. Toback arising out of these alleged statements, this Court may not exercise personal jurisdiction over Mr. Toback based upon such alleged statements. *See Phillips Exeter Academy v. Howard Phillips Fund, Inc.*, 196 F.3d 284, 288 (1st Cir. 1999).

[6] Dissatisfied with the PwC Decision, plaintiffs unilaterally refused to participate in the arbitration for the second year of the Earn-Out Period.

2. Personal Jurisdiction May Not Be Premised Upon Mr. Toback's Alleged Comment That He Originated The Idea Of Putting Supplemental Services Into the Bally Clubs In 1997 Because Plaintiffs Have Not Asserted Any Claim Directly Arising Out Of Or Relating To That Statement

As stated above, to satisfy the relatedness requirement of the due process analysis, in the absence of general jurisdiction, "the action must directly arise out of the specific contacts between the defendant and the forum state." *Sawtelle v. Farrell*, 70 F.3d 1381, 1389 (1st Cir. 1995). Plaintiffs have not asserted any claim arising out of Mr. Toback's alleged comment that he originated the idea of putting supplemental services into the Bally clubs in 1997 and that the idea had been successful for Bally. The generalized and non-specific comment attributed to Mr. Toback is not actionable as a misrepresentation, and there is no causal nexus even alleged between the purported comment and plaintiffs' claim, upon information and belief, that Mr. Toback initiated a scheme to book revenue through the sale of Starter Kits to new members. *See* Laird Aff. ¶¶24-28. Indeed, as set forth in more detail below, plaintiffs premise their "belief" that Mr. Toback was involved in an alleged scheme relating to Starter Kits (the only claim in the 44-page complaint even mentioning Mr. Toback) solely upon an alleged (and inadmissible) comment of Bally Regional Vice-President Sandor Feher. *See* Laird Aff. ¶¶27-28. But this Court may not exercise personal jurisdiction over Mr. Toback based upon the alleged statement of another Bally executive in Massachusetts. *See* Section III infra pp. 12-13. Plaintiffs' claims of fraud in the sale of Starter Kits cannot be said to arise directly or indirectly out of an alleged comment by Mr. Toback concerning supplemental services in the clubs.[7]

[7] Indeed, in the *2003 Action* which was filed on February 14, 2003, plaintiffs raised claims that they were promised that they would derive supplemental revenue from the sale of supplemental services but that Bally never installed juice bars, pro shops or retail stores as allegedly promised and, after the closing, told them that there was a lack of capital allocation funds available for such construction. Plaintiffs did not

For these reasons, personal jurisdiction may not be founded upon Mr. Toback's alleged generalized statement in Massachusetts concerning supplemental services.[8]

II. Mr. Laird's Affidavit Makes Clear That Mr. Toback Does Not Have The Minimum Contacts With Massachusetts That Would Be Necessary To Subject Him To The Court's Personal Jurisdiction

The only direct contact alleged between Mr. Toback and Massachusetts occurred during the tour of the clubs prior to the closing. Beyond that, plaintiffs appear to claim that this Court may premise a finding of personal jurisdiction upon three meetings plaintiffs allege they attended in Chicago at which Mr. Toback was also present, two pre-closing and one post-closcing. Plaintiffs appear to contend (without expressly doing so) that it would be proper for this Court to exercise personal jurisdiction over Mr. Toback based upon the in-forum effects of his alleged extra-forum statements. However, the First Circuit has already roundly rejected the argument that the in-forum effects of out of forum activity can suffice to demonstrate the necessary minimum contacts to survive constitutional scrutiny. *Mass. School of Law*, 142 F.3d at 36 (stating: "[w]e have wrestled before with this issue of whether in-forum effects of extra-forum activities suffice to constitute minimum contacts and have found in the negative" and holding that committee's decision at meeting in New York to deny accreditation to Massachusetts law school – a decision that had effects in Massachusetts – was insufficient to satisfy

---

raise any claim concerning a scheme in the sale of Starter Kits although Mr Laird claims in his Affidavit that Mr Feher informed him of the scheme and of Mr Toback's role therein in August of 2002, some six months prior to the filing of the 2003 Action

[8] Personal jurisdiction may not be grounded upon the generalized comment attributed to Mr. Toback in Massachusetts that Bally was excited about the new clubs and wanted Messrs Laird and Baker to run them That alleged statement cannot give rise to a misrepresentation claim given the generalized and off the cuff nature of the alleged statements, the lack of any provision in the Purchase Agreement on this point and the expressly integrated nature of the Purchase Agreement

minimum contacts test). For these reasons, personal jurisdiction over Mr. Toback may not be grounded on alleged comments at meetings in Chicago.

III. The Court May Not Exercise Personal Jurisdiction Over Mr. Toback Based Upon The Alleged Statements And Conduct Of Others

Finally, plaintiffs appear to contend that this Court may exercise personal jurisdiction over Mr. Toback based upon alleged comments that other Bally executives made to plaintiffs in Massachusetts (*i.e.*, that Mr. Feher allegedly commented to Mr. Laird that Bally did not really want to deliver the Starter Kits to new members and that this directive had come from Mr. Toback or that Mr. Fanelli asked plaintiffs to come to Chicago and Mr. Wildman and Mr. Feher communicated with plaintiffs in Massachusetts following a meeting in Chicago concerning personnel changes at the clubs). Plaintiffs' unarticulated position appears to be that, because these executives are subordinates of Mr. Toback, their in-forum communications and activity can somehow be attributed to Mr. Toback for purposes of minimum contacts analysis.

But as the First Circuit has made clear, due process requires more. The First Circuit has rejected the argument that due process may be transitive in nature and this Court may not exercise personal jurisdiction over Mr. Toback based upon the alleged activity or comments of other Bally executives in Massachusetts. *Mass. School of Law*, 142 F.3d at 35-36. Plaintiffs must show that Mr. Toback has invoked the privilege of conducting activities in the forum through a series of personalized affirmative choices reaffirmed at every significant juncture." *Ticketmaster-New York, Inc. v. Alioto*, 26 F.3d 201, 209 (1st Cir. 1994).

For these same reasons, plaintiffs' request for additional discovery bearing on issues of personal jurisdiction is futile and should be rejected. Plaintiffs claim that they

seek discovery in an effort to demonstrate that Mr. Toback "was orchestrating all the post-sale efforts to squeeze the Plaintiffs out of their clubs and deny them the benefits of their agreements." But even if such discovery existed – and it does not – it would be unavailing in plaintiffs' efforts to demonstrate that Mr. Toback could be subject to the personal jurisdiction of this Court absent evidence of any further conduct or activity of Mr. Toback in Massachusetts related to the subject matter of this lawsuit, and there is none. Plaintiffs' request to take discovery concerning personal jurisdiction should be denied.

Conclusion

For all of the foregoing reasons and for the reasons set forth in the Memorandum in Support of the Motion to Dismiss, Mr. Toback's Motion to Dismiss should be granted.

Respectfully submitted,

PAUL TOBACK,

By his attorneys,

/s/ Juliet A. Davison
Howard M. Cooper (BBO #543842)
hcooper@toddweld.com
Juliet A. Davison (BBO #562289)
jdavison@toddweld.com
Heidi A. Nadel (BBO #641617)
hnadel@toddweld.com
Todd & Weld LLP
28 State Street, 31st Floor
Boston, MA 02109
(617) 720-2626

Dated: February 7, 2006

**CERTIFICATE OF SERVICE**

I, Juliet A Davison, hereby certify that this document has been filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on this date.

Dated: February 7, 2006 /s/ Juliet A. Davison

# Exhibit A

PRICEWATERHOUSECOOPERS

PricewaterhouseCoopers LLP
One North Wacker
Chicago IL 60606
Telephone (312) 298 2000
Facsimile (312) 298 2001

September 24, 2004

*Via E-mail and Overnight Mail*

***Private and Confidential***

Mr. Earl Acquaviva
Bally Total Fitness Holding Corporation
c/o Juliet Davison/Heidi Nadel
Todd & Weld LLP
28 State Street
Boston, MA 02110

Mr. David Laird / Mr. Scott Baker
Fit Tech Inc.
c/o Deborah Thaxter/Jonathan Sablone
Nixon Peabody LLP
100 Summer Street
Boston, MA 02110-2131

***Re: Bally and Planet Fitness Arbitration***

Ladies and Gentlemen:

Pursuant to our Engagement Letter dated May 7, 2004 ("Engagement Letter"), following herein is the Arbitrator's Decision Letter with respect to the resolution of disputed items on the Advance Earn-Out Schedule between Bally Total Fitness Holding Corporation ("Bally") and Holiday Universal, Inc. on one hand and Fit Tech Inc. et al ("Planet Fitness") on the other, arising out of the sale of certain assets to Bally in accordance with the Asset Purchase Agreement ("Agreement") dated March 15, 2002 between Bally and Planet Fitness as defined in Section 3.5 of the Agreement.

Herein, Bally may be alternatively referred to as "Buyer" and Planet Fitness referred to as "Seller."[1]

The scope of our engagement does not constitute an attest service as that term is defined by the American Institute of Certified Public Accountants ("AICPA"). This engagement was performed under the rules for management consulting engagements as promulgated by the AICPA.

**Summary of the Arbitrator's Ruling**

As an initial matter, the Arbitrator notes that the Parties were in disagreement regarding whether or not the Arbitrator was asked to render a decision on the annual capital charges as they pertain to the Advance Earn-Out Schedule. Upon review of the October 1, 2003 Notice of Disagreement ("Notice of Disagreement"), the Arbitrator believes that Seller raised annual capital charges as a

[1] Buyer and Seller shall be referred to collectively herein as the "Parties." All capitalized terms used in this Decision Letter which are not otherwise defined have the meanings specified in the Agreement. In addition, the Planet Fitness health clubs sold pursuant to the transaction will be referred to herein as the "Company."

disputed item in accordance with Section 3.5(f) of the Agreement. The Arbitrator notes that Seller did indeed request the Arbitrator to render a decision on this matter in its submissions and response to the Arbitrator's interrogatories. As such, the Arbitrator determined that the annual capital charges issue is properly within the scope of this Decision Letter.

The Arbitrator has ruled in favor of Seller in the amount of $186,240 relating to the three disputed issues. Therefore, EBITDA, as reflected on the Advance Earn-Out Schedule as set forth in Section 3.5 of the Agreement, shall be increased by $186,240. The decisions in all matters are based upon the information provided by the Parties via written submissions and the Arbitrator's interpretations thereof. A summary narrative of the Arbitrator's rationale supporting the decision on each disputed item is attached as Appendix A.

There being no other matters before the Arbitrator at this time, this correspondence will conclude our performance in this matter. I thank you for allowing PricewaterhouseCoopers to assist you in resolving this dispute.

Sincerely,

Mark W. Haller

Enclosure

A

Appendix A
To the Arbitration Decision Letter
Dated September 24, 2004
Bally and Planet Fitness

## I. Crunch Fitness Salaries and Benefits ($604,449)

The Arbitrator has ruled in favor of Planet Fitness for $186,240 of the total amount of $604,449 in dispute relating to the salaries and benefits related to the Crunch Fitness club included in the calculation of EBITDA on the Advance Earn-Out Schedule. As such, $186,240 shall be excluded from EBITDA on the Advance Earn-Out Schedule with respect to this issue. The Arbitrator's decision is primarily based on the following evidence and reasons developed in the Parties' submissions and the Arbitrator's interpretations thereof:

- The Arbitrator has reviewed the Parties' submissions and the related affidavits surrounding the definition of "Corporate Overhead" as set forth in Section 15.1 of the Agreement as it pertains to the Crunch Club issue. The Arbitrator notes the Parties are opposed in their interpretation of the meaning and purpose of part (g) in the definition of "Corporate Overhead" in Section 15.1 of the Agreement. Given the differing positions, the Arbitrator has chosen apply as closely as possible the language as written in the definition of Corporate Overhead in Section 15.1 as the sole expression of the Parties Agreement.

- The Parties expressed as their agreement that Corporate Overhead includes the "...costs and expenses, including salaries, bonuses, relocation and other benefits and travel related expenses, of...personnel and consultants of the Buyer added at the request or direction of the Parent or any affiliate of the Parent...[1]". This definition makes no reference or distinction between salary expenses incurred at the local level versus at the corporate level or by managerial staff versus non-managerial staff.

- Therefore, the Arbitrator reviewed the information provided by the Parties to determine the costs (e.g. salaries, ect.) and expenses between July 1, 2002 and April 18, 2003 of the personnel the Buyer added at the request or direction of the Parent or any affiliate of the Parent. The Arbitrator interpreted the term "added" to mean any person who was requested or directed by Parent or Parent's affiliate to work at the Downtown Crossing location, not only those who were hired to fill new positions at the location.

- The Arbitrator has ruled that expenses relating to the following five employees are to be excluded from EBITDA based upon the Arbitrator's determination that they were added to the Downtown Crossing location at the request of Crunch Club Management: Christy Kemp, Frances Benedetto, John Towns, Maury Steele, and William Stepanian. To determine the total earnings of such individuals necessary to exclude from EBITDA, the Arbitrator referred to Buyer's calculation of the amount earned between June 28, 2002 and April 17, 2003 in Schedule A. The total earnings of such individuals to be excluded from EBITDA are $186,240.

---

[1] Agreement, Section 15.1, Definition of "Corporate Overhead."

Appendix A
To the Arbitration Decision Letter
Dated September 24, 2004
Bally and Planet Fitness

**II. Commissions Expense ($638,376 – $1,020,325)**

The Arbitrator has ruled in favor of Bally for the range of amounts in dispute relating to the deferral of commissions expense in the calculation of EBITDA on the Advance Earn-Out Schedule. As such, no change to EBITDA on the Advance Earn-Out Schedule is to be made with respect to this issue. The Arbitrator's decision is primarily based on the following evidence and reasons developed in the Submissions and the Arbitrator's interpretations thereof:

- The Arbitrator notes that the definition of EBITDA in Section 15.1 of the Agreement requires it to be "determined in accordance with the Sellers' current accounting practices as described on Exhibit 3.5(d)." The Arbitrator further noted that Seller's practice was to pay and record commissions based on an estimated duration of the customer's membership (ranging from 9 to 17 months) despite the prevalence of customer contract obligations that were month-to-month.

- Buyer's expensing sales commissions in the period they are incurred is consistent with Seller's historical practice. This is consistent with the expense recognition language in Exhibit 3.5(d) of the Agreement, which states that "the Company records expenses in the period that the expense is incurred."

- Seller's argument that GAAP and SEC regulations require deferral of commissions expenses is considered neither relevant (the Arbitrator does not interpret the Agreement to require the EBITDA calculation be prepared in accordance with GAAP) nor persuasive (the Arbitrator does not consider that GAAP and SEC regulations require the deferral of sales commissions in this case).

<u>Appendix A</u>
To the Arbitration Decision Letter
Dated September 24, 2004
Bally and Planet Fitness

**III. Annual Capital Charges ($272,455)**

The Arbitrator has ruled in favor of <u>Bally</u> for the $272,455 in dispute relating to the annual capital charges included on the Advance Earn-Out Schedule. As such, no change to the Advance Earn-Out Schedule is to be made with respect to this issue. The Arbitrator's decision is primarily based on the following evidence and reasons developed in the Parties' submissions and the Arbitrator's interpretations thereof:

- The Arbitrator notes that despite reserving its rights to challenge the Annual Capital Charges in a footnote in the October 1, 2003 Protest Notice, the Seller provided no evidence or argument alleging that Buyer did not calculate the annual capital charges as required by the Agreement. As such, there is no basis for the Arbitrator to conclude that the Annual Capital Charges should be zero.

- The Arbitrator also notes that Seller was in receipt of the "Fixed Asset Reconciliation Reports." (September 12, 2003 memo from John Levitske to Ronald E. Siegel, Esq.) While the Seller has stated that it has not received "verifiable confirmation on the Annual Capital Charges," the Seller provided no correspondence evidencing its request for any further information from the Buyer or any correspondence evidencing the Buyer's refusal to provide information regarding the Annual Capital Charges calculation.

- Finally, the Seller did not request the Arbitrator to consider and/or rule on any discovery matter in this proceeding that would allow the Arbitrator and/or Seller to further evaluate Buyer's calculation of the Annual Capital Charges.

# Exhibit B

*In the Matter of:*

***Re: Asset Purchase Agreement by and among Fit Tech, Inc., Planet Fitness Center, Inc., Boston Fitness Center, Inc., Planet Fitness Center of Maine, Inc., Planet Fitness Center of Dartmouth, Inc., Planet Fitness Center of Salem, Inc., Planet Fitness Center of Brighton, Inc., Stratford Fitness Center, Inc., Planet Fitness Center Dartmouth Trust, Planet Fitness Center Boston Trust, Planet Fitness Center Brighton Trust, Planet Fitness Center Medford Trust, Planet Fitness Center Salem Trust, Planet Fitness Center Boston, Planet Fitness Center Brighton, Planet Fitness Center Dartmouth, Planet Fitness Center Medford, Planet Fitness Center Salem, Boston Fitness Management Co, Inc., Planet Fitness Center Wakefield, Planet Fitness Center Wakefield Trust, David B. Laird, Scott G. Baker, Holiday Universal, Inc. and Bally Total Fitness Holding Corporation, Dated as of March 15, 2002***

---

**Second Affidavit of David B. Laird**

I, David B. Laird, do on oath hereby depose and say:

1. I am a principal and shareholder of the various Planet Fitness entities that are parties to an Asset Purchase Agreement executed with Bally Total Fitness Holding Corp. and Holiday Universal, Inc. (collectively "Bally"). I make this affidavit on my own personal knowledge and in response to the interrogatories issued by the Neutral Accountant in this matter.

2. **BACKGROUND**. This was the first acquisition of any kind for myself and Mr. Baker. Both Mr. Baker and I were very concerned that, since the earn-out represented a significant portion of the deal proceeds, we would have the ability to minimize any Bally impact on EBITDA. We wanted to avoid the situation wherein Bally could have any impact on expenses that would result in a lowering of our potential earn-out. We specifically discussed, and negotiated, with Bally provisions to the Asset Purchase Agreement to ensure that Bally could not add additional employees to our clubs; could not relocate any management from our clubs; could not take either myself or Mr. Baker out of control of our clubs; could not turn control of our clubs over to an affiliate; could

not add any additional expenses without our written consent; and could not charge for integration costs. Our specific concern was that Bally could take a club (or all clubs) away from us and turn it over to a Bally affiliate. To prevent this, we negotiated a significant economic penalty if Bally took such action, which became the salary and benefit expense exclusion from Corporate Overhead.

3. **FIELD NEGOTIATIONS WITH BALLY REPRESENTATIVES**. The issues outlined above were addressed numerous times in detailed discussions with Bally executives in the fall of 2001. These executives included COO, Paul Toback; Sr. VP Operations, Tom Massimino; Sr. VP Finance William Fanelli; Sr. VP Sales & Marketing, John Wildman; and, on a more limited scale, Regional VP, Sandor Feher; CFO, John Dwyer; and CEO, Lee Hillman. During one of these discussions, we were asked to show Messrs. Toback, Massimino and Feher some of our locations. We raised all the issues above with these individuals and they assured us that Bally had no intention of removing us from management of any of our clubs. Mr. Baker and I told Mr. Toback that it was our intention to receive our full earn-out, and that we did not want to add employees or any other expenses unless business dictates that it is the correct move. We also told Messrs. Toback and Massimino that, despite their oral assurances, we still wanted written protection to prevent our removal from management of any clubs, to prevent a takeover by a Bally affiliate and to restrict Bally's ability to increase costs that would result in a detrimental effect on our earn-out. Mr. Toback finally agreed with us saying that "Bally is buying your clubs because your payroll is low, you are great operators, and there is very little overlap between the current clubs we operate and your clubs. We are not

going to let anyone else run your clubs. We are not out to harm you. If you make money so do we. We can and will give you the assurances you need to protect yourselves."

4. **CHICAGO NEGOTIATIONS**. The most important negotiations with regard to the above issues, and specifically the issue of Bally taking over our clubs, occurred in Chicago. The Bally executives attending these meetings with myself and Mr. Baker were Messrs. Toback, Massimino, Fanelli, Wildman and Dwyer, with a short visit from the then CEO of Bally, Lee Hillman. During this meeting, we, reiterated the point that if Bally was going to take a club away from us, or turn it over to a Bally affiliate, then there should be some significant penalty in the agreement. We specifically proposed that the penalty for such an action on Bally's part should be that all payroll should be deducted from our EBITDA for any such club. Mr. Toback said that Bally would not take any clubs out of our control or give them to a Bally affiliate during our 2 year earn-out Period. He said that he did not mind adding the entire payroll back to our EBITDA if Bally took such action "because it is not going to happen." Of course, Bally ultimately took our flagship Boston club from us, and gave it to a Bally affiliate, but now wants to ignore the deal they struck with respect to the removal of salary and benefit expenses from EBITDA.

5. **NOTIFICATION AND UNCERTAINTY AT CLUB**. On the day of our closing, April 19, 2002, there was an Area Director's meeting at Bally corporate headquarters in Chicago. I could not attend this meeting because my wife and I were about to have our third child (a boy was born on April 23rd). I received a phone call from Mr. Massimino on that day. Mr. Massimino told me that Mr. Hillman, Bally CEO at the time, announced that our Boston club was going to be turned into a Crunch club, and that we would be

turning control over to Crunch immediately. Mr. Massimino said that he was sorry, but that the change was to occur on May 1st. On that day, the club went from being called "Bally," with all employees wearing Bally shirts, to "Crunch." After approximately two weeks, Bally told us that Crunch was not ready for the addition of the club, and requested that we turn the club back to "Planet Fitness," which we did. On June 1, 2002, Bally changed the club back to the name "Bally." One week later, we were again asked to change the club name back to "Planet Fitness." The club was in turmoil. Members were totally confused; potential members were totally confused; the staff was totally confused; and, frankly, Mr. Baker and I were totally confused. On July 1, 2002 the club finally received the "Crunch" name, and myself and Mr. Baker were permanently removed from management.

6. **LOSS OF CONTROL**. After Mr. Baker and I were removed from management of the Downtown Crossing club, we were deprived of the ability to make hiring decisions and had no further input into compensation decisions. I have reviewed Bally's material wherein they state that an "incremental approach" regarding salaries is the appropriate one, e.g. that only the salary and benefit costs attributable to the Crunch conversion should be removed from EBITDA. Such an approach is contrary to the negotiations detailed above. Furthermore, such an approach does not compensate Mr. Baker or myself in an appropriate manner. For example, Mr. Baker and I, by retaining control of the former Planet Fitness clubs, had the ability to <u>reduce</u> costs in order to maximize EBITDA, and, thus, our earn-out. This ability was stripped away when we were removed from management, and the incremental approach does not take into account the possible reduction of such costs during the earn-out period. Furthermore, I understand that, over

the course of the first earn-out year, Bally terminated virtually every former Planet Fitness employee who worked at the Downtown Crossing club, and replaced those employees (as well as hired additional employees) with new hires or transfers without any input from myself or Mr. Baker. This stripped Mr. Baker and I of our ability to hire employees of our choosing who we felt would best implement our prior successful business practices The termination of our Downtown Crossing club employees by Crunch also eliminated the many long-term relationships that existed between our employees and our customers. These relationships usually take between six and twelve months to develop in order to maximize the employee's productivity. In addition, we lost the ability to control the proper compensation system (e.g. salary versus commission) to keep those employees motivated. Under Bally's "incremental" argument, an underperforming employee who was being compensated entirely in salary might look the same as an overachieving former Planet Fitness employee who was being paid the same salary entirely on commission. The latter employee, however, would have had a much bigger positive impact on EBITDA and simply highlights why the Corporate Overhead exclusion was so important to Mr Baker and I. Finally, Mr. Baker and I specifically negotiated the language in the Corporate Overhead exclusion regarding "affiliates" because of our concern about the other Bally brands that existed in the marketplace. The Planet Fitness clubs were a very good match for "Bally" because both provided traditional health club amenities and the monthly out of pocket costs of the memberships were comparable. Bally, however, had at least four other brands of clubs, known as Crunch Fitness, Guerrilla Sports, Pinnacle and Holmes Place. Guerrilla Sports was an "urban" club whose monthly membership dues were at least in the $60 to $70 range (as

opposed to the $20 range for the former Planet Fitness clubs); Pinnacle clubs were high-end sports clubs that charged monthly membership fees starting in the $70 to $80 range; Holmes Place clubs can only be described as ultra high-end clubs marketed to the very wealthy that charged monthly membership dues in the $200 range. Crunch Fitness is a Bally brand that markets itself as an "alternative" club whose slogan is "no judgments." Crunch clubs, whose monthly membership dues range in the $60 to $70 range, have an overt sexual undertone. For example, the aerobics classes offered by Crunch are "theme" classes, which include strip-tease aerobics, as well as a class administrated by a "dominatrix" outfitted in leather and a whip (in fact, after the conversion, all of the former Planet Fitness aerobics instructors were immediately replaced by Crunch instructors trained in the "theme" concept). As an another example, Crunch clubs have shower facilities that are visible from the club floor through a semi-opaque glass which allows members to see the "silhouettes" of men and women showering. Not surprisingly, Mr. Baker and I were concerned that such Bally affiliates would not do well with the traditional Planet Fitness customer base. In fact, Mr. Toback specifically told us that the Planet Fitness model only fit into the "Bally" brand and did not have the proper customer base for the theme Bally clubs. It was these concerns and discussions that led us to negotiate the exclusion in Corporate Overhead for Bally "affiliates." Specifically, Mr Baker and I were concerned that a takeover by a Bally affiliate, such as Crunch, would create a large turnover in the customer base of a former Planet Fitness club, and were concerned that such a turnover would hurt the short-term profitability of the club (and our earn-out) while benefiting Bally in the long-run. Bally's "incremental" approach to salary ignores these issues by focusing solely on incremental personnel overhead, rather

than the removal of control of myself and Mr. Baker, and the takeover by a Bally affiliate, in this case Crunch Fitness. Finally, Bally's incremental approach ignores the fact that from the date of the conversion in July 2002, until at least August of 2003, when Mr. Baker and I were no longer granted access to the clubs by Bally, the Downtown Crossing Club was under construction to conform to the Crunch brand. Crunch removed over forty percent of our cardiovascular equipment and used the space for Crunch-specific workout and spinning programs, a lounge area with a fireplace and couches and even a Japanese Sand Garden. The locker rooms and showers were shut down for long periods of time so that tile colors could be changed to fit the Crunch color scheme, lockers could be replaced and the walls and ceiling could be painted (all of this despite the fact that these facilities were only five years old and in excellent condition). All of these changes generated numerous complaints from former Planet Fitness customers, and, undoubtedly, lowered the club's EBITDA, which is precisely why strict application of the Corporate Overhead exclusion is critical.

Signed under the pains and penalties of perjury, this 15th day of July, 2004.

David B. Laird

BOS1397990 1